UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>LUDWIG INSTITUTE FOR CANCER<br>RESEARCH LTD. et al.,<br><br>                              Defendant. | Case No.:  19cv2141 JM (JLB)<br><br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION TO DISMISS** |

Defendants Ludwig Institute for Cancer Research ("Ludwig"), Chi Van Dang, Edward A. McDermott, Jr., and John L. Notter ("Defendants") move to dismiss the Amended Complaint ("Complaint") of Don Cleveland, Arshad Desai, Richard Kolodner, Paul Mischel, Karen Oegema, and Bing Ren, ("Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 14.)  The motion has been briefed and argued.  For the below reasons, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART.**

## I.    BACKGROUND

According to their Amended Complaint,[1]  Plaintiffs are "internationally acclaimed cancer research scientists and physicians."  (¶ 1.)[2]  Ludwig is an international nonprofit

---

[1] Plaintiffs' well-pled allegations are taken to be true at this juncture for the purposes of ruling upon the pending Rule 12(b)(6) motion.

[2] All citations containing "¶" or "¶¶" symbols are to the Amended Complaint, (Doc. No. 3).  The Amended Complaint will also be referred to herein simply as "the Complaint."

organization dedicated to finding a cure for cancer that operates multiple cancer research branches.  (¶¶ 3, 122.)   In 1991, Ludwig entered into an "Affiliation Agreement" (hereinafter "the AA") with the University of California at San Diego (UCSD) to establish a San Diego Branch ("the Branch").  (¶ 47.)  Ludwig agreed to conduct "active" and "continuous" medical research to "discover, develop, or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer."  (¶ 48.)   Ludwig also agreed to "bear the costs directly related to conducting the research program," including equipment and Plaintiffs' compensation.  (¶ 52.)  The AA, as amended, also "requires Ludwig to operate the [b]ranch at UCSD and in conjunction with the [UCSD hospital] during the term of the [AA]."  (¶ 6.)  The term of the AA is coterminous with a lease agreement for research facilities between Ludwig and UCSD, which allows Ludwig to terminate the lease no earlier than December 31, 2023.  (¶¶ 5, 6, 50.)

In addition to leasing its facilities to Ludwig, UCSD agreed to: (1) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff at the Branch; (2) grant "academic recognition and titles" to qualified Ludwig employees; and (3) pursuant to an August 2000 amendment to the AA, make 15 "full time equivalency" positions available for Ludwig employees.  (¶ 130.)

Plaintiffs allege that "[t]he [AA] requires Ludwig to hire Plaintiffs to conduct cancer research[.]"  (¶ 1.)  Plaintiffs allege that "[b]efore agreeing to join Ludwig, Plaintiffs each held other secure and well-funded positions or had other attractive opportunities to start research careers at other institutions."  (¶ 9.)  Plaintiffs also allege that "Ludwig solicited Plaintiffs to become 'members' of the Branch," and that "Ludwig assured Plaintiffs that, pursuant to Ludwig's long-term commitment to operate and fund the Branch under the [AA], Ludwig would deploy its vast resources to adequately fund cancer research programs at the Branch, from basic research to cure, for the duration of the [AA]."  (¶ 7.)  Plaintiffs further allege that "Ludwig induced the Plaintiffs to leave positions, or to decline other offers with noted research organizations, in order to affiliate with Ludwig at its San Diego Branch[.]"  (¶ 5.)

Plaintiffs were hired by Ludwig between 1996 and 2011. (¶¶ 29-34.) By October of 2017, the San Diego Branch had a total of 170 administrative and scientific employees. (¶ 15.) Each Plaintiff operated his or her own lab at the Branch that utilized a variety of advanced equipment, much of which was owned or provided by Ludwig. (*Id.*) Each Plaintiff employs research teams made up of both permanent research staff and postdoctoral and graduate students. (*Id.*)

On May 4, 2018, Defendant McDermott, the President and Chief Executive Officer of Ludwig, and Defendant Dang, Ludwig's Scientific Director, visited the San Diego Branch and announced the Branch would close over the next four to five years. (¶ 74.) They admitted that under their agreements with UCSD, they were obligated to keep the Branch open through December 31, 2023. (*Id.*) McDermott claimed that Ludwig had no obligation to provide any further support to the Branch, or any research funding to Plaintiffs, but that they would provide some minimal funding to enable a transition period. (*Id.*) Ludwig continued, however, to pay Plaintiffs' salaries at their current levels. (¶ 21.)

On or about May 21, 2018, Ludwig sent letters to the lab heads, including Plaintiffs, informing them that their rolling five-year memberships at the Branch would not be renewed, and their remaining terms would be fixed at four or five years. (¶ 75.) Ludwig asserted that its nonrenewal was pursuant to section 6.6 of Ludwig's "Member-Track Appointment and Promotion Policy," which became effective on December 9, 2013 and is binding upon Ludwig pursuant to the AA. (¶¶ 68, 75.) Section 6.6 refers to action following a negative scientific review. (¶ 68.) Under section 6.6, Ludwig was required to conduct an individual review of each Plaintiff and then receive a recommendation from an independent review committee before Ludwig was entitled to convert the Plaintiffs' rolling terms into a fixed term. (*Id.*) No individual reviews or independent recommendations occurred prior to the May 21, 2018 letters. (*Id.*) Lab head presentations and a review of the San Diego Branch were scheduled to take place in 2018 and 2019, but were cancelled without explanation. (¶ 76.) Plaintiffs' research has been accorded praise, both by Ludwig and by numerous peer reviews in medical journals. (¶ 77.)

On or about June 12, 2018, counsel for UCSD wrote to McDermott stating that Ludwig was not permitted under the AA to close the Branch prior to December 31, 2023, and that Ludwig was also obligated to operate and adequately fund the Branch until that date. (¶ 80.) The letter also challenged Ludwig's assertions that it performed scientific evaluations of Plaintiffs and could, on that basis, terminate Plaintiffs' rolling Branch memberships. (*Id.*) Dang then called Plaintiff Kolodner, who was Branch director at the time, and stated that unless Kolodner helped Ludwig obtain the cooperation of UCSD in connection with Ludwig's decision to close the Branch, Ludwig would cut the research funding to the amount Dang and McDermott determined was the absolute minimum Ludwig was required to provide. (¶ 81.)

On or about June 25, 2018, McDermott responded to UCSD and stated, "you have asked for assurance that Ludwig will continue to operate the San Diego Branch until December 31, 2023 as required by the [AA].  You have that assurance."  (¶ 82.) McDermott did not dispute UCSD's contention that Ludwig had not performed any individual scientific reviews and thus could not invoke a nonrenewal of Plaintiffs' rolling terms of employment under section 6.6. (*Id.*) At a subsequent meeting, McDermott and Dang admitted that Ludwig had not reviewed Plaintiffs' work, (¶ 88), and promised to provide Plaintiffs with corrected letters regarding the basis for nonrenewal of their membership terms with the Branch, (¶ 97). Ludwig ultimately sent "amended and restated" letters to Plaintiffs terminating Plaintiffs' Branch memberships, this time under section 7 of the policy, which stated:

> [Ludwig] may terminate a scientist's status as . . . . [m]ember in the event the [b]ranch to which the scientist is assigned is closed or relocated, and/or the scientist['s] position . . . . is eliminated for budgetary reasons; provided that [Ludwig] pays the affected . . . . [member] his/her compensation and benefits (or the value thereof) for the balance of the then-current term of his/her appointment or one year whichever is longer.

(¶ 98.)

4

On or about July 12, 2018, McDermott sent Kolodner a letter setting out the Branch's proposed budget for the next five years, provided that Ludwig received the cooperation of the Branch and UCSD in the transition. (¶ 83.)  Under the proposed budget, annual funding for research was cut beginning in 2019, effectively eliminating research funding.  (*Id.*) Between 2013 and 2018, the budget had always been around $12 million per year. (¶ 85.) Ludwig proposed providing $45 million over the next five years (an average of $9 million per year), gradually cutting the budget to $4.5 million for the year 2023.  (¶ 86.)

At a February 12, 2019 meeting, Ludwig presented the proposed budget to Plaintiffs, and demanded that all Plaintiffs sign a "transition agreement and release," or else no funding would be provided.  (¶ 89.)  The transition agreement and release required Plaintiffs to continue to perform research through 2023, and contained a release of all claims, a non-disparagement clause, a confidentiality clause, and a restriction on the use of any information or materials Plaintiffs acquired, developed, or created while affiliated with the Branch. (¶¶ 91-92.)  None of the Plaintiffs signed the agreement.  (¶ 96.)  Ludwig subsequently cut the budget to $37 million over the next five years (an average of $7.4 million per year), (¶ 101), and stated to Plaintiffs that it will not be funding any research at the Branch, starting January 1, 2020, (¶ 108).

On or about October 31, 2019, Kolodner wrote to McDermott and others explaining that the budget for the years 2020 and 2021 was insufficient to pay Ludwigs' lease with UCSD, researcher salaries, prudent administration, and cost-sharing obligations to granting institutions, including the National Institutes of Health (NIH).  (¶ 111.)  Four days later, Kolodner was replaced by Robert Strausberg, Ludwig's Deputy Scientific Director. (¶ 112.)  Strausberg met with each of the Plaintiffs individually and informed them that Ludwig would be withdrawing all research funding for their labs, commencing January 2020.  (*Id.*)  Shortly thereafter, Strausberg took medical leave, and on December 31, 2019, was replaced by Jonathan Skipper.  (¶ 113.)  Skipper subsequently directed certain Plaintiffs to "invalidate" employment contracts for some Branch lab personnel or potentially face "personal liability."  (¶ 114.)

On January 30, 2020, Plaintiffs filed their Amended Complaint, which is the operative pleading, containing claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) rescission; (4) defamation per se;[3] (5) false light and invasion of privacy; and (6) injunctive and declaratory relief.  Plaintiffs assert diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiffs are citizens of California, (¶¶ 29-34), Ludwig is incorporated in Switzerland and has its principal place of business in Switzerland or New York, (¶ 35), Dang is a citizen of Pennsylvania, (¶ 37), McDermott is a citizen of New York, (¶ 36), and Notter is a citizen of Florida, (¶ 38).  Defendants waived service of process and filed the instant motion on March 31, 2020. (Doc. No. 14.)  Plaintiffs filed their opposition on April 20, 2020, (Doc. No. 15), to which Defendants responded on April 27, 2020, (Doc. No. 17).  The court heard oral argument on the motion on June 5, 2020.

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a) states that a "pleading which sets forth a claim for relief . . . . shall contain . . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).[4]  A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on a lack of a cognizable legal theory

---

[3] Plaintiffs' factual allegations in support of their defamation and false light claims are set forth below.

[4] The court notes, at the outset, the Complaint contains a substantial amount of evidentiary pleading, argument, and the underlying motivation for bringing this action.

or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint "'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 570).

## III.    DISCUSSION

### A.    Third Party Beneficiaries of the Affiliation Agreement

Plaintiffs' claims for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief are dependent on alleged breaches of the AA between Ludwig and UCSD.  A threshold issue is, therefore, whether under California law Plaintiffs are third party beneficiaries of the AA.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Hanna v. Plumer*, 380 U.S. 460, 465 (1965); 28 U.S.C. § 1652.  Plaintiffs allege they are third party beneficiaries of the AA between Ludwig and UCSD based on multiple provisions of the AA, but primarily, because they are the professional research scientists employed by Ludwig to engage in the active and continuous medical research required under the AA.  (¶¶ 1, 130.)  In support of this allegation, Plaintiffs point to the various provisions in the AA benefiting them, including: (1) that the research program "be under the immediate direction and control of the professional scientists employed by

7

[Ludwig] and assigned by [Ludwig] to the research programs;" (2) that Ludwig will "bear the costs directly related to conducting the research program" including equipment costs and compensation of its employees; (3) that Ludwig will obtain malpractice insurance for all Ludwig scientific personnel performing research; and (4) that Ludwig will select, employ, supervise and assign employees to the research program at the Branch, including appropriate administrative personnel.  (¶ 130.)

Plaintiffs also point to UCSD's obligations under the AA benefiting them, including: (1)  that UCSD will grant privileges for the practice of medicine at its hospital to qualified members of the medical staff of Ludwig working at the UCSD campus; (2) that UCSD will grant academic recognition and titles to qualified Ludwig employees; and (3) that UCSD will make 15 "full time equivalency" positions available for Ludwig employees.  (*Id*.) Finally, Plaintiffs note that pursuant to the individual intellectual property (IP) agreements they signed with Ludwig, they are entitled to an "inventor's share of income" received from licensing IP created under the AA, and that Plaintiffs applied for NIH grants as the principal investigator in reliance on Ludwig's performance as the grant administrator, which includes funding their research.  (*Id*.)

California law provides that "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  CAL. CIV. CODE § 1559.  In *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 828 (2019), the Court recognized that "[c]ourts have struggled . . . . to formulate useful, general principles to identify those circumstances in which a third party should be permitted to maintain an action for an alleged breach of a contract to which it is not a contracting party[.]"  Based on a review of cases going back to 1931, the Court described the history of its jurisprudence on the law of third party beneficiaries as follows:

> [O]ur court has carefully examined the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to, in order to determine not only (1) whether the third party would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3)

8

whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties. All three elements must be satisfied to permit the third party action to go forward.

*Id.* at 829-30.[5]

### 1.    Benefit in Fact

Plaintiffs allege that, as a result of the AA between Ludwig and UCSD, they forewent prestigious employment opportunities elsewhere, a consideration they argue buttresses their respective third party beneficiary claims.[6] Defendants do not dispute that Plaintiffs satisfy the first element of the *Goonewardene* test in that they benefit from the AA. To the extent that Plaintiffs have received compensation from Ludwig (and continue to do so), as well as opportunities to practice medicine, teach at UCSD, and conduct adequately funded research for multiple years, Plaintiffs have benefited from the AA. The parties seem to agree that even though the 1991 AA in no way provided that Ludwig and UCSD intended to specifically hire Plaintiffs, as opposed to other "professional scientists" as of 1991, to the extent that the 1991 AA was amended and/or renewed in 2000, 2004, 2012, and 2015, (Doc. No. 21-1 at 35-48), at least some of the Plaintiffs were employed by Ludwig at those later points in time. There are, however, challenges for *these specific* Plaintiffs qualifying as third party beneficiaries under the AA utilizing the *Goonewardene* test.

### a.    General Benefits to Employees

First, *Goonewardene* instructs that when an employer executes a contract that will

---

[5] The *Goonewardene* court also cited and discussed the court's two "most prominent" third party beneficiary decisions. 6 Cal. 5th at 831-32 (citing *Lucas v. Hamm*, 56 Cal. 2d 583 (1961) and *Martinez v. Socoma Companies, Inc.*, 11 Cal. 3d 394, 400 (1974)).

[6] Additionally, as discussed in the below analysis of Plaintiffs' defamation and false light claims, Plaintiffs allege their work was undermined and that their professional reputations were besmirched.

9

"generally" benefit its employees, but its employees are not signatories to the contract, that fact is insufficient to find those employees would "in fact" benefit from the contract in a way that supports their status as third party beneficiaries. In *Goonewardene*, a wage and hour case, the Court provided relatively little guidance on determining whether a proclaimed third party beneficiary would in fact benefit from the contract. The Court questioned, but did not decide, whether an employer's hiring of an independent payroll company "will in fact generally benefit" employees with regard to the wages they received. *Id.* at 835 n.7. The Court reasoned that employees are entitled to receive their wages, and to sue their employer for failure to pay them, regardless of whether their employer hired a third party to process its payroll. *Id.* The Court also reasoned that hiring a payroll processing company may not actually benefit the employees more than if the employer processed its own payroll. *Id.* The Court nonetheless found, even assuming that hiring a payroll company "will in fact generally benefit" employees, this fact is insufficient to authorize the employees to sue the payroll company. *Id.* at 835.

Here, although Plaintiffs repeatedly refer to themselves as "members" who were "appointed" to the San Diego Branch, (*see*, *e.g.*, ¶¶ 29-34, 61), Plaintiffs acknowledge they are employees of Ludwig, (*see*, *e.g.*, ¶ 52 ("The scientists employed at the Branch are intended beneficiaries of the [AA]."), ¶ 82 (alleging that Plaintiffs had "rolling terms of employment.")). Plaintiffs also do not allege that the benefits they received from Ludwig's agreement with UCSD would be any different than those that are "generally" available based on similar research agreements between research universities and nonprofit funders. (*See* ¶ 9 (alleging that "[b]efore agreeing to join Ludwig, Plaintiffs each held other secure and well-funded positions or had other attractive opportunities to start research careers at other institutions").) Therefore, to the extent that the AA merely "generally benefits" Plaintiffs by setting out the mission responsibilities of Ludwig and UCSD as well as the scope of Plaintiffs' professional responsibilities, ultimately, it only provides Plaintiffs the opportunity to be employed by Ludwig and conduct cancer research as set forth in their employment contracts with Ludwig.

1    Plaintiffs correctly point out that *Goonewardene* is factually distinguishable because
2  Plaintiffs are not suing the entity with which their employer entered into a contract, i.e.
3  UCSD.  (Doc. No. 15 at 14.)  Rather, Plaintiffs are directly suing their employer, i.e.
4  Ludwig, for breaching a contract Ludwig made with UCSD.  Plaintiffs do not argue,
5  however, and nothing in *Goonewardene* suggests, that the *Goonewardene* test does not
6  apply when third party employees sue their employer.[7]

### b.  Identifiable Beneficiaries

8    Second, the few cases applying the first element of the *Goonewardene* test suggest
9  that, in order to establish that a third party "would in fact benefit from the contract," the
10  third party must have been at least somewhat identifiable at the time when the contract was
11  executed.  In *Blatt v. Pambakian*, Case No. CV 19-7046-MWF (FFMx), 2020 WL 821040,
12  at *8 (C.D. Cal. Jan. 9, 2020), for example, the district court found that a company's former
13  CEO was a third-party beneficiary, and could therefore invoke an arbitration agreement
14  between the company and a former employee.  The court found that the express provisions
15  of the agreement specifically allowed "former officers" and "current directors" to compel
16  arbitration, and that the plaintiff was a former CEO and current director "at the time" the
17  contract was signed by the employee and the company.  *Id.*

18    Additionally, in *Adhvaryu v. Bank of Am., N.A.*, Case No. CV 18-1836-DOC
19  (ADSx), 2019 WL 3000611, at *7 (C.D. Cal. Apr. 10, 2019), the district court found that
20  the wife of a signatory to a mortgage agreement, who was not married to the signatory
21  when the agreement was signed, was not a third party beneficiary for the purpose of
22  maintaining the wife's claim for breach of the covenant of good faith and fair dealing
23  against the bank.  The court rejected the wife's argument that she benefited from the
24  mortgage because, at the time the mortgage agreement was signed, the signatory was of

_____

[7] Plaintiffs also argue that *Goonewardene* is distinguishable because Ludwig, unlike the defendant in *Goonewardene*, is not a payroll conduit or a processor.  (Doc. No. 15 at 14.) Plaintiffs nonetheless apply the *Goonewardene* test in their opposition.

marriageable age.  *Id.*

Finally, in *City of Oakland v. Oakland Raiders*, Case No. 18-cv-07444-JCS, 2019 WL 3344624, at *14 (N.D. Cal. July 25, 2019), the district court found the City of Oakland was not a third party beneficiary of the National Football League's (NFL) relocation policy, which the court interpreted as an agreement between the NFL and Raiders.  The case involved a challenge by the city to the Raiders' attempt to move to Las Vegas.  *Id.*  The court found the first element under *Goonewardene* was a "relatively low hurdle" for the city because "[a]s an existing host city, Oakland would benefit from policies that restrict the ability of the Raiders to leave Oakland for a new city."  *Id.*  Although the court did not expressly state that the Raiders were in Oakland when the relocation agreement was first established, the city claimed that the policy was enacted in response to the Raiders' previous attempt to move the team out of Oakland.  *Id.* at *15.

Here, Plaintiffs do not allege they were expressly identified by name in the 1991 AA or in any of its amendments.  *See* CAL. CIV. CODE § 1559 ("A contract, made *expressly* for the benefit of a third person, may be enforced by him[.]") (emphasis added).  Instead, Plaintiffs argue that under *Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1232 (2004), they are third party beneficiaries because they need not be named and identified as individuals in the contract, and because they are members of the *class* for whose benefit the contract was made.  (Doc. 15 at 12-13.)  In *Prouty*, the defendant company acquired another company and, in the acquisition agreement, agreed to provide terminated employees with severance benefits.  121 Cal. App. 4th at 1227.  The plaintiffs were long-time employees who were terminated, and who argued that the acquiring company breached its agreement with their former employer regarding severance.  *Id.* at 1229.  In deciding that the plaintiffs were third party beneficiaries, the court quoted an unidentified case stating that "'[i]t is not necessary that the beneficiary be named and identified as an individual; a third party may enforce a contract if he can show he is a member of a class for whose benefit it was made.'"  *Id.* at 1232.

In addition to being decided before *Goonewardene*, *Prouty* does not likely control

because in *Prouty* the plaintiffs were identifiable employees at the time their employer entered into the acquisition agreement and the severance provision was directly to their benefit.  Here, the agreement between Ludwig and UCSD merely states that Ludwig will hire "professional scientists," but does not specify which professional scientists. Additionally, *Prouty* quoted a Court of Appeal case stating "'[t]he fact that [a beneficiary] is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment. It must appear to have been the intention of the parties to secure to him personally the benefit of its provisions.'"  121 Cal. App. 4th at 1233 (quoting *E. Aviation Grp., Inc. v. Airborne Express, Inc.*, 6 Cal. App. 4th 1448, 1452 (1992)).  Accordingly, *Prouty*, reasonably interpreted, merely holds that in order to be a member of a "class" that is entitled to third party beneficiary status, the party must be an employee at the time its employer promised another party to provide their employees with a benefit.  Overall, *Goonewardene*, and the few cases applying it, suggest that in order to be a third party beneficiary the party must be at least somewhat identifiable at the point when the agreement was made.  Regardless, the remaining two elements of the *Goonewardene* test seem not to confer third party beneficiary status on Plaintiffs.

## 2.    Motivating Purpose

With respect to whether "a motivating purpose of the contracting parties was to provide a benefit to the third party," *Goonewardene* explained that "the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract."[8]  6 Cal. 5th at 835.  The Court also cited language from two cases emphasizing that it is the contracting parties' intent to benefit the third party that controls.  *Id.* at 835; *see Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 436 (1984) ("A putative third party's rights under a contract are predicated upon the

---

[8] *Goonewardene* also stated that its "intent-to-benefit caselaw remains pertinent in applying this element of the third party beneficiary doctrine."  6 Cal. 5th at 830.

contracting parties' intent to benefit him."); *Neverkovec v. Fredericks*, 74 Cal. App. 4th 337 (1999) ("The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.  The contracting parties must have intended to confer a benefit on the third party.").  *Goonewardene* found:

> When an employer hires a payroll company, providing a benefit to employees with regard to the wages they receive is ordinarily not a motivating purpose of the transaction.  Instead, the relevant motivating purpose is to provide a benefit to the employer, with regard to the cost and efficiency of the tasks performed and the avoidance of potential penalties.  Although the employer intends that the payroll company will accurately calculate the wages owed to its employees under the applicable labor statutes and wage orders, in situations in which it may be unclear or debatable as to how the applicable rules should be interpreted or applied, the employer would reasonably expect the payroll company to proceed with the employer's interest in mind.  In short, the relevant motivating purpose of the contract is simply to assist the employer in the performance of its required tasks, not to provide a benefit to its employees with regard to the amount of wages they receive.

*Id.*

Plaintiffs argue that a motivating purpose of the agreement was to benefit them because: (1) the AA expressly addresses a class to which Plaintiffs belong, i.e. the "professional scientists" to be employed and paid by Ludwig and assigned to the research program; (2) the stated purpose of the agreement is to provide an environment for the pursuit of active and continuous medical research by top scientists; (3) Ludwig was required to hire Plaintiffs, as professional scientists, to run research programs; (4) Ludwig is required to "bear all costs directly related to running the research program" under the AA; (5) Ludwig's funding is earmarked for Plaintiffs' respective research programs; (6) UCSD never administered Ludwig's funding or directed the program; (7) the AA contains no disclaimer of third party rights; (8) the AA grants Plaintiffs medical privileges, academic recognition, and potential faculty positions at UCSD after the AA expires; (9) Ludwig recruited Plaintiffs as lab heads with the promise of robust research funding; (10) UCSD wrote to Ludwig objecting to Ludwig impairing Plaintiffs' research during the term

of the AA; (11) Ludwig cannot conduct research, only its scientists can, and the San Diego Branch is not an incorporated entity; and (12) this is not a case where Ludwig contracted to pay UCSD and Plaintiffs happened to be UCSD employees who indirectly benefited from UCSD's receipt of funding, but rather one where Ludwig agreed to hire professional scientists to head the research program and fund the costs of that research.  (Doc. No. 15 at 14-17.)[9]

Applying *Goonewardene's* analytical framework here, whether a motivating purpose of the AA between Ludwig and UCSD was to benefit Plaintiffs depends on the "ordinary" motivating purposes of agreements between nonprofit organizations (like Ludwig) dedicated to an important social goal (like curing cancer) and universities (like UCSD) that possess research facilities and other attributes (like medical practice and academic opportunities) capable of attracting scientists and researchers (like Plaintiffs) whose research advances that important social goal.  Viewed least favorably to Plaintiffs, the sole motivating purpose of the AA between Ludwig and UCSD was to advance a cure for cancer, which, if successful, would also promote the reputation, stability, and other interests of their respective nonprofit institutions.  Under that view, the only third parties that Ludwig and UCSD intended to benefit would be current and future cancer patients.[10] Viewed another way, there are no intended third party beneficiaries to the agreement because, when read most literally, the only motivating purpose of the "affiliation" agreement between Ludwig and UCSD was precisely that, i.e. to *affiliate* in advancing a cure for cancer in a way that would mutually benefit each institution.  When viewed most

_____

[9] Plaintiffs also argue that the type of research contemplated by the agreement, which they refer to as "translational research" and which allegedly requires "robust funding and long-term stability," must be recognized as weighing in their favor.  (¶ 14.)

[10] In *Oakland*, the district court stated, "[t]his Court is bound by the test set by the California Supreme Court [in *Goonewardene*], which does not consider whether allowing suit by a third party would serve public interests separate from the interests of the contracting parties."  2019 WL 3344624, at *16.

favorably to Plaintiffs, the sole purpose of the agreement was to advance *Plaintiffs' research* towards a cure for cancer because, without Plaintiffs, neither party was capable of advancing a cure for cancer or promoting the resulting institutional interests.

However, the task here is not to ferret out the parties' *sole* motivating factor or purpose.  Rather, the question is whether the 1991 AA can reasonably be read to mean that Ludwig and UCSD mutually intended, through the AA, to provide to future but unnamed scientific employees of Ludwig, a contractual right to sue Ludwig for lack of adequate research funding.  Put another way, can the 1991 AA reasonably be read to reflect a mutual motivation of Ludwig and UCSD to confer upon putative third party scientists, to be employed by Ludwig in the future, a contractual right to sue for insufficient funding?

There exists no express or direct language in the AA setting forth any such third party right in favor of scientific "members" of the Branch to sue Ludwig for inadequate research funding.  And any argument that the AA might confer other third party rights (e.g. allowing Plaintiffs to enforce UCSD's AA obligations to grant hospital privileges, academic recognition, etc.) misses the mark.  Although such an argument favors the AA being interpreted as a "hybrid contract" (conferring some but not other third party rights), *see Fuentes v. TMCSF, Inc.*, 26 Cal. App. 5th 541, 551-52 (Ct. App. 2018) (a third party can only enforce the provisions of a contract made for his or her benefit), any such argument is not pertinent here.  Clearly, if sophisticated and prestigious scientific and academic institutions like Ludwig and UCSD had been motivated in whole or in part to advance Plaintiffs' specific research by funding it, as opposed to advancing a cure in general, they could have stated so in the AA or in the Plaintiffs' individual employment agreements.  Based on the language of the AA, and the facts alleged in the Complaint, it is not reasonable to infer that a motivating purpose of the AA was to support Plaintiffs' research by conferring upon them a third party contractual right to sue Ludwig for insufficient funding.  Provisions of the AA supporting the goals(s) of advanced medical research to treat and cure cancer, such as adequately funding labs and acquisition of necessary personnel, were the means designated by which the mutual mission was to be

achieved.  Accordingly, Plaintiffs have failed to adequately plead that a motivating factor of the parties to the AA was to accord Plaintiffs a third party right to sue Ludwig for claimed inadequate funding.

### 3.   Objectives and Reasonable Expectations

The third element in the *Goonewardene* test is whether "permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties."  6 Cal. 5th at 830.  The Court explained:

> [T]he third element does not focus upon whether the parties specifically intended third party enforcement but rather upon whether, taking into account the language of the contract and all of the relevant circumstances under which the contract was entered into, permitting the third party to bring the proposed breach of contract action would be consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

> In other words, this element calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals, rather than a determination whether the parties actually anticipated third party enforcement at the time the contract was entered into.

*Id.* at 830-831 (internal citations omitted).  With respect to the requirement that third party enforcement be consistent with "the objectives of the contract," *Goonewardene* stated the inquiry is "comparable" to asking "whether third party enforcement will effectuate the contracting parties' performance objectives, namely those objectives of the enterprise embodied in the contract, read in the light of surrounding circumstances[.]" *Id.* at 831 (citations and internal quotation marks omitted).  With respect to the requirement that third party enforcement be consistent with "the reasonable expectations of the contracting parties," the Court stated this requirement "reflects the teaching of prior California decisions that have denied application of the third party beneficiary doctrine when permitting the third party to maintain a breach of contract action would not be consistent with the reasonable expectations of the contracting parties."  *Id.* (citations omitted).  *Goonewardene* also noted that under *Socoma Companies*, 11 Cal. 3d at 401-02,

"even if a motivating purpose of the contracting parties is to provide a benefit to the employees, it still may be inconsistent with the objectives of the contract and the reasonable expectations of the contracting parties to permit the employees to sue the payroll company for an alleged breach of the contract." *Id.* at 836.

Applying the third element, *Goonewardene* found that there was no need to permit the third party employee to bring suit to enforce an alleged breach by the payroll processer because the employer was fully capable of pursuing a breach of contract action against the payroll processor if the payroll processor rendered the employer liable for any damages. *Id.* The Court found that permitting the third party employee to sue the payroll processor was not necessary to effectuate the objectives of the contract. *Id.* The Court also noted the substantial additional costs on the payroll processor that would result if each of the employer's employees were allowed to sue the payroll processor, which it would likely pass onto the employer. *Id.* Thus, permitting third party employees to sue payroll processing companies "would ordinarily be inconsistent with the reasonable expectations of the employer as well as the payroll company and also unnecessary because employees retain the right to obtain full recovery for unpaid wages from their employer." *Id.*

Applying the reasoning from *Goonewardene* here, there is no apparent need to permit Plaintiffs to bring suit against Ludwig based on a breach of Ludwig's agreement with UCSD because Plaintiffs can bring suit against Ludwig under their own individual employment contracts with Ludwig. Additionally, if Ludwig were not to honor its funding obligations under the AA, then UCSD could bring suit. Permitting third party researchers employed by a nonprofit institution to sue their employer based on the employer's alleged breach of its affiliation agreement with a university to advance research might impose some costs on the nonprofit employer, which would potentially undermine the desire of nonprofit organizations to affiliate with universities for their mutual benefit, as well as the benefit of society. Alternatively, nonprofit institutions could simply adjust their affiliation agreements with universities to expressly state that its researchers are not intended to be third party beneficiaries, and researchers would be more careful to ensure that funding

levels would be more specifically memorialized in their employment contracts, neither of which is likely to be particularly costly. Suffice to say, once again, there exists nothing in the AA evidencing a reasonable expectation of the parties that third party enforcement rights by Ludwig's lead researchers against Ludwig for funding shortfalls were being created or contemplated in 1991. Accordingly, Defendants' motion to dismiss Plaintiffs' breach of contract claim related to the AA is GRANTED with leave to amend.

### B. Breach of Affiliation Agreement and Bad Faith

Plaintiffs do not bring a claim for breach of contract with respect to any agreement other than the AA. (*See* ¶¶ 128-34.) Additionally, Plaintiffs allege that Ludwig breached the implied duty of good faith and fair dealing by: (1) threatening to cut Plaintiffs' funding if they could not guarantee UCSD's cooperation; (2) eliminating funding for Plaintiffs' research but requiring Plaintiffs to keep working; and (3) attempting to extract a release containing "oppressive" terms from Plaintiffs, such as a non-disparagement clause, a confidentiality clause, and a prohibition on using their residual knowledge gained from their research, in exchange for their agreement to the tapering budget. (¶ 142.) Plaintiffs also allege that "Ludwig knew that a sudden withdrawal of financial support from the Branch would jeopardize the entire body of Plaintiffs' prior research at the Branch as well as Plaintiffs' ability to conduct research in the future by making it impossible for Plaintiffs to transition their research elsewhere and by endangering Plaintiffs' NIH grant funding[.]" (¶ 143.) Because Plaintiffs are not third party beneficiaries of the AA, and because their only breach of contract claim relates to the AA, Plaintiffs' claims for breach of contract and bad faith under the AA fall short. Plaintiffs are, however, GRANTED leave to amend.

### C. Rescission of IP Agreements

Plaintiffs also bring a claim for rescission of their IP agreements with Ludwig based on a lack of consideration. (¶¶ 160-170.) Under California law, a party to a contract may rescind the contract if: (1) "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds;" (2) "the consideration for the obligation of the rescinding party becomes entirely void from any

19cv2141 JM (JLB)

cause;" or (3) "[i]f the public interest will be prejudiced by permitting the contract to stand."   Cal. Civ. Code § 1689(b)(2)-(3), (6).   Under California law, consideration is defined as:

> Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

Cal. Civ. Code § 1605.

Ludwig argues that consideration has not failed in whole or in part, and has not become entirely void, because Plaintiffs have been, and continue to be, employed by Ludwig. (Doc. No. 14-1 at 25-26.) Ludwig also argues that Plaintiffs provide no facts regarding why or how the IP agreements are highly prejudicial to the public interest. (*Id.*) In opposition, Plaintiffs argue (1) their employment is not consideration because the "essence" of their employment is their research, which is not being funded, and by refusing to fund their research, Ludwig has rendered that consideration void, and (2) the assignment of IP rights to Ludwig are against the public interest because "they may be asserted to prevent Plaintiffs from completing the development of cancer treatments and cures they began[.]" (Doc. No. 15 at 22-23.)

Here, the compensation and research funding that Plaintiffs received for years, and the compensation they continue to receive, constitutes valid consideration for their IP agreements.   Plaintiffs' argument that the "essence" of their work has been rendered void due to the lack of research funding does not render void the essence of the IP agreements, i.e. the value of the compensation they received and continue to receive in exchange for giving up the IP rights to their work.   Plaintiffs' rescission claim is also inconsistent with "[t]he consequence of rescission [which] is not only the termination of further liability, but also the restoration of the parties to their former positions by requiring each to return whatever consideration has been received." *Imperial Cas. & Indem. Co. v. Sogomonian*, 198 Cal. App. 3d 169 (Ct. App. 1988); *see also Johnson v. Altamirano*, 418 F. Supp. 3d

530, 550 (S.D. Cal. 2019); Cal. Civ. Code § 1691 ("[T]o effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind . . . . [r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise[.]"). Plaintiffs do not allege, nor is it reasonable to infer, that Plaintiffs desire to return to Ludwig the entirety of their compensation in exchange for the return of the IP rights to their work.

Furthermore, the cases cited by Plaintiffs are distinguishable because they involve a breach of the contract for which rescission was sought. *See Fed. Deposit Ins. Corp. v. Air Fla. Sys., Inc.*, 822 F.2d 833, 840 (9th Cir. 1987) (finding a breach of contract and remanding the case to the district court because "the right to rescind a particular contract 'depends upon the gravity of the breach' relied on to justify the rescission") (citation omitted); *Coleman v. Mora*, 263 Cal. App. 2d 137, 151 (Ct. App. 1968) (involving a broker who had breached his agreement to perform services with reasonable diligence in an attempt to sell a property); *see also Mosier v. Phoenix Life Ins. Co.*, SA CV 12-227 PSG (Ex), 2013 WL 12132065, at *8 (C.D. Cal. Jan. 15, 2013) (without showing a breach of contract, or at least making an anticipatory breach of contract claim, rescission claims based on the failure of consideration are not ripe); *Chao v. Aurora Loan Servs., LLC*, Nos. C 10-03383 SBA, C 10–03118 SBA, 2011 WL 6963098, at *7 (N.D. Cal. Sept. 13, 2011) ("Failure to perform any material part of a contract can justify rescission."). Rather than allege that their IP agreements with Ludwig were breached, Plaintiffs allege that Ludwig's AA with UCSD was breached. Finally, it is speculative and conclusory for Plaintiffs to allege "that if the Intellectual Property Agreements are not rescinded, Ludwig may seek to enforce them and may try to prevent Plaintiffs from both continuing their research and commercializing the fruits of their research, which would be highly prejudicial to the public interest." (¶ 170.) It is not reasonable to infer that rescission is the only remedy to prevent Ludwig from enforcing the IP agreements, that Ludwig will successfully enforce the agreements to prevent Plaintiffs from continuing and commercializing their research, or that Ludwig's cannot or will not use the IP to benefit the public interest. Accordingly,

Plaintiffs have not alleged a plausible claim for rescission.  Ludwig's motion to dismiss Plaintiffs' recession claim is GRANTED with leave to amend.

### D.     Defamation Per Se

Plaintiffs bring a claim for defamation per se against all Defendants.  (¶¶ 145-55.) Defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007); *see also Herring Networks, Inc. v. Maddow*, Case No. 19-cv-1713-BAS-AHG, 2020 WL 2614857, at *3 (S.D. Cal. May 22, 2020).  Under California law, defamation per se is "libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face."  Cal. Civ. Code § 45a.  "Where a plaintiff can prove libel per se, damage to reputation is presumed, so that the plaintiff need not introduce evidence of actual damages to recover compensatory, or, in appropriate cases, punitive damages."  *Vargas v. Bank of Am., N.A.*, No. 12-CV-2247-L MDD, 2013 WL 1386342, at *4 (S.D. Cal. Apr. 4, 2013) (citing *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986)).

In their Complaint, Plaintiffs allege they were defamed because McDermott, Notter and Dang stated that the reason Ludwig is closing the Branch is because Plaintiffs "are not engaged in cancer research at a level commensurate with the quality and seniority of the scientists."  (¶ 146.)  Plaintiffs claim the statement was made to UCSD representatives at a December 2018 meeting and in a January 30, 2019 letter from Notter to UCSD.  (*Id.*) Plaintiffs also allege that McDermott, Notter and Dang "made clear" that the Branch was being closed (1) "due to deficiencies in the Plaintiffs' scientific performance," and (2) because "Plaintiffs did not conduct cancer research."  (¶¶ 146-47.)  Plaintiffs further claim the statements "caused UCSD to state to one or more of the Plaintiffs that Plaintiffs were at fault for Ludwig's closure of the Branch, which is untrue."  (¶ 148.)  With respect to damages, Plaintiffs claim they suffered damage to their professional reputations as a result of the statements, and that they are entitled to punitive damages under California Civil

Code § 3294.  (¶¶ 149, 153.)  Finally, Plaintiffs allege the statements were a pretext for closing the Branch because Ludwig had not performed a scientific review of Plaintiffs or the Branch.[11]  (¶¶ 150-51.)

### 1.    Statements of Opinion

The January 30, 2019 Notter letter[12] states "[t]he Board took the action it did because in its judgment the Branch is not having an impact on cancer commensurate with the quality and seniority of its scientists[.]"  (Doc. Nos. 14-1 at 28 and 21-3 at 127.)  Defendants primarily argue that this statement is not defamatory because it is an opinion, as indicated by the words "in its judgment," and the subjectivity inherent in determining the scientists' "quality" and the commensurate "impact" on cancer.  (*Id*. at 28-30.)  Defendants also argue that it is not defamatory because it "imput[es] no blame on the individual scientists," but instead merely states *the Branch* was not performing in a manner reflective of the scientists' quality and seniority.  (*Id*. at 28; *see also* Doc. No. 17 at 10 (arguing that the letter merely states that "the scientists are of a high quality, but the Branch (i.e., [Ludwig]) has fallen short.").

"[S]tatements that do not imply facts capable of being proved true or false" are protected under the First Amendment and are not defamatory.  *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 n.2 (9th Cir. 1990), *cert. denied*, 499 U.S. 961 (1991); *see also*

---

[11] Plaintiffs also allege in their Complaint that "Ludwig's decision to close the Branch and breach of the AA was motivated by Defendants' own conflicts of interest and desire for private or financial gain for themselves or others, including, without limitation, those with whom they have family, business, or other ties," (¶ 151), which allegedly violates the terms of the NIH grants, (¶154).

[12] The documents attached to Defendants' motion to dismiss, (Docs. 14-2 and 14-2), as amended, (Doc. No. 22), which include the January 30, 2019 Notter letter, are incorporated into the Complaint by reference because they are central to the Complaint and the Complaint necessarily relies on the documents.  *See Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013).  Defendants' motion to amend the documents to include the amendments to the AA (Doc. No. 22) is GRANTED.

*Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009).  Statements couched in terms of opinion may still imply false assertions of fact.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) ("[T]he statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar.").  "[T]here is no wholesale defamation exemption for anything that might be labeled an opinion.  If a statement of opinion implies a knowledge of facts that may lead to a defamatory conclusion, the implied facts must themselves be true."  *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1166 (2000).  In determining whether a statement implies a factual assertion, the court looks at "the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work."  *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995); *see also Maddow*, 2020 WL 2614857, at *3.  Courts consider the "specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation."  *Id.*  Finally, the court considers whether the "statement itself is sufficiently factual to be susceptible of being proved true or false."  *Id.*  "The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court.  If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury."  *Campanelli v. Regents of Univ. of California*, 44 Cal. App. 4th 572, 578 (1996); *see also Maddow*, 2020 WL 2614857, at *3.

Here, Notter's statement that "[t]he Board took the action it did because in its judgment the Branch is not having an impact on cancer commensurate with the quality and seniority of its scientists" is not, as a matter of law, merely an opinion devoid of a factual implication.  Though perhaps a complicated endeavor requiring expert testimony, it is at least unclear whether the statement that "the Branch is not having an impact on cancer commensurate with the quality and seniority of its scientists" is capable of being proven

true or false.[13]  With discovery, whether this was the reason "[t]he Board took the action it did," is also a fact that is likely capable of being proven true or false.  Additionally, Plaintiffs' allegation, which is not contradicted by Notter's letter, that at a December 2018 meeting McDermott, Notter and Dang communicated that Plaintiffs' scientific performance had "deficiencies" and that "Plaintiffs did not conduct cancer research," (¶¶ 146-47), are statements containing facts capable of being proven true or false.  That Notter's statement was couched as an opinion does not make it so.  The context and circumstances under which the statements were allegedly made also do not show that the statements were opinions.  The statements were made among scientific, medical, and academic professionals as an explanation for Ludwig's decision to forego funding a multi-million dollar research center that had operated at UCSD for many years.  The tenor, subject, setting, and format of these consequential statements, as well as the reasonable expectations of the UCSD officials to whom they were made, suggests they were meant to be serious, professional, and accurate.  As Plaintiffs allege, and as it is reasonable to infer, UCSD officials interpreted the statements to imply that it was Plaintiffs' "fault" for Ludwig's decision to close the Branch, (¶ 148), which also may be capable of being proven true or false.

Furthermore, the Notter letter does not, as Plaintiffs claim, impart blame on the Branch but not the scientists running the branch.  As Plaintiffs point out and Defendants do not dispute, although the letter does not mention them by name, the letter references the "seven Principal Branch Investigators," and Plaintiffs are six of the seven principals whose labs constitute the Branch.  (Doc. 21-3 at 127.)  At this stage in the litigation, Plaintiffs are entitled to the inference that this was known to the UCSD official to whom the letter was

---

[13] Although there may be differing views as to whether the Branch was having an impact on cancer commensurate with the quality and seniority of its scientists, Plaintiffs are entitled to an inference, at this early stage in the litigation, that a consensus could be reached among those capable of making such a determination.

addressed.  Additionally, under California law, there is no requirement that Plaintiffs be mentioned by name if the jury can infer that the defamatory statement applied to them. *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) (citing *DiGiorgio Fruit Corp. v. AFL-CIO*, 215 Cal. App. 2d 560 (1963)); *see also Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1160 (Ct. App. 2019) ("A statement may be actionable if it refers to a group to which the plaintiff belongs, but only if the group is sufficiently small and its members easily ascertainable.").

Finally, the two cases upon which Defendants rely are not controlling.  Defendants first rely on *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995), in which the court held that the implication by one attorney in a book that another attorney performed poorly at trial was an opinion protected by the First Amendment.  Although the implication in *Partington* is somewhat analogous to the implication here because it involves criticism of professional work performance, the court in *Partington* relied heavily on context that is not present here to find that the statement was an opinion.  Specifically, the court found the "book's general tenor makes clear that [the defendant's] observations about [plaintiff's] trial strategies . . . . represent statements of personal viewpoint, not assertions of an objective fact." *Id*.  The context of the statements in this case, which involve an employer's statements about its employees' work performance, is far different than in *Partington*, which involved a well-known trial attorney's account of a notorious trial in a book and movie for public consumption.  The *Partington* court also specifically held that statements concerning a lawyer's performance during trial are generally not susceptible of being proved true or false. *Id*. at 1157.  While a court is in a good position to judge whether an attorney's allegedly poor performance at trial is capable of being verified, the same is not true for judging scientists' performance in advancing a cure for cancer.

Defendants also rely on *Jensen v. Hewlett-Packard Co.*, 14 Cal. App. 4th 958, 965 (1993), in which the court held that "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior, it cannot support a cause of action for

libel." However, Plaintiffs correctly argue, and Defendants do not dispute, that *Jensen* has been distinguished based on the fact that it involved routine employee evaluations. *See Webber v. Nike USA, Inc.*, No. 12-CV-00974 BEN (WVG), 2012 WL 4845549, at *6 (S.D. Cal. Oct. 9, 2012) (distinguishing *Jensen* because "the statement of 'poor performance' was not made in a job performance evaluation, but in the context of explaining to Plaintiff and his former clients why he was fired"); *Reese v. Barton Healthcare Sys.*, 693 F. Supp. 2d 1170, 1190 (E.D. Cal. 2010) (distinguishing *Jensen* because the alleged defamatory statements were set forth in disciplinary records, not a performance evaluation).

### 2.    Common Interest Privilege

Defendants also argue that their allegedly defamatory statements are protected by the common interest privilege. (Doc. No. 14-1 at 29-30.) The common interest privilege applies to "a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." CAL. CIV. CODE § 47(c).

Defendants bear the initial burden of showing that the allegedly defamatory statement was made on a privileged occasion. *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1196, (1994). Defendants argue that UCSD is an interested party because UCSD, as Ludwig's landlord, has a financial interest in the Branch closure. (Doc. No. 14-1 at 30.) This argument may be unavailing because, although UCSD had a financial interest in knowing of its lease status, that interest may not have been advanced by allegedly defamatory statements regarding Plaintiffs. Although Ludwig's interest may have been financial as well, it is unclear at this juncture whether it was necessary to allegedly defame Plaintiffs to explain or buttress Ludwig's decision to close the Branch.

The only case Defendants cite in support of their common interest privilege argument is *Inst. of Athletic Motivation v. Univ. of Illinois*, 114 Cal. App. 3d 1 (Ct. App. 1980), in which a university professor of sports psychology sent a letter to professional

27

athletic organizations and sports magazines warning them of an allegedly faulty psychological questionnaire for measuring athletic ability that the plaintiffs were marketing.  That case is inapposite, however, because Ludwig's statements to UCSD about Plaintiffs were not a warning.  The Complaint does not reasonably suggest, for example, that Ludwig's purpose in telling UCSD of its dissatisfaction with Plaintiffs' research progress was to warn UCSD that it would not be in UCSD's interests to hire Plaintiffs or to continue to provide them with medical or academic privileges.  Accordingly, at this time, Defendants have not met their burden of showing that their statements were privileged.

Furthermore, even assuming Defendants have met their "interested party" burden, Plaintiffs allege that Defendants' statements concerning their research were malicious.  (¶ 23.)  "[I]f malice is shown, the privilege is not merely overcome; it never arises in the first instance."  *Kashian v. Harriman*, 98 Cal. App. 4th 892, 914-15 (2002).  Plaintiffs may establish actual malice "by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights."  *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976) (citation omitted).  To prove reckless disregard, a plaintiff must show the defendant "made the false publication with a high degree of awareness of . . . . probable falsity, or must have entertained serious doubts as to the truth of his publication."  *Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 563, (2012) (citations omitted) (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989)); *see also Toranto v. Jaffurs*, 297 F. Supp. 3d 1073, 1101 (S.D. Cal. 2018).  Here, Plaintiffs allege that Defendants acted maliciously because: (1) Defendants' statements were a pretext for Ludwig's "business" decision, (¶ 23); (2) the statements were made in retaliation for Plaintiffs' refusal to sign the release, (¶ 143); (3) Ludwig knew the statements would jeopardize Plaintiffs' ability to conduct research in the future; (*id*.); (4) Ludwig did not conduct a scientific review of Plaintiffs' work, (¶ 150); (5) Ludwig knew Plaintiffs are highly accomplished scientists whose work is acclaimed by peer reviews, (¶ 158); and (6) Ludwig hoped to place itself in a position to monopolize the science and block Plaintiffs from future pursuit of a cure for cancer, (¶

169).  This is more than a general allegation of malice without any allegations of supporting fact.  *See Solarcity Corp. v. Doria*, Case No.: 16cv3085-JAH (RBB), 2018 WL 2229397, at *6 (S.D. Cal. May 16, 2018) ("General allegations of malice will not suffice, rather 'actual facts of malice must be alleged or be apparent from the communications themselves.'") (citation omitted).  Accordingly, Plaintiffs have adequately pled a plausible claim for defamation.  Defendants' motion to dismiss Plaintiffs' defamation claim is DENIED.

### E.   False Light

Plaintiffs also claim that Defendants portrayed them in a false light.  (¶¶ 156-59.) "'False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.'" *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264 (Ct. App. 2017), *as modified* (Apr. 19, 2017), *review denied* (June 28, 2017) (quoting *Price v. Operating Engineers Local Union No. 3*, 195 Cal. App. 4th 962, 970 (2011)).

Plaintiffs allege that "Ludwig has publicly disclosed the fact that it has ceased all support for Plaintiffs' research" and that Ludwig's conduct "involved personal attacks on the Plaintiffs."  (¶ 157.)  Plaintiffs further allege "[t]he information that Ludwig has eliminated all of Plaintiffs' research funding shows Plaintiffs in a false light [because] Ludwig knew that cutting all research funding and making that fact known to others would create the false impression that Plaintiffs' respective research programs are qualitatively flawed."  (¶ 158.)  Plaintiffs claim this would be highly offensive to a reasonable person in Plaintiffs' position as "dedicated scientists who depend upon their professional standing and reputation for superior research for their livelihood and in order to sustain their research programs."  (*Id.*)  Plaintiffs also claim that Defendants put them in a false light before the NIH because, under the NIH grant, Plaintiffs were the proponent and "principal investigator."  (*Id.*)

The publicity element in a false light claim requires that the relevant material must be communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge," and not "confined to a few persons or limited circumstances," *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 27 (1994); *see also Orff v. City of Imperial*, Case No.: 17-CV-0116 W (AGS), 2017 WL 5569843, at *11 (S.D. Cal. Nov. 17, 2017). Here, Plaintiffs allege that the defamatory statements were made to "multiple third persons," to "representatives of UCSD at a meeting held in December 2018," and to "others." (¶¶ 115, 146-47, 158.) Additionally, it is unclear whether Ludwig's alleged misstatement as to the quality of Plaintiffs' research would be "highly" offensive to a reasonable person. Under California law, however, "[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1385 n.13 (1999); *see also Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 n.1 (9th Cir. 2016) (considering claims of false light and libel "collectively" where they rely on the same set of facts); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1083 n.2 (9th Cir. 2002) (treating California libel and false light claims as substantially equivalent); *Uriarte v. Bostic*, No. 15CV1606-MMA (PCL), 2017 WL 2312084, at *13 (S.D. Cal. May 26, 2017); *Lorenzo v. U.S.*, 719 F. Supp. 2d 1208, 1213 (S.D. Cal. 2010) ("[I]n California, false light invasion of privacy is equivalent to libel."). Accordingly, because Plaintiffs have sufficiently pled a claim for defamation per se, and Plaintiffs' false light claim relies on the same facts, Plaintiffs' false light claim survives. Defendants' motion to dismiss Plaintiffs' false light claim is DENIED.

## F.   Declaratory Relief

Plaintiffs bring a claim, under California Code of Civil Procedure § 1060, for a declaration regarding the parties' rights, duties, and obligations under Ludwig's AA with UCSD, and under Plaintiffs' individual employment and IP agreements with Ludwig. (¶ 127.) In claims for declaratory relief, courts sitting in diversity apply California law. *See*

*Commerce Point Capital, Inc. v. First Data Corp.*, Case No.: 19-cv-556-W (LL), 2019 WL 7020057, at *9 (S.D. Cal. Dec. 20, 2019) ("A request for declaratory relief is based in equity.  As such it is controlled by California law.") (internal citation omitted); *John M. Floyd & Assocs., Inc. v. First Imperial Credit Union*, No. 16-CV-1851 DMS (WVG), 2017 WL 4810223, at *4 n.6 (S.D. Cal. Oct. 25, 2017) ("*Floyd*") ("[F]ederal courts have consistently applied California Code of Civil Procedure § 1060 rather than the federal Declaratory Judgment Act when sitting in diversity."), *aff'd*, 771 F. App'x 840 (9th Cir. 2019).  Under California law:

> Any person interested . . . . under a contract, or who desires a declaration of his or her rights or duties with respect to another . . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties . . . . ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time.

CAL. CIV. PROC. CODE § 1060.  Additionally, "[t]he declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."  *Id.*

Declaratory relief "is designed in large part as a practical means of resolving controversies, so that parties can conform their conduct to the law and prevent future litigation." *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 648 (Cal. 2009); *see also Floyd*, 2017 WL 4810223, at *5.  "To qualify for declaratory relief, [a party] would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations.'"  *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 909 (Cal. Ct. App. 2013) (quoting *Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 4th 1559, 1582 (Cal. Ct. App. 2011)).  The first element is subject to the court's discretion. *See Tower Bridge Trade Servs. S.A. v. Proformance Apparel Grp., LLC*, Case No. 11-CV-

2944 W (MDD), 2012 WL 13175881, at *4 (S.D. Cal. Apr. 11, 2012).[14]  Declaratory relief operates prospectively and is not a corrective action used to remedy past wrongs.  *Floyd*, 2017 WL 4810223, at *5 (citations omitted).  "Therefore, 'where there is an accrued cause of action for an actual breach of contract or other wrongful act, declaratory relief may be denied.'"  *Id*. (citing *Baldwin v. Marina City Properties, Inc.*, 79 Cal. App. 3d 393, 407 (Cal. Ct. App. 1978)).  Additionally, a claim for declaratory relief cannot stand as an independent claim if the underlying substantive claim is not adequately pled.  *See Davis v. Zimmerman*, Case No. 17-cv-01230-BAS-NLS, 2018 WL 1806101, at *6 (S.D. Cal. Apr. 17, 2018) (listing cases); *Fenton v. Wells Fargo Home Mortg.*, Case No. 17-cv-0113 DMS (WVG), 2017 WL 1346672, at *5 (S.D. Cal. Apr. 12, 2017) ("Because the Court grants [d]efendant's motion to dismiss on the quiet title cause of action, the declaratory relief claim, which is based on the same factual and legal theories, must also be dismissed."); *Lopez v. Wells Fargo Bank, N.A.*, Case No.: 16cv0811 AJB (DHB), 2016 WL 6893591, at *12 (S.D. Cal. Nov. 23, 2016) ("[W]here a court has concluded that a plaintiff did not state sufficient facts to support a cause of action and therefore dismissed the claim, a dismissal is also proper as to a claim for declaratory relief which is 'wholly derivative' of the statutory claim.") (citing *Ball v. FleetBoston Fin. Corp.*, 164 Cal. App. 4th 794, 800 (2008)); *Suellentrop v. Countrywide Bank FSB*, No. 11-CV-2274 BEN (BGS), 2012 WL 6094136, at *4 (S.D. Cal. Dec. 7, 2012) (declaratory relief is improper if based on the allegations of wrongdoing contained in other dismissed claims).

### 1.    Affiliation Agreement

Plaintiffs first request a declaration that they are third party beneficiaries of the AA. (¶ 127.)  This request fails because the court has already determined that Plaintiffs are not

---

[14] In *Tower Bridge*, the district court noted that "California courts have declined to find an 'actual controversy' where the dispute between the parties has already been resolved, or where a 'money judgment will fully resolve the dispute' and there is 'no possibility of future dispute' between the parties[.]"  2012 WL 13175881, at *5 (internal citations omitted).

third party beneficiaries and that Plaintiffs cannot bring a claim against Ludwig for breach of the AA.  A closer question is presented, however, as to whether Plaintiffs adequately stated a plausible claim for a declaration that Ludwig violated the AA by declining to fund Plaintiffs' research through 2023 at the pre-2019 levels.  On the one hand, Plaintiffs concede that under *Lafferty v. Wells Fargo Bank*, 213 Cal. App. 4th 545, 570 (2013), *as modified on denial of reh'g* (Feb. 27, 2013), the court held that "[b]ecause the . . . . agreement was not made for the benefit of the [plaintiffs], they lack standing to seek declaratory and injunctive relief under that agreement."  Additionally, given the court's decision that Plaintiffs are not third party beneficiaries of the AA, they have no right to enforce the agreement, and it is therefore unclear that an actual controversy exists, or could legally exist, between Plaintiffs and Ludwig as to Plaintiffs' "legal" rights and obligations under the AA.  Plaintiffs also fail to allege what, if any, future litigation might be prevented, as opposed to created, if the court declared that Ludwig breached the AA.

On the other hand, Plaintiffs argue that their request operates prospectively and is not limited to redressing Ludwig's past alleged breaches.  (Doc. No. 15 at 28.)  Indeed, Plaintiffs clearly allege that Ludwig's alleged breach of the AA is a continuing breach.  (*See*, *e.g.*, ¶ 118.)  Additionally, Plaintiffs argue that under California Code of Civil Procedure § 1060, they need not be third party beneficiaries to seek declaratory relief under the AA, but merely that they be persons "interested . . . . under a contract" or persons "who[] desire[] a declaration of [their] rights or duties with respect to another."  (*Id*. at 29.)  In support of this argument, Plaintiffs cite *Olson v. Toy*, 46 Cal. App. 4th 818, 824-25 (1996), in which the court held that § 1060 did not require either plaintiffs or defendants be parties to, or that plaintiffs be interested under, a trust instrument as a predicate to plaintiffs maintaining a declaratory relief action because the trust "directly affect[ed]" the plaintiffs' legal rights to property under a will.  In reply, Defendants make no attempt to reconcile the third party beneficiary standard with the mere "interest" or "desire" standard under § 1060.  *See also Tower Bridge*, 2012 WL 13175881, at *5 ("Under both California and federal law, the party seeking declaratory relief need only request that the court

adjudicate a substantial and immediate legal controversy between the parties.") (citations omitted).  Accordingly, at this stage in the litigation, Defendants have not met their burden of showing that Plaintiffs fail to state a plausible claim for a declaration that Ludwig violated the AA by declining to fund Plaintiffs' research through 2023 at the pre-2019 levels.  Defendants' motion to dismiss Plaintiffs' declaratory relief claim related to the AA is DENIED.

### 2.    Employment Agreements

Plaintiffs also seek a declaration that under their individual employment agreements, Plaintiffs are entitled to their salaries for at least four years beyond the Branch closure, and that the two letters they each received declining to renew or terminate their memberships are void *ab initio*.  (¶ 127.)   As indicated by both parties' detailed and substantive arguments on these issues, (*see* Doc. Nos. 14-1 at 23-25 and 15 at 29-32), there is an actual controversy concerning Plaintiffs' rights under their employment agreements.  Also, given that Plaintiffs have not yet brought a breach of contract claim related to their individual employment agreements, a declaration as to Plaintiffs' rights thereunder would prevent future litigation, at least to the issue of some of Plaintiffs' rights thereunder.  *See* Cal. Civ. Proc. Code § 1060 ("[T]he court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time.").  As alleged, an actual breach of their employment agreements with respect to their salaries might not occur until 2023.[15]  For these reasons, the court finds this to be a proper issue for possible declaratory relief.  Accordingly, Plaintiffs have stated a plausible claim for declaratory relief related to their individual employment agreements.  Defendants' motion to dismiss Plaintiffs' claim for declaratory related to their individual employment agreements is DENIED.

### 3.    IP Agreements

Plaintiffs also seek a declaration that their IP agreements "are subject to rescission

---

[15] In their papers, neither party addresses constitutional issues such as the prohibition on advisory opinions and the requirements of ripeness and injury in fact.

1   and are void *ab initio* or voidable, for material failure of consideration, as a result of

2   Ludwig's breach of its obligations under the [AA]." (¶ 127.)  Because the court has decided

3   that Plaintiffs fail to plead a plausible claim for rescission of the IP agreements for lack of

4   consideration, Plaintiffs' claim for a declaration that they are entitled to rescission fails.

5   With respect to Plaintiffs' remaining request for declaratory relief under the IP agreements,

6   Defendants argue that the request merely restates Plaintiffs' request that the IP agreements

7   be rescinded.  (Doc. No. 14-1 at 26-27.)  Plaintiffs argue that its request is not repetitive

8   because "it seeks a declaration regarding Plaintiffs' future rights to IP created during their

9   time at [Ludwig], which is necessary to settle the parties' rights even if the IP Agreements

10  are not rescinded." (Doc. No. 15 at 32.)  In their reply, Defendants do not dispute Plaintiffs'

11  argument.  (*See* Doc. No. 17 at 8.)  Here, Plaintiffs do not identify the rights under their IP

12  agreements that are in potential need of settling.  Also, Plaintiffs' request in their Complaint

13  for declaratory relief regarding its unidentified rights under the IP agreements is conclusory

14  and unsupported by factual allegations.  Thus, there does not appear to be an actual

15  controversy.  Finally, this issue is not proper for declaratory relief given that it appears to

16  be redundant with Plaintiffs' claim for rescission, which the court has rejected.

17  Accordingly, Plaintiffs have not adequately pled a plausible claim for a declaration

18  regarding their IP agreements.  Defendants' motion to dismiss Plaintiffs' claim for

19  declaratory relief related to the IP agreements is GRANTED with leave to amend.

20  **IV.   CONCLUSION**

21  For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED IN PART**.

22  Defendants' motion to dismiss Plaintiffs' claims for breach of contract, breach of the

23  implied duty of good faith and fair dealing, and rescission is **GRANTED**.  Defendants'

24  motion to dismiss Plaintiffs' claims for defamation and false light is **DENIED**.

25  Defendants' motion to dismiss Plaintiffs' claim for declaratory relief, as consistent

26  with the above, is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' request for

27  a declaration that they are third party beneficiaries of the AA is **DISMISSED**.  Plaintiffs'

28  request for a declaration that Ludwig violated the AA by declining to fund Plaintiffs'

research through 2023 at the pre-2019 levels is **NOT DISMISSED**.  Plaintiffs' request for a declaration that, under their individual employment agreements, Plaintiffs are entitled to their salaries for at least four years beyond the Branch closure, and that the two letters they each received declining to renew or terminate their memberships are void *ab initio*, is **NOT DISMISSED**.  Finally, Plaintiffs' request for a declaration regarding their IP agreements is **DISMISSED**.

Plaintiffs shall file their second amended complaint, should they choose to file one, *within 21 days* of the filing of this order.  Defendants' response to the operative complaint is due *within 21 days* after the expiration of the Plaintiffs' deadline to file their amended complaint.  *See* Fed. R. Civ. P. 15(a)(3).

IT IS SO ORDERED.

Dated: June 17, 2020

JEFFREY T. MILLER
United States District Judge

19cv2141 JM (JLB)