**BARNES & THORNBURG LLP**
Ali M.M. Mojdehi (SBN #123846)
amojdehi@btlaw.com
Kevin D. Rising (SBN #211663)
krising@btlaw.com
Janet D. Gertz (SBN #231172)
jgertz@btlaw.com
Allison M. Rego (SBN #272840)
arego@btlaw.com
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone:  619-321-5000
Facsimile:  310-284-3894

Attorneys for Plaintiffs, Doctors Don
Cleveland, Arshad Desai, Frank Furnari,
Richard Kolodner, Paul Mischel, Karen
Oegema and Bing Ren

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND, an individual; ARSHAD DESAI, an individual; FRANK FURNARI, an individual; RICHARD KOLODNER, an individual; PAUL MISCHEL, an individual; KAREN OEGEMA, an individual; and BING REN, an individual,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LUDWIG INSTITUTE FOR CANCER RESEARCH LTD., a corporation; CHI VAN DANG, an individual; EDWARD A. McDERMOTT, JR., an individual; JOHN L. NOTTER, an individual and DOES 1 through 100, inclusive,<br><br>                    Defendants. | Case No. 3:19-cv-02141-JM-JLB<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**1)      DECLARATORY RELIEF,**<br>**2)      BREACH OF CONTRACT,**<br>**3)      BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING,**<br>**4)      DEFAMATION PER SE,**<br>**5)      FALSE LIGHT INVASION OF PRIVACY,**<br>**6)      BREACH OF INTELLECTUAL PROPERTY CONTRACT;**<br>**7)      BREACH OF GOOD FAITH AND FAIR DEALING INTELLECTUAL PROPERTY CONTRACT;**<br>**8)      PROMISSORY ESTOPPEL,**<br>**9) THROUGH 15) BREACH OF LABORATORY CONTRACTS, AND PRELIMINARY & PERMANENT INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Doctors Don Cleveland, Arshad Desai, Frank Furnari, Richard Kolodner, Paul Mischel, Karen Oegema and Bing Ren (collectively, "Plaintiffs") allege as follows:

## **PRELIMINARY STATEMENT**

1.     The Plaintiffs are internationally acclaimed cancer research scientists and physicians, and each has committed his or her research program to pursuing breakthroughs in cancer prevention, treatment and control.  This Complaint alleges the breach by the Defendant, Ludwig Institute for Cancer Research, Ltd. ("Ludwig") a Swiss non-profit dedicated to the study of causes, treatments, and cures for cancer, of its various contractual obligations to the Plaintiffs, whom Ludwig recruited to move their research laboratories to the San Diego Branch (the "Branch) of the Ludwig Institute for Cancer Research, which Ludwig has operated on the campus of the University of California at San Diego ("UCSD") since the fall of 1991 in premises Ludwig leases from The Regents of the University of California, acting on behalf of the University of California, San Diego, in conjunction with the UCSD Medical Center (the "Hospital").

2.     The Plaintiffs uprooted their families and gave up tenured endowed positions at other institutions, and/or declined promising opportunities at other institutions, relying on (i) the provisions in an Affiliation Agreement (defined below) and related real property Lease (defined below) Ludwig had executed with UCSD in 1991, which, *inter alia*, requires Ludwig and UCSD to collaborate in "continuous, active conduct of medical research" towards curing cancer during the term of the Affiliation Agreement and Lease, (ii) the Laboratory Support Agreements (defined below) Ludwig made with Plaintiffs obligating Ludwig to provide adequate financial support for Plaintiffs' research laboratories, and (ii) the Membership agreements Ludwig made with Plaintiffs granting Plaintiffs a secure tenure with Ludwig that would continue indefinitely, absent the occurrence of agreed events.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

3.      The Affiliation Agreement was entered into by UCSD and Ludwig for the specific and intended purpose of inducing the scientists to move their laboratories to UCSD and in order to provide an ongoing framework for the scientists (including Plaintiffs here) to operate these laboratories and commercialize intellectual property. The Affiliation Agreement provided Plaintiffs with express direct and intended benefits.  Such benefits included, *inter alia*, (i) establishing a benchmark for the length of Plaintiffs' tenure as Members of Ludwig and related thereto, (ii) establishing a benchmark for duration of the funding and other support Ludwig separately obligated itself to provide Plaintiffs research laboratories, (iii) establishing the terms under which for Plaintiffs may hold faculty positions at UCSD, paid by Ludwig, and (iv) obligated Ludwig to abide by UCSD policies, including without limitation, providing Plaintiffs the same rights, privileges and opportunities regarding developed intellectual property as were provided UCSD faculty under UCSD's guidelines, including without limitation, relating  to Plaintiffs' rights to participate in the commercialization and receive equity ownership in ventures involving their developed intellectual property.

4.      The Affiliation Agreement, as amended, requires Ludwig to operate the Branch at UCSD and in conjunction with the Hospital during the term of the Affiliation Agreement.  During the term of the Affiliation Agreement, Ludwig committed to, among other things, fund "continuous, active conduct of medical research" at the Branch "to discover, develop or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer" in conjunction with UCSD and the Hospital.  The current term of the Affiliation Agreement continues through December 31, 2023.

5.      To enable its performance under the Affiliation Agreement of continuous, active conduct of medical research related to causes, diagnoses, treatment, prevention and control of cancer at the Branch, Ludwig solicited Plaintiffs to become "members" of the Branch, as the principal scientists performing such research, in conjunction with UCSD and the Hospital.  Ludwig assured Plaintiffs that, pursuant to Ludwig's long-

term commitment to operate and fund the Branch under the Affiliation Agreement, Ludwig would deploy its vast resources to adequately fund cancer research programs at the Branch, from basic research to cure, for the duration of the Affiliation Agreement.

6.      Ludwig also made representations to Plaintiffs that the Branch's location at UCSD and the framework for collaboration with UCSD and the Hospital under the Affiliation Agreement would provide Plaintiffs with a superior platform and secure environment to engage in active continuous research for a cure for cancer. Relying on Ludwig's faithful performance of its contractual obligations during the term of the Affiliation Agreement, Plaintiffs assisted Ludwig in procuring substantial federal and other extramural funding for the Branch, including without limitation, by submitting grant applications to the National Institutes of Health ("NIH").  Moreover, in reliance on Ludwig's commitment to fund continuous active research for the entire term of the Affiliation Agreement and Lease, Plaintiffs agreed to use their scientific background, knowledge, and expertise to identify research opportunities, develop those ideas into multiyear research programs of their design, attract and hire scientific research personnel, write their designs into research proposals of which they act as "principal investigators," and obtain long-term grants from the NIH that were awarded to Ludwig.  As a condition of receiving these NIH grants, Ludwig also represented to the NIH that it would adequately support ongoing cancer research at the Branch during the entire term of such grants, including, without limitation, by being responsible for payment of all of Ludwig's cost sharing obligations undertaken by negotiation with NIH and/or specifically detailed in submitted grant applications.

7.      Ludwig's performance of, "active and continuous medical research," as used in the Affiliation Agreement, is to be construed as such term is defined the U.S. Internal Revenue Code 26 U.S. Code § 1 *et seq.* (the "IRC"), which is expressly referenced in the Affiliation Agreement.  Specifically, shortly after its formation, in August 1971, the U.S. Internal Revenue Service (the "IRS") determined that Ludwig's

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

U.S. based activities qualified it as a "medical research organization directly engaged in the continuous, active conduct of medical research in conjunction with a hospital," as provided in section 170(b)(1)(A)(iii) of the IRC. Under such code section and related regulations, in order to maintain tax exempt status under IRC § 501(c)(3), a medical research organization is required to have such medical research as its "principal purpose". In order to satisfy that requirement, the organization must devote a "substantial" amount of its endowment assets for the funding of "active and continuous medical research" with a "hospital". In addition, any contribution made to a medical research organization for such research must be "committed" to be spent for such research within five years.

8.      Upon information and belief, the Affiliation Agreement and Ludwig's funding of "continuous, active conduct of medical research" at the Branch under the Affiliation Agreement has been and remains a substantial factor in Ludwig's maintaining its status as a tax exempt organization under IRC § 501(c)(3). Plaintiffs established their research programs with Ludwig at the Branch and in conjunction with UCSD and the Hospital because they understood and relied on the fact that Ludwig was a tax exempt medical research organization and that, in such capacity, Ludwig was required to devote a "substantial" amount of its endowment assets for the funding of "active and continuous medical research" with a "hospital" and, as provided under the Affiliation Agreement, at the Branch in conjunction with UCSD and the Hospital. Upon information and belief, pursuant to 26 CFR § 1.170A-9, as part of its receipt of funding from the Fund, Ludwig had entered into a binding commitment with the Fund to use such funds for continuous active medical research at the Branch in conjunction with UCSD and the Hospital.

9.      In addition to relying upon Ludwig's performance of the Affiliation Agreement, Plaintiffs relied upon their own agreements with Ludwig. In order to induce the Plaintiffs to move their laboratories to the Branch, Ludwig extended a written offer to each of the Plaintiffs, promising financial and other support that

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

Ludwig would provide for the operation of each of the Plaintiff's research laboratories if Plaintiffs moved their laboratories to UCSD, including support for salaries and benefits for Plaintiffs along with other laboratory personnel, other costs of research, and outlining the designated physical lab and office space and equipment and administrative support that Ludwig would provide.  The offers were accepted by the Plaintiffs in writing, forming binding Laboratory Support Agreements.

10.    Each of the Laboratory Support Agreements entered into by Ludwig with each of the individual Plaintiffs obligated Ludwig to provide laboratory support for a "term" co-terminus with such Plaintiff's Rolling Term (defined below) as a Member of the Ludwig.  The conditions governing the Rolling Term and its duration were not contained in the Laboratory Support Agreements, which were extended by the San Diego Branch Director on behalf of Ludwig.  Because such Rolling Term had to be separately approved by the board of Ludwig in Switzerland, it was to be contained in a separate Membership Agreement (defined below) which itself incorporated by reference the Ludwig policies that specified its parameters.

11.    The Rolling Terms were offered to Plaintiffs as an inducement to attract Plaintiffs to Ludwig's San Diego Branch, and were developed for the purpose of providing Plaintiffs with similar security as the tenured university faculty positions Plaintiffs left or declined at other institutions. The Rolling Term also enabled Plaintiffs to accept outside grants, which was not practical with a fixed term.  The Rolling Terms continued indefinitely, and could only be "*converted*" into a Fixed Term (defined below), of an additional five years, for _one_ reason – upon the failure of a Plaintiff to receive a favorable scientific review, which was to be conducted at least once every five years.  Plaintiffs relied upon the fact that conversion of their Rolling Term to a Fixed Term for failure of a scientific review would be within their control and otherwise remote, in light of Plaintiffs' professional stature and the peer-regarded quality of their research. In addition, other than very limited grounds for termination (*e.g.* upon death) identified in some of the Membership agreements, the Plaintiffs'

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

status as a Member could be only be *terminated* for two reasons under the Ludwig policies: (i) upon the closure of the San Diego Branch, or (ii) if Ludwig experienced financial difficulties.  Upon termination, Plaintiff's status as a Member (and as Ludwig employee) would immediately end, but Ludwig would remain obligated to pay such Plaintiff's salary and benefits for the remainder of the time left on such Plaintiff's Rolling Term on the date of such termination.  The Plaintiffs relied upon the fact that the San Diego Branch could not close prior to the expiration of the Affiliation Agreement between Ludwig and UCSD, which was co-terminus with Ludwig's Lease of UCSD property.  Termination resulting from Ludwig's financial difficulty was also remote where Ludwig held an endowment of hundreds of millions of dollars that was required under Ludwig's articles to be used for the sole purpose of cancer research.

12.    For nearly thirty years, Ludwig's funding commitment for continuous active medical research under the Affiliation Agreement and under the Laboratory Support Agreements with Plaintiffs has been determined through a joint process, starting with information provided by the Branch and has always included research funding.  Plaintiffs are acutely dependent upon Ludwig's continued adequate funding of their laboratories. Each of the seven Plaintiffs established and operates his or her own laboratory (individually, a "Laboratory" and collectively, the "Laboratories"). Together, Plaintiffs and their Laboratories constitute the entirety of the research program at the Branch.  Each Laboratory utilizes a variety of advanced equipment (much of it owned or otherwise provided by Ludwig).  Each Plaintiff employs research teams in its Laboratory made up of both permanent research staff and postdoctoral and graduate students to achieve these goals.  In October of 2017, the Branch had a total of 170 administrative and scientific employees, most of them working in Plaintiffs' respective Laboratories.

13.    In its nearly three decades of existence, scientists or investigators at the Branch, including Plaintiffs, have made substantial contributions to cancer research. The Branch's performance and accomplishments since its founding have been nothing

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

less than exemplary, as documented by Ludwig's own internal reviews, along with numerous peer reviews.  For example, the renowned scientific journal *Nature*, prominently featured the Branch's work in its 2006 article on Milestones in Cancer Research.  The article discussed research dating back to 1889 and discussed the importance of Branch investigators' research in three of twenty-five milestones leading to the present day understanding of cancer.  On April 24, 2019, Ludwig issued a press release announcing that the Branch's findings relating to the cellular lineage of tumors had been published in *Nature*. On November 20, 2019, the New York Times published an article about ground-breaking cancer research being performed by Plaintiffs Mischel and Ren. Likewise, Ludwig featured Branch research relating to brain cancer cells in its own 2018 Annual Research Highlights.

14.     Research at the Branch has led to an unprecedented level of recognition by awards[1], the development of both new early-stage therapies for ovarian cancer, neuroblastoma, Ewing sarcoma and brain cancer and therapeutics in clinical trials. The Branch is ranked by *Nature* as 42nd in its 2019 index of the Top 100 Non-Profit Research Organizations in Biomedical Sciences, which evaluates all Non-Profit Research Organizations in Biomedical Sciences worldwide.  This is particularly significant given that the Branch has only 7 investigators, the Plaintiffs, and by comparison, many of the organizations ranking higher have well over 100 investigators.  UCSD was ranked by *Nature* 9th in its Top 200 Academic Institutions in Biomedical Sciences worldwide and 7th in its Top 200 Healthcare Institutions in Biomedical Sciences. These high rankings for UCSD (with more than 1000 MD or PhD faculty in biomedical research/medicine) are dependent on the Plaintiffs, because without inclusion of the seven Ludwig investigators, UCSD's rankings would drop,

---

[1] For example, Plaintiff Mischel has been peer voted as one of Americas Top Doctors for Cancer for the past 10 years, even though his work does not include seeing patients.  Plaintiff Kolodner was elected as a Fellow of the American Association for Cancer Research Academy in 2013 and a Member of the National Academy of Sciences in 2000.

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

respectively, from 9th to 13th in biomedical sciences and from 7th to 11th in Healthcare Institutions.

15.    Abruptly, however, in or around May to July 2018 Ludwig precipitously announced that it would breach the Affiliation Agreement, breach Plaintiffs' individual Member agreements and Laboratory Support Agreements and Intellectual Property Agreements, cease funding the Branch and otherwise halt the "continuous active conduct of medical research" at the Branch, resulting in the Laboratories having to cease their work.  Upon information and belief, Ludwig also intends to refuse to pay the cost sharing expenses it is obligated to pay under the Plaintiffs' NIH grants.

16.    Because Ludwig was obligated under the Laboratory Support Agreements to continue its support of the Plaintiffs' Laboratories as long as the Plaintiffs' Rolling Terms endured, Ludwig initially sought a means to convert the Plaintiffs' rolling terms to a Fixed Term.  In bad faith and with knowledge that it was false, Ludwig asserted that the Plaintiffs had each failed a scientific review.  Ludwig's assertion was an utterly baseless fabrication.  Ludwig had not even conducted a scientific review of any of the Plaintiffs!  Nor would Plaintiffs have failed any legitimate scientific review, if one had actually been done.  Confronted with the falsity of their statements, Ludwig then sought grounds to terminate Plaintiffs as Members, asserting that the Branch had "closed."  That was equally false, because so long as the Affiliation Agreement remained in existence, the Branch could not close.  The Affiliation Agreement was co-terminus with the Lease, and the Lease and did not expire until, at the earliest, December 31, 2023.  Adding insult to injury, Ludwig affirmed to the Plaintiffs what was otherwise obvious—that the reason for Ludwig's purported "termination" had nothing to do with any lack of funds by Ludwig.

17.    Ludwig continues to falsely represent to the Plaintiffs that the Branch has been "closed" and, together with that, continues to breach its obligation to fund the continuous, active medical research at the Branch under the Affiliation Agreement. Predicated upon this false and otherwise improper assertion and wrongful breach,

Ludwig first *cut*, then ultimately *terminated* its financial support for the Plaintiffs' laboratories.  *First*, in a meeting in May 2018 with Plaintiffs, Ludwig announced that it would be closing the Branch, and that it would provide a "tapering research budget," beginning in January 2019, designed to provide minimal resources to enable the researchers to transition their research elsewhere.  In February 2019, however, Ludwig added conditions to Plaintiffs' receipt of the "tapering research budget," demanding their execution of a one-sided release and confidentiality agreement to Ludwig, exonerating Ludwig from all liability.  In addition, the Plaintiffs were required to ensure that UCSD "cooperated" with Ludwig's premature closure of the Branch.  If Plaintiffs did not execute the release and obtain UCSD's acquiescence, then Ludwig would withdraw all financial support from the Laboratories.  Ludwig knew that, if all research funding were suddenly discontinued, Plaintiffs would lose the ability to transition their research and place their ongoing research projects at serious risk. Plaintiffs refused to execute the release because they considered it an inappropriate and unlawful attempt by Ludwig to cloak its wrongful conduct in secrecy and escape liability for breach of the Affiliation Agreement. Plaintiffs also continued to object to Ludwig's conduct and breach of its obligations and violation of its own policies.

18.    As a consequence, after already cutting funding, Ludwig terminated all funding for the Laboratories and terminated key Laboratory personnel, effective January 1, 2020. Ludwig continues to fund at least part of the rent due under the Lease and it continues to pay the Plaintiffs' own salaries and benefits, but nothing more.  As a result, Plaintiffs' Laboratories and ongoing translational research programs have ceased or substantially curtailed ongoing research projects, except to the extent that they have access to outside grants.

19.    Moreover, the precipitous nature of Ludwig's withdrawal of support after Plaintiffs refused to execute the release has undermined Plaintiffs' ability to transition their work and other sources of funding to other research facilities, thus impairing Plaintiffs in continuing their research. Ludwig's continued performance of its funding

commitments at a level in accord with principles of good faith is required for Plaintiffs to foster their research for a sufficient time to enable their efforts to bear fruit. Given the complexity of Plaintiffs' respective research programs, their research plans can span decades of work.  As is standard practice in this context, Plaintiffs rely on the ability to recruit research teams made up of both permanent research staff, on one hand, and postdoctoral and graduate student trainees, on the other, who generally work on a research team for a set number of years.  In light of the nature of Plaintiffs' work, it was known or reasonably foreseeable that Ludwig's unjustified and unexpected termination of research funding has and will continue to cause irreparable harm to Plaintiff's respective research programs, much of which is also funded by the NIH as well as other granting agencies and foundations.  Ludwig's conduct in cutting research funding and forcing a shutdown of the Branch's activities materially impairs each Plaintiff's ability to recruit new postdoctoral and graduate student trainees and retain long-term research staff and in turn, their ability to maintain their research programs going forward. By way of example, Plaintiffs have already been forced to severely reduce the number of staff employed at their Laboratories, and the absence of research funding by Ludwig continues to require Plaintiffs to cut staffing of researchers in their Laboratories. Damage to Plaintiffs' research programs not only harms each of the Plaintiffs, but derails research aimed at developing therapies for the treatment of cancer and other diseases, which is contrary to the public good.  Ludwig's abandonment of the Branch and repudiation of the Affiliation Agreement has materially breached the Affiliation Agreement, along with Ludwig's direct obligations to Plaintiffs thereunder, as third-party beneficiaries of the Affiliation Agreement. Ludwig's current conduct stands in stark contrast and is manifestly counter to the Affiliation Agreement's sole purpose – to perform *continuous*, *active* medical research at the Branch during its term.

20.     Ludwig's conduct has also breached the Laboratory Support Agreements and Membership agreements that Ludwig entered into with the Plaintiffs individually.

1   Ludwig's breaches and unethical attempt to justify its actions upon a purported

2   "closure" of the Branch violates both the letter of Ludwig's contractual obligations as

3   well as the duty of good faith and fair dealing applicable to every contract.

4           21.     Ludwig's refusal to fund research, in breach of the Affiliation Agreement

5   _and_ in breach of the individual contracts Ludwig entered into with each of the

6   Plaintiffs, will have a catastrophic impact on Plaintiffs' research and will destroy

7   nascent developments in support of a cure for cancer. Plaintiffs have experienced

8   severe detriment as a result of Ludwig's breaches of their obligations to Plaintiffs,

9   which were carried out in extreme bad faith. Plaintiffs' careers have been stalled, their

10  futures have been put at risk, their laboratory staff have been disbursed, and their

11  research has been halted, substantially destroying the value of the intellectual property

12  they created over many years.  Moreover, in this case, the collateral damage of

13  Ludwig's bad faith breach harms not only Plaintiffs but also society at large.  Here, the

14  disruption of Plaintiffs' research caused by Ludwig's breach is likely to prevent one or

15  more of the Plaintiffs from discoveries that would result in a cure for cancer. Ludwig

16  should not be allowed to escape the consequences of such a breach.

17          22.     Ludwig's harmful conduct towards Plaintiffs did not stop with their

18  contractual breaches, but also included intentionally tortious actions.  Seeking a _post_

19  _hoc_ pretext for their sudden defunding of the Branch, Ludwig, together with Ludwig's

20  President and Chief Executive Officer Edward McDermott ("McDermott"), Scientific

21  Director Dr. Chi Van Dang ("Dang") and Chairman of its Board of Directors John L.

22  Notter ("Notter") maliciously defamed Plaintiffs. In order to support what, in truth,

23  was a business decision by the Ludwig board, Defendants made reckless, unjustified

24  and unsupported public statements that Ludwig was withdrawing Branch funding

25  because Plaintiffs were not performing cancer research at a level on par with their

26  seniority and the funding provided by Ludwig.

27          23.     Ludwig, together with Dang, McDermott and Notter also perpetuated

28  other false information harmful to Plaintiffs' professional reputations, including that

Plaintiffs were not conducting cancer research.  Defendants' false statements were made by Defendants intentionally and with a reckless disregard of the truth.  First, each of Plaintiffs had historically received positive reviews.  Second, Ludwig itself has published many positive statements regarding the quality and importance of the Plaintiffs' research work.  Third, Ludwig has detailed policies and procedures that govern review of its branches and its research scientists' work.  Under these policies and procedures, any negative determination would have to be in writing, following a secondary review by an independent scientific review board, Ludwig's Scientific Advisory Committee.  No such negative review existed as to any of Plaintiffs' work. Even apart from the Defendants' defamatory statements, the Defendants' actions in withdrawing funding also placed Plaintiffs' professional reputations in a negative and false light in the public eye, creating an inference that Plaintiffs' research and accomplishments at the Branch were not sufficiently valuable to continue to support. This false inference was particularly damaging where Ludwig has a longstanding and prominent presence at UCSD, where Plaintiffs also hold professorships. It was otherwise publicly known that Ludwig was contractually obligated to provide continued funding and support for the Branch through December 2023 under the Affiliation Agreement with UCSD.

24.     Plaintiffs' research is internationally recognized, ground-breaking, and is on the cusp of discovering the causes, diagnoses, treatment, prevention and control of cancer.  Plaintiffs brought their research to the Branch and partnered with Ludwig in reliance upon Ludwig's promises under the Laboratory Research Agreements, the Membership Agreement, and the direct and intended benefits provided to Plaintiffs under the Affiliation Agreement, including without limitation, the requirement that Ludwig would to support "continuous and active" research at the Branch towards the treatment, prevention and cure of cancer during its term.  Ludwig now prefers to divert its abundant capital resources elsewhere, presumably for richer short-term gains.  Such also appears to be Ludwig's *modus operandi*.  The treatment of the San Diego Branch

echoes prior actions by the Ludwig administration that abruptly closed branches at other locations, which the scientific community described as having been handled "appallingly" "cavalierly" and in an "abrupt and insensitive" manner.  Ludwig's cavalier and destructive behavior needs to be brought to light and halted.

25.     Ludwig's contractual breaches and intentionally tortious actions are a betrayal of Ludwig's institutional mission as an international not-for-profit organization, ostensibly dedicated to pioneering cancer discoveries for the public good. Defendants' reckless breaches, if not remedied, will have grievous consequences to Plaintiffs and society and potentially would encourage Ludwig to continue to conduct its affairs without any regard for the law or the public good.

## PARTIES

26.     Plaintiff Don Cleveland, PhD ("Plaintiff Cleveland") is an individual that Ludwig appointed as a "Member" researcher at the Branch in 1996. Plaintiff Cleveland is the Department Chair of Cellular and Molecular Medicine and Distinguished Professor of Medicine, Cellular and Molecular Medicine and Neurosciences at UCSD and a Member of the National Academy of Sciences (US) and the National Academy of Medicine (US), a fellow of the American Academy of Arts and Sciences, as well as the recipient of numerous international prizes, including the Breakthrough Prize in Life Sciences, for his achievements in cancer research and gene silencing therapies for nervous system disease. Plaintiff Cleveland is a citizen of California.

27.     Plaintiff Arshad Desai, PhD ("Plaintiff Desai") is an individual that Ludwig appointed as a "Member" researcher at the Branch effective January 1, 2011. Plaintiff Desai is a Professor of Cellular and Molecular Medicine at UCSD.  Plaintiff Desai is a citizen of California.

28.     Plaintiff Frank Furnari, PhD ("Plaintiff Furnari") is an individual Ludwig appointed as a "Member" researcher at the Branch effective January 1, 2016. Plaintiff Furnari is a Professor of Pathology at UCSD. Plaintiff Furnari is a citizen of California.

29.     Plaintiff Richard Kolodner, PhD ("Plaintiff Kolodner") is an individual that Ludwig appointed as a "Member" researcher at the Branch effective September 1, 1997.  Plaintiff Kolodner is a Distinguished Professor of Cellular and Molecular Medicine at UCSD, a Member of the National Academy of Sciences (US) and the National Academy of Medicine (US), a fellow of the American Academy of Arts and Sciences and a Fellow of the American Association for Cancer Research Academy (AACR) as well as a recipient of numerous awards in recognition of his cancer research including the General Motors Cancer Research Foundation Mott Prize and the Landon-AACR Prize for basic cancer research. Plaintiff Kolodner is a citizen of California.

30.     Plaintiff Paul Mischel, M.D., ("Plaintiff Mischel") is an individual that Ludwig appointed as a "Member" researcher at the Branch effective August 1, 2012. Plaintiff Mischel is a Distinguished Professor of Pathology at UCSD, a Member and Past-President of the American Society of Clinical Investigation, an elected member of the American Association of Physicians and a fellow of the American Association for the Advancement of Science.  Plaintiff Mischel is a citizen of California.

31.     Plaintiff Karen Oegema, PhD ("Plaintiff Oegema") is an individual that Ludwig appointed as a "Member" researcher at the Branch effective January 1, 2011. Plaintiff Oegema is a Professor of Cellular and Molecular Medicine at UCSD. Plaintiff Oegema is a citizen of California.

32.     Plaintiff Bing Ren, PhD ("Plaintiff Ren") is an individual that Ludwig appointed as a "Member" researcher at the Branch effective October 1, 2009. Plaintiff Ren is a Professor of Cellular and Molecular Medicine at UCSD and a fellow of the American Association for the Advancement of Science. Plaintiff Ren is a citizen of California.

33.     Defendant Ludwig Institute for Cancer Research Ltd. ("Ludwig") is a corporation organized under the laws of Switzerland and is qualified by the United States Internal Revenue Service as exempt under IRC § 501(c)(3), as "an organization

described in [IRC] section 170(b)(1)(A)(iii)."  Defendant is registered to do, and is doing, business in the State of California and has, at all times relevant to this Complaint, transacted business from the location of 9500 Gilman Drive, 3262 Holiday Court, or presently, 8950 Villa La Jolla Drive, all located in La Jolla, California. Ludwig is incorporated in Switzerland and has its principal place of business in Switzerland or New York.

34.   Defendant Edward A. McDermott, Jr., ("McDermott") is the President and Chief Executive Officer of Ludwig.  McDermott is a citizen of New York.

35.   Defendant Chi Van Dang ("Dang") is the Scientific Director of Ludwig. Dang is a citizen of Pennsylvania.

36.   Defendant John L. Notter ("Notter") is the Chairman of the Board of Directors of Ludwig.  Notter is a citizen of Florida.

37.   The names and true capacities, whether individual, corporate or otherwise, of the defendants named herein as Does 1 through 100, inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiffs are informed and believe and, on the basis of such information and belief, allege that Does 1 through 100, inclusive, or some of them, participated in some or all of the acts as hereinafter alleged and are liable to Plaintiffs.  Ludwig, McDermott, Dang, Notter and Does 1 through 100, inclusive, are sometimes hereinafter referred to collectively as "Defendants."

## JURISDICTION

38.   The court has jurisdiction under 28 U.S.C. § 1332 based on diversity because the Plaintiffs and Defendants are citizens of different states as set forth in the paragraphs above and the amount in controversy exceeds $75,000.

39.   Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## **GENERAL ALLEGATIONS**

### I.   **THE LUDWIG INSTITUTE**

40.     Ludwig is an international not-for-profit organization. In the United States, Ludwig is qualified as a tax exempt organization under IRC § 501(c)(3), pursuant to an IRS letter determination dated August 4, 1971, which provides that Ludwig is "an organization described in section 170(b)(1)(A)(iii)" of the IRC.  To maintain such status, Ludwig must be

> an organization the *principal purpose* or functions of which are the providing of medical or hospital care or medical education or *medical research*, [and] *if the organization is a medical research organization* directly engaged in the *continuous active conduct of medical research in conjunction with a hospital* . . . . (emphasis added).

41.     Under 26 CFR § 1.170A-9, "medical research" is defined as "conduct of investigations, experiments, and studies to discover, develop, or verify knowledge relating to the causes, diagnosis, treatment, prevention, or control of physical or mental diseases and impairments of man."  To be deemed engaged in "medical research," however, Ludwig must have or *continuously* provide for regular use the "*appropriate* equipment and professional personnel *necessary* to carry out" such medical research (emphasis added). The mere disbursing of funds to other organizations for the conduct of research by them does not qualify.  Rather, the medical research must be conducted *by Ludwig* in conjunction with a *hospital* that is a qualified charitable organization under IRC § 501(c)(3).

42.     To be deemed engaged in the "continuous active conduct of medical research," Ludwig is required to "devot[e] a substantial part of its assets" to "continuous active conduct of medical research."  Under 26 CFR §1.170A-9, devoting a "substantial" part of its assets generally requires that an annual expenditure equal to or exceeding 3.5 percent of the fair market value of its endowment be dedicated to "continuous active conduct of medical research" in conjunction with a "hospital."

43.     Ludwig is supported by the Fund, which represents that its goal is "to provide sustainable core spending for Ludwig while maintaining the purchasing power

**SECOND AMENDED COMPLAINT**

Barnes & Thornburg LLP
Attorneys At Law
San Diego

of the Fund for future generations of scientists." The Fund's assets are currently valued in excess of $1.5 billion.  The Fund received IRC 501(c)(3) status under IRC section 509(a)(3), which requires that it be "operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in section 509 (a)(1) and (2).  Upon information and belief, the Fund's section 501(c)(3) status is substantially predicated upon its funding of Ludwig's "continuous active conduct of medical research" at the Branch under the Affiliation Agreement.

44.     Ludwig's Bylaws, as amended effective December 5, 2017, provide that "[a]s specified in the Statutes, the research activities of the Institute *shall* be conducted in connection with one or more charitable hospitals principally at Branches established at such academic and other scientific and medical centres as the Board may from time to time determine."  (emphasis added).  Initially, Ludwig's section 501(c)(3) status was predicated upon an affiliation by its former London Branch with Royal Marsden Hospital.  Ludwig abruptly closed its London Branch in 1987.

## II.     THE AFFILIATION AGREEMENT

45.     In 1990 and early 1991, Ludwig operated a North American Branch located in Montreal, Canada.  The Montreal Branch Director, Web Cavenee ("Cavenee"), became dissatisfied with working in Montreal and began looking at other institutions where he might take his research.  After investigating other locations, Cavenee decided to move to San Diego and began discussions with UCSD to establish his laboratory at UCSD.  At or about that same time, a second laboratory head at the Montreal Branch also decided to move to UCSD.

46.     Desirous of keeping Cavenee as part of Ludwig, it suggested that it instead Cavenee would establish a Ludwig Branch in San Diego, at UCSD.  Cavenee welcomed this idea, along with Ludwig, began negotiating a deal with UCSD to establish a Ludwig Branch at UCSD.

47.     The parties therefore negotiated a "net" lease for the premises in which the Branch was to be located on the UCSD campus, which also provided for certain tenant improvements to be made and certain services to be provided by UCSD, as part of the rent. A true and correct copy of the lease, as amended, is attached as the Exhibit "A" hereto the "Lease").

48.     Because the premises in which Ludwig chose to establish the Branch was subject to a covenant by the grantor of the property that restricted its uses to university purposes, Ludwig was also required to enter into an affiliation agreement with UCSD, in order to satisfy that requirement.  Further, the term of the affiliation agreement was required to be co-terminus with the lease.

49.     In March 1991, the then-Vice Chancellor for Health Sciences for UCSD wrote to Cavenee in regarding to moving his laboratory to UCSD, to say "I am delighted that things are moving along.  We would like to have you here by September 1st if possible. . . . George has contacted you in regard to the space requirements, and hopefully we will have concluded negotiations and can go ahead with the appointment."

50.     The negotiations for the affiliation between UCSD and Ludwig were concluded by the Fall of 1991, and Cavenee moved his laboratory and the Branch to UCSD on August 12, 1991.

51.     Concurrent with Cavenee moving to UCSD, in August 1991, Ludwig entered into an Affiliation Agreement (as subsequently amended, the "Affiliation Agreement" a true and correct copy of which is attached hereto as Exhibit "B") with UCSD to establish a Ludwig research branch at UCSD, for the specific purpose of funding Cavenee after he moved to UCSD and for the Branch to be legally able to operate at UCSD in premises leased by Ludwig from UCSD.

52.     The Affiliation Agreement and the establishment of the Branch in cooperation with UCSD and in conjunction with the Hospital is also drafted in contemplation of Ludwig's satisfaction of the requirements of section 170(b)(1)(A)(iii)

of the IRC.  The Affiliation Agreement incorporates the language of these code provisions, as such relate to the requirements for Ludwig's tax exempt status under IRC § 501(c)(3).

53.     The express purpose of the Affiliation Agreement "is to provide for the continuous, active conduct of medical research," as defined under section 170(b)(1)(A)(iii) of the IRC.  The recitals to the Affiliation Agreement identify UCSD as a "hospital," in the same manner defined by IRC § 170(b)(1)(A)(iii) (defined as "HOSPITAL" under the Affiliation Agreement). Section 1 of the Affiliation Agreement provides that "[t]he purpose of this Agreement is to provide for the *continuous, active conduct of medical research* by [Ludwig] in cooperation with [UCSD] and its HOSPITAL." (emphasis added).  Section 1.1.1 of the Affiliation Agreement provides that, "[d]uring the term of this Agreement, [Ludwig] will, in conjunction with [UCSD] and its HOSPITAL, conduct research to *discover, develop, or verify knowledge* related to *causes, diagnoses, treatment, prevention and control* of cancer." (emphasis added).  Section 1.1.2 of the Affiliation Agreement also borrows directly from the language of IRC § 170(b)(1)(A)(iii), specifying that the research will include "*conduct of investigations, experiments and studies to discover, develop or verify knowledge related to causes, diagnoses, treatment, prevention and control* of cancer in conjunction with [UCSD] and its HOSPITAL." (emphasis added).

54.     Pursuant to Section 1.1.1 of the Affiliation Agreement, for the entirety of the term of the Affiliation Agreement, Ludwig is required to engage in the *continuous active conduct of medical research* in conjunction with UCSD and its Hospital. Engaging in "medical research," as used in IRC § 170(b)(1)(A)(iii) and as defined in 26 CFR § 1.170A-9(d)(2)(iii), requires that "the organization must have or must have continuously available for its regular use the appropriate equipment and professional personnel necessary to carry out its principal function."

55.     The *continuous active conduct of medical research* in conjunction with UCSD was the research that was to be performed at the laboratory established by

Cavenee along with the Laboratories to be established by head researchers to be recruited during the term of the Affiliation Agreement, specifically, the Plaintiffs.

56.     The Fourth Amendment to the Affiliation Agreement provides that the term of the Affiliation Agreement is coterminous with the Amended and Restated Lease between Ludwig and UCSD.  The earliest that Ludwig can terminate its lease with UCSD is December 31, 2023 (such date, unless extended by the parties to the Affiliation Agreement, the "Termination Date").

57.     The recitals to the Affiliation Agreement state that Ludwig "desires to conduct its research in conjunction with [UCSD] and its HOSPITAL and to cooperate closely in the active conduct of medical research . . . ."  Similarly, section 1.3 of the Affiliation Agreement obligates Ludwig, UCSD and its hospital to "cooperate continuously and closely with each other in the active conduct of the clinical and non-clinical medical research of [Ludwig] at the facilities to be maintained by [Ludwig] near the University and its Hospital."  Section 1.3.2 of the Affiliation Agreement also obligates Ludwig to "plan[ ], supervise[ ], conduct[ ], and evaluate[ ]" the research program "in consultation with [UCSD]."  Ludwig's decision to terminate the "continuous medical research" at the Branch prior to the Termination Date by imposing extreme budget cuts and eliminating all funding for all research—thereby effectively closing the Branch—was made unilaterally by Ludwig, in breach of its obligations.

58.     The scientists employed at the Branch are intended beneficiaries of the Affiliation Agreement, which was entered into by UCSD and Ludwig with the specific intended purpose for inducing Cavenee and other scientists (including Plaintiffs) to move their Laboratories to UCSD and to provide the terms under which the Laboratories would operate, receiving direct benefits from each of Ludwig and UCSD thereunder.

59.     Following its execution, and in further performance of the express purpose of the Affiliation Agreement, Ludwig hired other distinguished scientists,

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

20

1   including Plaintiffs, to establish additional Laboratories where they would perform
2   active continuous medical research at the Branch, together with UCSD.  Accordingly,
3   the Recitals to the Affiliation Agreement state that a primary purpose of the Affiliation
4   Agreement is to "provid[e] the academic and scientific environment needed to attract
5   and retain for such research, scientific personnel of the high caliber and recognized
6   international scientific reputation required for the most effective conduct of said
7   research."

8           60.    The Plaintiffs' research, and the inventive fruits of same, forms the
9   material intended purpose of the Affiliation Agreement, which principally outlines a
10  framework for establishing and funding research labs at the Branch and the Hospital,
11  in conjunction with UCSD.  This framework was intended to attract leading scientists,
12  who would become Branch Members and UCSD professors and engage in the
13  development and commercialization of patents and other intellectual property relating
14  to cancer treatment, prevention and cures, at the Branch and the Hospital.

15          61.    *But for* the scientists, there would have been no Affiliation Agreement.
16          62.    Plaintiffs were the beneficiaries of a material and intended benefit under
17  the provisions of the Affiliation Agreement requiring Ludwig to conduct the
18  "continuous, active conduct of medical research" which requires Ludwig's financial
19  support of Plaintiffs' Laboratories, which funds are earmarked by Ludwig specifically
20  for the Plaintiffs' respective research Laboratories.  The Affiliation Agreement
21  requires Ludwig to "**bear the costs directly related to conducting the research
22  program**" at the Branch and the Hospital. (emphasis added).  Such costs include,
23  without limitation, 1) equipment costs, 2) Plaintiffs' compensation as Branch
24  members, 3) obtaining and keeping in full force and effect, at its expense, malpractice
25  insurance for all Ludwig scientific personnel performing research under the Affiliation
26  Agreement; and 4) selecting, employing, supervising and assigning employees to the
27  research program at the Branch, including appropriate administrative personnel to

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

support Plaintiffs' research programs.  Section 1.3.5.1 of the Affiliation Agreement further obligates Ludwig to,

> pay the University for the cost of veterinary and animal services (including any specialized equipment necessary for the research program), hazardous waste disposal, environmental health and safety monitoring, and similar mutually agreed upon research support services. . . .

63.    All of these provisions are intended by UCSD and Ludwig to directly benefit the scientists' Laboratories, because their sole purpose is to facilitate the Laboratories' operations.

64.    The intent and purpose of UCSD and Ludwig to benefit the scientists and facilitate the operations of their Laboratories under the Affiliation Agreement is evidenced by the covenant granting the *scientists* primary control over funding and research decisions.  Section 1.1.3 of the Affiliation Agreement requires Ludwig to appoint a Branch Director, and the "Branch Director *shall* direct all research conducted by [Ludwig] under this Agreement." (emphasis added).  Consistent with this process for funding, Section 1.3.3 of the Affiliation Agreement requires that the research program at the Branch "be under the *immediate direction and control* of the *professional scientists* employed by the Institute and assigned by the Institute to the research programs, and will be conducted by the Institute's employees." (emphasis added).

65.    Ludwig's funding to the Branch was memorialized in an annual Branch budget, under which funds were allocated to Plaintiffs' Laboratories and expended under the direction and control of Plaintiffs. The Branch budget from Ludwig for the years 2013 - 2018 ranged from approximately $11,527,342 - $13,169,638 annually. These budgets included, among other things, funding to the Plaintiffs of more than $3 million annually for research, with additional support for administrative staff, inflationary increases, equipment, lease payments to UCSD and other research support.

66.    The Affiliation Agreement requires Ludwig to ensure Plaintiffs obtain and hold academic titles including professorships at UCSD, obligating UCSD to grant

Plaintiffs with privileges for the practice of medicine at its hospital to qualified members of the medical staff of Ludwig working at the UCSD campus and grant academic recognition and titles to qualified Ludwig employees.  The First Amendment to the Affiliation Agreement, executed in August 2000, additionally obligates UCSD to make 15 FTE (full time equivalency) positions available for Ludwig employees.

67.     The Affiliation Agreement materially benefits Plaintiffs by ensuring that the Plaintiffs receive broad rights concerning the ownership, receipt of royalties, and benefits from commercialization of intellectual property that was created by the Plaintiffs' Laboratories.  First, Ludwig was obligated under the Affiliation Agreement to grant Plaintiffs certain rights in the fruits of inventions that the Plaintiffs create during the course of such joint research.  Section 1.3.3 of the Affiliation Agreement binds Ludwig to the "applicable policies, procedures, rules and regulations of [UCSD], including review and approval of its committees having cognizance in such areas . . . ." Such included the University IP Policies and Guidelines, *available at* https://innovation.ucsd.edu/university-ip-policies-and-guidelines/ which granted Plaintiffs, *inter alia*, broad protections regarding future use of their research and knowledge and permitted them to engage in third party commercialization projects and receive such benefits as equity ownership and sponsorships.

68.     In addition, other applicable UCSD policies include, without limitation, the policies on Research Integrity, Statement of Ethical Values, and Principles of Financial Management.  The UCSD Statement of Ethical Values provides that all persons associated with UCSD are required to "conduct themselves ethically, honestly and with integrity in all dealings. . . .[meaning] principles of fairness, good faith and respect . . . ."  The Policy's Subdivision 7, entitled "Ethical Conduct of Research," also requires that such persons are "expected to demonstrate accountability for sponsors' funds and to comply with specific terms and conditions of contracts and grants."  The Policy on Principles of Financial Management requires, among other things, that "[f]inancial consequences are evaluated before existing activities are changed or

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

eliminated and new activities begin." Moreover, UCSD's policies required such persons to comply with all applicable state and/or federal laws. These provisions provided Plaintiffs with direct and measurable benefits and evidence the intent of UCSD and Ludwig to craft the Affiliation Agreement to provide protections to Plaintiffs and ensure the continuity of their Laboratories.

69.     The Affiliation Agreement also evidences its intent to benefit the Plaintiffs in that it specifically provides a structure for the joint ownership and sharing of the royalties generated by the intellectual property created jointly with UCSD in the Plaintiffs' Laboratories. Specifically, as outlined in Section 3.2 of the Third Amendment to the Affiliation Agreement, Ludwig was required to cause Plaintiffs to assign their intellectual property to Ludwig. Depending upon whether Plaintiffs had used UCSD facilities (including the premises under the Lease, where the Branch was located) and/or USCD funds, the inventions were either required to be assigned by Ludwig to UCSD, or would be jointly owned by UCSD and Ludwig. The Third Amendment also guaranteed Plaintiffs a share in the Net Royalties payable under any license granted to the intellectual property they created, regardless of whether that intellectual property was assigned to Ludwig or ultimately to UCSD.

70.     Section 3.6.1 of the Third Amendment also provided Plaintiffs with protections regarding the prompt commercialization of their developments, requiring the party having the first option to commercialize the development one year to commercialize or license the development, or lose the right to the other party.

71.     Section 3.2.1 of the Affiliation Agreement requires that each of the Plaintiffs would assign all right, title and interest in any Invention(s) (as defined in the Affiliation Agreement) to Ludwig. Ludwig's Intellectual Property Policy and Procedure and its Code of Ethics and Standards, which policies are binding upon Ludwig, pursuant to, *inter alia*, the Affiliation Agreement, likewise requires Plaintiffs to assign intellectual property rights to Ludwig in "consideration of the research opportunities and support provided" by Ludwig. Accordingly, Ludwig, required each

1   of the Plaintiffs to execute a certain Intellectual Property Agreement (each, an

2   "Intellectual Property Agreement"), under which Plaintiffs assigned all of their "rights,

3   title and interest in and to all commercially exploitable results obtained [by them] in

4   the course of or as a result of" their research at the Branch.  These assignments

5   facilitated Ludwig's performance of the covenants in the Affiliation Agreement

6   regarding the development, commercialization and revenue sharing with UCSD of the

7   intellectual property created at the Branch. The consideration to be given by Ludwig

8   for the assignments made by Plaintiffs under the Intellectual Property Agreements was,

9   "the research opportunities *and support* provided by" Ludwig (emphasis added),

10  together with a Royalty Sharing of Net Income received by Ludwig on the licensing of

11  Branch developments, which Ludwig was obligated to share with the inventor Plaintiff

12  and the Branch under the Affiliation Agreement and the Intellectual Property Policy

13  and Procedure.

14          72.     The Affiliation Agreement provides that if any Plaintiff has invented the

15  intellectual property, the Plaintiffs' "inventor's share of income" received from

16  licensing intellectual property created at the Branch shall be paid to such Plaintiff,

17  prior to Ludwig receiving its share of Net Royalties (as defined in the Affiliation

18  Agreement) generated from such licensing activities.

19          73.     Plaintiffs reasonably relied on Ludwig's performance of the Affiliation

20  Agreement, including without limitation, Ludwig's obligations to fund Plaintiffs'

21  continuous, active cancer research at the Branch during the term of the Affiliation

22  Agreement, including without limitation, by providing the appropriate equipment and

23  professional personnel necessary for the Plaintiffs to conduct their medical research.

24  Similarly, Plaintiffs relied upon Ludwig's promises to provide "support" and share Net

25  Revenues of Branch developments, in exchange for Plaintiffs' assignments of

26  intellectual property, as each were also required under the Affiliation Agreement and

27  the Intellectual Property Policy and Procedure and Code of Ethics and Standards.

28  Plaintiffs also relied upon the covenants in the Affiliation Agreement that bound

Ludwig to act in accordance with integrity and to otherwise comply with all relevant Ludwig and UCSD policies and with NIH conditions for its receipt of federal grant funds.

## III.   LUDWIG INDUCES PLAINTIFFS TO ESTABLISH THEIR LABORATORIES AT THE BRANCH AND TO CONDUCT MEDICAL RESEARCH FUNDED UNDER THE AFFILIATION AGREEMENT FRAMEWORK

74.    As provided under the Affiliation Agreement, Ludwig solicited Plaintiffs to become Branch members and, in such capacity, extended specific offers to Plaintiffs to establish their Laboratories at the Branch and perform medical research at the Branch.

75.    The then-current Branch Director, Cavenee, acting on behalf of Ludwig, with the knowledge of the President and others involved in the central administration of Ludwig, made written offers to Plaintiffs to invite them to establish research laboratories at the Branch (collectively, the "Laboratory Support Agreements"). Each of the Laboratory Support Agreements promised that Plaintiffs' laboratories would be funded "through your ongoing [Ludwig] budget." That budget would include a salary and critically, additional lab space, set-up funds (*e.g.* for equipment), administrative support and laboratory support, including payment of salaries for the personnel that each of Plaintiffs hired to work in their respective laboratories. In addition, in the Laboratory Support Agreements Ludwig promised each of the Plaintiffs that it would provide ongoing funding to support each Plaintiff's research at the laboratory that each Plaintiff established at the Branch. Such was to consist of "a core budget" for research, which included a salary component, that could be "freely allocated" by Plaintiffs. Plaintiffs' research also benefited from a share of the Branch Director's budget for research and their individual budgets were adjusted upward for inflation and promotions on a regular basis. In addition, Ludwig advised Plaintiffs in these Laboratory Support Agreements that they would "be expected to successfully apply for

SECOND AMENDED COMPLAINT

external grants" that would be "managed and accounted by the Branch." Ludwig also promised that, "[t]he bottom line is that all of us . . . will do everything we can to make sure that you have the best possible situation for continued success."

76.    Plaintiffs each accepted Ludwig's offer to establish a laboratory at the Branch, and proceeded in reliance to move their research to the Branch and establish their research laboratories there.  As provided in Sections 2.3 and 2.4 of the Affiliation Agreement, each of the Plaintiffs also held titles as a Professor or Professor in Residence at UCSD, but Ludwig was required to pay the salary and benefits they would otherwise have received from UCSD, in that Plaintiffs were not to be employed by UCSD.

77.    Plaintiffs also were advised by Ludwig that the "core budget" for Plaintiffs' research was to be used exclusively for their continuous active conduct of medical research at the Branch and at the Hospital, as provided under the Affiliation Agreement and that they were to dedicate their professional efforts to research activities.

78.    Plaintiffs' acceptance of Ludwig's offers to establish their Laboratories at the Branch under the Laboratory Support Agreements and Ludwig's obligations thereunder to provide Plaintiffs with a "core budget" for their research at the Branch and in cooperation with UCSD and the Hospital depend upon Ludwig's full performance of the Affiliation Agreement, which expressly contemplates that Ludwig would attract and retain principal research scientists, who would perform the Branch research functions, in cooperation with UCSD and the Hospital and would fund the continuous and active conduct of cancer research at UCSD, which was conducted by the Plaintiffs.

79.    Separately, Plaintiffs and Ludwig entered into Membership Appointment Agreements. As evidenced in Ludwig's correspondence with Plaintiffs, member appointments are "bestowed by" Ludwig's Board of Directors.  Membership is a prestigious appointment.  It is Ludwig's policy that to be appointed as "Members,"

researchers must have (i) service as an Associate Member for up to five years or equivalent accomplishment; (ii) evidence of exceptional individual scientific accomplishment and productivity in which distinctive scientific contribution is recognized, (iii) international professional recognition for the candidate's work; (iv) exemplary scientific leadership; and (v) research interests consistent with the mission and priorities of Ludwig. Each of the Plaintiffs was contemporaneously or shortly thereafter appointed a "Member" of the Ludwig Institute by action of the Ludwig Board, which Plaintiffs were advised would be memorialized pursuant to a separate agreement, which would be specific as to the terms for their rolling term of appointment.

80.   Also at the time of their member appointment by Ludwig, each of the Plaintiffs executed the above-referenced Intellectual Property Agreement, in consideration for, *inter alia*, "the research opportunities and support provided by" Ludwig.  Each of the Plaintiffs executed such Intellectual Property Agreement, as such assignment was required of them under the Affiliation Agreement and the Intellectual Property Policy and Procedure and Code of Ethics and Standards, *subject to* UCSD's University IP Policies and Guidelines, as provided in Section 1.3.3 of the Affiliation Agreement, which binds Ludwig to the "applicable policies, procedures, rules and regulations of [UCSD], including review and approval of its committees having cognizance in such areas . . . ."

81.   In reliance upon the provisions in the UCSD University IP Policies and Guidelines, and upon Ludwig's continuation of the funding for their research by supporting "continuous active medical research" at the Branch through the Termination Date of the Affiliation Agreement, several of the Plaintiffs entered into discussions with third parties for the commercialization of the developments of their Laboratories.  Such discussions included, *inter alia*, the right for such Plaintiffs to receive equity, including founders' shares, sit on the new company's scientific advisory board, and to receive a percentage of royalties from the commercializing

entity.  Plaintiffs' ability to consummate and benefit from such relationships depended upon Ludwig's full and continued performance of the Affiliation Agreement.

82.     In addition, Plaintiffs properly expected to receive a share of Net Revenues of licensing revenues with the Branch and Plaintiffs, for inventions Plaintiffs created during the full term of the Affiliation Agreement, in the manner required under the Affiliation Agreement and the Intellectual Property Policy and Procedure.  Further, under the Intellectual Property Policy and Procedure, in addition to Plaintiffs' individual royalty share, the Branch as a whole is entitled to a share of the royalties from the licensing of Plaintiffs' work, which funds are to be reinvested in Plaintiffs' Laboratories.  However, if royalties are not generated until after the Branch is closed, Ludwig is able to capture this additional royalty share for itself.

83.     Ludwig's performance of its obligations under the Affiliation Agreement to conduct "continuous medical research" is also directly tied to Plaintiffs' Membership appointments, the duration of which are tied to the term of the Affiliation Agreement. Each of Plaintiffs Cleveland, Desai, Furnari, Kolodner, Mischel and Oegema's memberships are for a rolling, renewing term of five years, as follows:  "a term of five (5) years commencing on the Effective Date," that shall "be automatically extended for an additional one (1) year period on each anniversary of the Effective date." Plaintiff Ren's contract similarly states that his appointment to Member "is to be made for a rolling five year period subject to review."

84.     A five year "rolling term" (the "Rolling Term") means that, in effect, on each annual anniversary of their membership, Plaintiffs would have five years remaining on their membership term because their term would be automatically extended by an additional year.  Further, there are only very narrow grounds on which Ludwig may prevent the rolling term of a Member's appointment from automatically renewing each year. Other than very limited grounds for termination, *e.g.*, upon death, identified in some of the Membership agreements, these grounds are set forth in Ludwig's Member-Track Appointment and Promotion Policy, effective December 9,

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

2013 (the "Policy"), a true and correct copy of which is attached hereto as Exhibit "C", which Policy is binding upon Ludwig, pursuant to, *inter alia*, the Affiliation Agreement as well as the conditions to which Ludwig has bound itself to the NIH for its receipt of NIH funds.

85.     The Policy states that Ludwig may *terminate* a scientist's status as Member for only two reasons: if "the Branch to which the scientist is assigned is closed or relocated" and or upon elimination of the position "for budgetary reasons." Further, Ludwig may only "convert" the Rolling Term to a fixed term of five years (a "Fixed Term) following a negative review of the Member's performance by the Scientific Advisory Committee, which is a standing committee of independent scientists, and as further approved by the Scientific Director and Ludwig's Board of Directors.

86.     Specifically, Section 6.5 of the Policy states, in part

- As a condition of a Member's continued rolling five year appointment, the Member must make a presentation at least every five years to some or all of the [Scientific Advisory Committee] members either at a meeting of the [Scientific Advisory Committee] or in the context of a five- year Branch Review to allow evaluation of his/her research and to ensure that the outstanding level of performance that merited the original Member appointment is being maintained.

- Notwithstanding the above, a Member may be formally reviewed at any time as described in Section 6 pursuant to the above process if, in the judgment of the Scientific Director, there is evidence that the Member may not be satisfying the criteria for a rolling appointment.

- If following the review, it is recommended [by the Scientific Advisory Committee] that the rolling appointment not be continued, the Scientific Director agrees, and the Board of Directors approves, the Member's appointment shall be converted to a four-year fixed term.

87.     Under Section 6.1 of the Policy, the Scientific Director is required to collect a dossier regarding the Member being reviewed that includes, among a number

of other things, a written 3,000 word "summary of past research accomplishments and future research plans".

88.     Section 6.6 of the Policy states, in part, that any such notice must be delivered timely and in writing:

> •     Members whose rolling five year appointment is being converted to a fixed term with four years remaining (see Section 6.5) shall receive written notice to that effect not less than six months before the annual renewal date of the existing rolling term.

89.     In bringing their research to Ludwig and establishing their Laboratories at the Branch, Plaintiffs relied upon the Rolling Term structure of their Branch Membership and that, absent a failed review, their membership would be automatically renewed, so long as the Branch remained open. Further, the Branch could not close until, at the earliest, upon the Termination Date of the Affiliation Agreement, which was co-terminus with the Lease.

## IV.   LUDWIG'S IMPROPER CLOSURE OF THE BRANCH AND PRETEXTUAL DEFAMING OF PLAINTIFFS AND THEIR RESEARCH

90.     On May 4, 2018, McDermott and Dang made a visit to the Branch in San Diego and announced that Ludwig would be closing the Branch in the next four to five years.  At the same time, McDermott and Dang admitted that, due to the Lease and Affiliation Agreement with UCSD, they were obligated to keep the Branch open through the Termination Date.  At this meeting, McDermott claimed, however, that Ludwig had no obligation to provide any further support to the Branch or any research funding to Plaintiffs, but that they would provide some minimal funding, to enable a transition period.

91.     Less than three weeks later, on or about May 21, 2018, Ludwig sent letters, signed by McDermott and Dang, to every Laboratory head at the Branch, that is, the Plaintiffs, informing them that their rolling five-year Memberships at the Branch would be converted to a Fixed Term and would have a fixed four or five year term remaining.  Attempting to escape its obligations to fund the Plaintiffs' research under

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

the Affiliation Agreement, and knowing that it could not assert a termination event predicated upon a Branch closure, prior to the Termination Date, Ludwig asserted, as a pretext, that such conversion was triggered pursuant to "Section 6.6 of the Policy", which refers to action following a negative scientific review.  Under Section 6.6 of the Policy, Ludwig was required to conduct an individual review of each of the Plaintiffs and then to receive a recommendation from an independent review committee, the Scientific Advisory Committee, before Ludwig was entitled to convert the Plaintiffs' Rolling Terms to a Fixed Term. No such individual reviews or independent recommendations occurred prior to the May 21, 2018 letters.

92.    Ludwig's assertion that its conversion to a Fixed Term was predicated upon Plaintiffs' failure of a scientific review was objectively unreasonable, pre-textual, and even fraudulent.  Ludwig has not held Branch reviews, or meetings of the Scientific Advisory Committee pertaining to a review of the Branch since August 2013. San Diego Member Laboratory head presentations and a review of the San Diego Branch were scheduled to take place in 2018 and 2019.  On or about November 15, 2017, the Scientific Director cancelled the Branch review and Laboratory head presentations, without explanation. These reviews were not rescheduled.  Nor did Ludwig conduct the required review thereafter.  Likewise, Ludwig did not request and collect individual dossiers as required under the Policy in connection with a review.

93.    Moreover, the objective evidence of the results of the Plaintiffs' research contradicted the assertions in the May 21, 2018 letters, that Plaintiffs' research did not satisfy the criteria required for continuing their Rolling Terms, thereby permitting conversion of Plaintiffs' Rolling Terms to a Fixed Term.  Plaintiffs' Branch research has been accorded high praise, both by Ludwig and by numerous peer reviews in prestigious medical journals. In December 2011, Ludwig's President (Defendant McDermott) and then Scientific Director (Dr. Andrew Simpson) wrote to the director of the Branch setting out a plan for expansion that included recruiting additional scientists, providing an annual salary and research support packages for these

**SECOND AMENDED COMPLAINT**

scientists, which support packages mirrored those provided to Plaintiffs' in their Laboratory Support Agreements, and adding additional space to the Branch. The letter stated, among other things, that the "San Diego Branch has developed over the past 20 years into an ***internationally recognized*** model ***of high-impact, high-energy and highly original cancer research*** and has become an open and collaborative resources for investigators at other Branches." (emphasis added).

94.     Since 2012, Ludwig has acknowledged the success and importance of Plaintiffs' research at least 13 times on its "Success Stories" webpage, which is dedicated to showing "the novel ways Ludwig researchers have teamed up to advance our understanding and control of cancer."  Ludwig has also cited Branch research in their reports approximately 140 times in the last seven years.

95.     Ludwig's May 21, 2018 letters, sent shortly after Ludwig had determined to effectively shut down the Branch and thereby breach its obligations to conduct "continuous, active, medical research" under the Affiliation Agreement, were entirely pre-textual.  The letters were designed to provide Ludwig with a means to escape their contractual obligations under the Affiliation Agreement, which Ludwig desired to avoid for strictly economic reasons.  In so doing, Ludwig defamed and impugned Plaintiffs' professional standing by falsely stating that the reason for the decision was the existence of an unfavorable review of the Branch and the Plaintiffs' research—although such a review had not occurred.

96.     UCSD strenuously objected to Ludwig's action, and asserted it was not permitted.  On or about June 12, 2018, Chief Campus Counsel for UCSD wrote to McDermott stating, among other things, that Ludwig was not permitted under the Affiliation Agreement to close the Branch prior to December 31, 2023 at the earliest and that, pursuant to that requirement, Ludwig was also obligated to operate, a concept inclusive of adequate funding, the Branch until that date.  Further, because the Branch could not operate or conduct research without members, UCSD's letter also challenged Ludwig's assertions that it had performed scientific evaluations of each of Plaintiffs

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

and could, on that basis, invoke a conversion of Plaintiffs' Rolling Terms to Fixed Terms.

97.     On or about June 13, 2018, Dang called Plaintiff Kolodner to discuss UCSD's letter of June 12 to McDermott.  Dang threatened Plaintiff Kolodner multiple times, asserting that unless Plaintiff Kolodner helped Ludwig obtain the cooperation of UCSD in connection with Ludwig's decision to close the Branch, Ludwig would slash funding to the amount Dang and McDermott determined was the absolute minimum Ludwig was required to provide the Branch.  At the same time, Dang suggested that Ludwig would be prepared to be more generous, provided that Kolodner changed UCSD's position.

98.     On or about June 25, 2018, McDermott responded to counsel for UCSD acknowledging that under the Affiliation Agreement, and Ludwig's Lease with UCSD, the earliest Ludwig can close the Branch is December 31, 2023.  Particularly, McDermott stated: "You have asked for assurance that Ludwig will continue to operate the San Diego Branch until December 31, 2023 'as required by the Affiliation Agreement.' You have that assurance."  McDermott did not dispute UCSD's contention that Ludwig had not performed any individual scientific reviews of Plaintiffs' work and thus could not invoke a conversion of Plaintiffs' Rolling Terms to a Fixed Term under Section 6.6 of the Policy.

99.     At the time they moved their laboratories to the Branch under the Laboratory Contracts and thereafter, the Plaintiffs relied on Ludwig's commitments to provide adequate and continuous funding for long-term research plans under the Affiliation Agreement, including the commitment to fund costs of "continuous, active medical research" during the term of the Affiliation Agreement. Since its founding in 1991, the Branch has received funding from Ludwig on a yearly basis that has always included funding to lab heads, such as Plaintiffs, to operate their laboratories.  Such funds were then allocated to the Plaintiffs (pursuant to the terms of their Laboratory Contracts) and freely assigned by them for purposes of research support, equipment

support and administration. The budget amount was based on the base budget for the Branch for the previous year adjusted for inflation and promotions as well as the Branch's plans and anticipated costs, including whether any new members were coming on board to establish new laboratories. Historically, the yearly budget has been determined on the basis of information provided to Ludwig from the Branch about anticipated costs to be incurred by each of the Plaintiffs and plans for the coming year at each of the Laboratories.  The Branch budget also earmarks research funding for each of Plaintiffs' Laboratories, all of which is required to enable the continuous and active research at the Branch required under the Affiliation Agreement. After announcing Branch closure, Ludwig unilaterally imposed a multi-year budget that only covers the Plaintiffs own salaries and benefits, but fails to provide funding to Plaintiffs for research support necessary to continue to operate their Laboratories.

100.   Particularly, funding to support the Plaintiffs' Laboratories at the Branch in the five years prior to Ludwig's breaches was consistently at or around $12 million per year, as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Base Budget | $10,398,187 | $11,164,987 | $11,984,376 | $12,059,622 | $12,692,636 | $13,169,638 |
| One Time Items | $2,142,000 | $362,355 | - | ($378,525) | - | - |
| Total | $12,540,187 | $11,527,342 | $11,984,376 | $11,681,097 | $12,692,636 | $13,169,638 |

101.   Beginning in July 2018, Ludwig proceeded to first *cut*, then *further reduce*, then *entirely eliminate* research funding for the Plaintiffs' Laboratories.

102.   On or about July 12, 2018, McDermott sent Plaintiff Kolodner a letter setting out "the budget which [Ludwig] is prepared to provide over the next five years assuming that it receives the cooperation of the Branch and the University in the transition," and which Ludwig referred to as a "tapering research budget" (the "Initial Cut Budget")  The Initial Cut Budget Ludwig proposed in July 2018 was far below the level of commitment that Ludwig is obligated to provide under the Affiliation Agreement and its individual contracts with Plaintiffs.  The Initial Cut Budget

described in McDermott's letter proposed to begin improperly cutting research funds starting in 2019 and in the following years, effectively eliminate research funding. In fact, starting in 2021, the funds budgeted were insufficient to meet Ludwig's contractual obligations even as the Ludwig improperly defined them.

103.   The funding Ludwig is required to provide through the end of 2023 to meet its obligation under the Affiliation Agreement and its Laboratory Contracts with Plaintiffs, consistent with the conduct of the parties before any controversy arose, in comparison to the reduced Initial Cut Budget Ludwig proposed in July 2018, following its announcement that it would be closing the Branch is as follows:

|  | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Required | $12,907,884 | $13,333,141 | $13,383,728 | $13,862,516 | $14,343,795 |
| Ludwig | $12,000,000 | $12,000,000 | $9,000,000 | $8,000,000 | $4,500,000 |
| Deficiency | ($907,884) | ($1,333,141) | ($4,3083,728) | ($5,862,516) | ($9,843,795) |

104.   On February 12, 2019, at Ludwig's request, Plaintiffs (other than Plaintiff Mischel)[2] attended a meeting with McDermott and Dang in San Diego.

105.   At the February 12, 2019 meeting, Plaintiffs explained that the May 2018 letters from Ludwig improperly asserted that the Plaintiffs' Rolling Terms were being converted to Fixed Terms pursuant to Section 6.6 of the Policy. Plaintiffs specifically informed Ludwig that it had not conducted the individualized scientific review required under that section, much less any individualized scientific reviews that each of the Plaintiffs failed.  McDermott and Dang admitted that Ludwig had not conducted any such reviews of Plaintiffs and also stated that Ludwig did not intend to perform such reviews.  At this meeting, McDermott and Dang also admitted that Ludwig could not identify any instance of non-cooperation by Plaintiffs.

106.   At the meeting, Ludwig again presented the same Initial Cut Budget for the Branch that it had sent to Plaintiff Kolodner in July 2018 for the years 2019 –

---

[2] Plaintiff Mischel advised McDermott he was traveling out of the country and could not attend a meeting on the dates proposed by McDermott. McDermott nevertheless proceeded with holding the meeting on a date that precluded Plaintiff Mischel's attendance.

2023, but now with additional strings attached.  Now, Ludwig also demanded that to receive even the reduced funding contained in the Initial Cut Budget, each of the Plaintiffs must execute and comply with a "Transition Agreement and Release."  If even one of the Plaintiffs refused to sign the Transition Agreement and Release, zero funds would be provided by Ludwig, as follows:

A.    The Five Year Branch Budget.

1.    Subject to the terms and conditions set forth herein, the Institute agrees to provide the sum of $45,500,000 over the next five years (2019 through 2023), plus any savings carried over from the 2018 Institute funded Branch budget, in support of the winding down of the Branch's operations in accordance with the following schedule (collectively, the "Budget"):

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Amount in millions | $12.0 | $12.0 | $9.0 | $8.0 | $4.5 |

2.    As a condition of the Branch's receiving the Budget described in Section A(1) above, each and every Member must sign this Agreement, not revoke his/her signature, and comply with its terms.

107.   The Transition Agreement and Release also sought to impose harsh and one-sided terms upon Plaintiffs.  It required Plaintiffs to continue to diligently pursue scientific research as Ludwig's at the Branch through 2023, including continuing to assign intellectual property to Ludwig, even though Ludwig would not be funding that research in the manner required by the Affiliation Agreement. It also included an all-encompassing unilateral release in Ludwig's favor of "whatever claims you have against the Institute," a broad unilateral non-disparagement clause in Ludwig's favor that does not restrict Ludwig from disparaging the Plaintiffs and required each of the Plaintiffs to ensure that Ludwig received the "cooperation" of UCSD in connection with, *inter alia*, "the transition," which was Ludwig's euphemism for its breach of the Affiliation Agreement.

108.   Moreover, buried within the Transition Agreement and Release was a draconian restriction on Plaintiffs' "use" of any information they had "acquired, learned, developed or created" while Plaintiffs were affiliated with the Branch.  By this language—and contrary to NIH's, UCSD's and Ludwig's own policies—Ludwig sought to preclude Plaintiffs from using their "residual knowledge" gained in pursuing cancer research at the Branch.  The Transition Agreement also required Plaintiffs to deliver "all property….including without limitation . . . primary laboratory notebooks . . . and other physical or personal property which you received or prepared or helped prepare in connection with your appointment with the Institute, and you must not retain any copies, duplicates…."  The Transition Agreement and Release was a "Trojan Horse," which would have given Ludwig broad ownership rights to the intellectual property, to which Ludwig was not entitled.  Moreover, by this language, Ludwig intended to foreclose Plaintiffs from freely using their body of research, knowledge and works, stemming from research programs Plaintiffs – not Ludwig – designed, including for commercial purposes, which likely would have ended their research careers.

109.   The Transition Agreement and Release also provided that it must be kept confidential.  In this manner, Ludwig sought to hide its wrongful conduct, to the end that its positive public image and reputation might remain untarnished.  At the same time, Ludwig could breach its agreements and destroy Plaintiffs' research careers and scientific reputations with impunity.

110.   The release, non-disparagement and confidentiality provisions sought by Ludwig were principally designed to enable Ludwig to maintain its reputational profile and escape liability for their breach of the Affiliation Agreement, and including without limitation, potential claims resulting from Ludwig's breaches of the terms of NIH grants received by Ludwig in the course of its performance of the Affiliation Agreement and under which Plaintiffs served as principal investigators and grant proponents.  Moreover, Ludwig's proposed broad use restriction respecting the subject

matter of Plaintiffs' research efforts at the Branch would have imposed draconian limitations upon the Plaintiffs' ability to practice their science for the public benefit. Ludwig knew that this attempted monopolization of the fruits of the Branch's research was wrongful and a further breach of the Affiliation Agreement. Ludwig's proposed Transition Agreement and Release was particularly offensive in light of Ludwig's status as a public benefit institution and its receipt of State and Federal funds for research.

111.    Among other things, the proposed use restriction violated the terms of the NIH grants Ludwig had received for the research. Among other things, the NIH Grants Policy Statement 8.2 requires "that inventions are used in a manner that promotes free competition and enterprise without unduly encumbering future research and discovery." Similarly, Section 3.2.5 of the Affiliation Agreement requires that any "data" authored under the Affiliation Agreement "will be made widely available in a manner consistent with '[UCSD] policies. Among others, UCSD's Principles Regarding Future Research Results[3] provides that

> The University has a commitment to make the fruits of its research *widely available* through publication and *open distribution* of research products. The University also seeks to *protect the viability of its research programs*, to foster *open inquiry beyond the interests of any one research partner*, and to recognize its *fiduciary responsibility* as the *beneficiary of a publicly -funded research infrastructure*.
> . . .
> Agreements with external parties *shall* ensure the ability of University researchers *to utilize the results of their research to perform future research*.
> . . .
> Agreements with external parties *shall* support the ability of the University to *make available for the public benefit* in a diligent and timely manner any resulting innovations and works of authorship. (emphasis added).

112.    Ludwig also knew that a sudden withdrawal of its financial support from the Branch would place in jeopardy the entire body of Plaintiffs' prior research at the Branch, as well as Plaintiffs' ability to continue to operate their Laboratories and

---

[3] Available at https://www.ucop.edu/research-policy-analysis-coordination/policies-guidance/future-research-results/index.html (last visited December 23, 2019).

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

conduct research in the future. Ludwig's attempt to extract such oppressive terms from Plaintiffs with threats to immediately withdraw all financial support from the Branch if not signed was unethical, malicious, fraudulent and in extreme bad faith.

113.   None of the Plaintiffs signed the Transition Agreement and Release.

114.   Despite having admitted in June 2018 in its letter to UCSD's in-house counsel that it could not close the Branch before December 2023, Ludwig claimed that the basis for its action was not due to a failed scientific review, but instead because Ludwig was closing the Branch.  Ludwig asserted, falsely, that, as a result, its only contractual obligation to Plaintiffs was to pay each Plaintiff a salary for the time them remaining  on their Fixed Term, and further asserted that it was not required to further engage in "continuous active medical research" at the Branch, but its only obligations under the Affiliation Agreement was to pay rent under the Lease with UCSD up through the Termination Date of the Affiliation Agreement.  Ludwig promised to provide Plaintiffs with corrected letters.

115.   On or about February 20, 2019, Ludwig sent "Amended and Restated" letters to Plaintiffs purporting to retroactively "terminate" Plaintiffs' Branch Membership, as provided in Section 7 of the Policy "as it relates to Branch closures." Section 7 states, in part,

> Notwithstanding anything to the contrary in this Policy, [Ludwig] may terminate a scientist's status as Assistant Member, Associate Member or Member. . . in the event the Branch to which the scientist is assigned is closed or relocated, and/or the scientist position of the affected Assistant Member, Associate Member or Member is eliminated for budgetary reasons; provided that [Ludwig] pays the affected Assistant Member, Associate Member, or Member his/her compensation and benefits (or the value thereof) for the balance of the then-current term of his/her appointment or one year whichever is longer.

116.   The "Amended and Restated" letters Ludwig sent to Plaintiffs were false and deceptive. Section 7 provides for termination of a scientist's status as a "Member" of Ludwig only if and when a branch "*is* closed." (emphasis added). The language is present tense, referring to *present*—not future— Branch closure. The San Diego

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

Branch is not "closed." Nor, under the terms of the Affiliation Agreement, may it be closed prior to December 31, 2023.  Furthermore, Ludwig has acknowledged to UCSD in writing that it is obligated under the Affiliation Agreement to continue to "operate" the branch prior to the Termination Date, and it affirmed its continued performance to UCSD, "[y]ou have asked for assurance that Ludwig will continue to operate the San Diego Branch until December 31, 2023 'as required by the Affiliation Agreement.' You have that assurance."

117.   Section 7 otherwise refers to termination of a member's position for budgetary reasons.  No budgetary reasons exist here. Ludwig's 2018 Consolidated Financial Statements discloses that its balance of donated capital as of December 31, 2018 was $572,000,000 and its voluntary retained surplus  amounted to $837,219,110, for a total shareholders' equity of over $1.4 billion.  Ludwig previously admitted the same in a letter from Defendant Notter, the Chairman of Ludwig's Board of Directors to UCSD Vice Chancellor, David Brenner, in which he stated, "Your impression that the Institute is closing the Branch 'to save money' is quite mistaken." Ludwig's attempted use of Section 7 of the Policy to escape its obligations under the Affiliation Agreement to conduct "continuous, active medical research" at the Branch through the Termination Date is pretext, just as Ludwig's earlier attempt to escape its obligations by invoking Section 6.6 of the Policy was pretext.

118.   On or about March 29, 2019, Chief Campus Counsel for UCSD wrote to McDermott once again. A true and correct copy of the correspondence is attached hereto as Exhibit "D."  UCSD's correspondence stated in part,

> I am writing because I am informed that the Ludwig Institute for Cancer Research ("Ludwig" or "Institute") has publicly stated that it intends to slash funding for Ludwig's San Diego Branch to a level that would effectively end the continuous, active conduct of research that Ludwig promised to UC San Diego in the Affiliation Agreement between Ludwig and UC San Diego.

> I am informed that in February of this year, you met with the professional scientists employed in Ludwig's San Diego Branch and informed them that Ludwig intended to slash the Branch's budget such that Ludwig would be providing no support for the scientists' laboratories. Such a draconian budget cut would effectively prevent the faculty from continuing their research programs. The purpose of this letter is to notify

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

Ludwig that UC San Diego would consider a reduction of the San Diego Branch's budget below the amount necessary to fully fund the existing research program to be a breach of the Affiliation Agreement.

Based on your letter of June 25, 2018, Ludwig has acknowledged that it has a contractual obligation to keep open its San Diego branch until December 31, 2023. Nevertheless, you contend that Ludwig's obligation to keep the San Diego branch open is a nullity because, according to you, "nothing in the Affiliation Agreement prescribes a scale of operations which must be undertaken or maintained at the Branch."

Contrary to your interpretation, the Affiliation Agreement clearly requires Ludwig's continuous financial support at a level necessary to maintain the San Diego Branch's active research program.

119.   UCSD's correspondence went on to explain in detail that supporting continuous, active research at the Branch is the purpose of the Affiliation Agreement and to that end, Ludwig is required to provide adequate funding for Plaintiffs' research programs through the term of the Affiliation Agreement.

120.   Finally, in June 2019 Ludwig announced that it would further reduce research funding of Plaintiffs' Laboratories, with the elimination of *all* such funding effective January 1, 2020, as follows (the "Operative Punitive Budget"):

|  | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| **Required** | $12,907,884 | $13,333,141 | $13,383,728 | $13,862,516 | $14,343,795 |
| **Ludwig** | $12,000,000 | $6,500,000 | $6,000,000 | $8,000,000 | $4,500,000 |
| **Deficiency** | ($907,884) | ($6,833,141) | ($7,383,728) | ($5,862,516) | ($9,843,795) |

121.   The retaliatory cuts in the Operative Punitive Budget made it impossible for the Plaintiffs to continue to operate their Laboratories, because, among other deficiencies, it did not provide for payment of the salaries of the personnel engaged in Plaintiffs' Laboratories nor for the supplies, travel expenses, and other operating expenses necessary to keep Plaintiffs' Laboratories running.  Indeed, the budgeted amounts for 2020 and 2021 are not even sufficient to pay Ludwig's lease with UCSD and Plaintiffs' salaries, much less fund the cost of research in the Laboratories as is required of Ludwig.

122.   As a result of the Operative Punitive Budget, Ludwig breached its obligation to "continued active medical research" under the Affiliation Agreement as well as breaching its individual contracts with Plaintiffs.

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

123.   Defendants' breach of their obligation under the Affiliation Agreement to fund Plaintiffs' continuous active medical research has greatly harmed Plaintiffs. Plaintiffs' Laboratories are engaged in far-reaching, long-term research programs that depend upon long-term and continuous funding of the type contemplated under the Affiliation Agreement.  Plaintiffs' 5-year rolling membership terms were designed in light of the "continuous, active medical research" that Ludwig was committed to fund up through the Termination Date.

124.   Among other commitments, the Branch is obligated to fund specific costs under a number of grants it has received from the Federal government, particularly the NIH, in connection with Ludwig's performance of the Affiliation Agreement. As a foreign institution, Ludwig is not legally permitted to recover "indirect costs" (including costs paid by the grantor to the grantee to cover facilities, administrative costs, etc.) from NIH in the same manner as a domestic institution.  As a result, in and around 2001, Ludwig was required to qualify the Branch as a "domestic institution" before it could receive grants from the NIH that allowed for indirect cost recovery.  In a letter from PricewaterhouseCoopers LLP ("PWC") to McDermott, PWC expressly advised McDermott that "indirect and direct cost recoveries from the federal government *must not directly or indirectly subsidize the foreign parent or branches*. Therefore, neither indirect nor direct cost recoveries can be used to reduce or offset the [Ludwig] budget or [Ludwig] cash disbursements (*i.e.*, periodical fund transfers from Zurich to the San Diego Branch cannot be reduced by cash available due to indirect cost recoveries)." In addition, Ludwig represented to the NIH that the Branch Director would be "resident" in San Diego.

125.   Ludwig's refusal to fund the costs of research at the Branch effectively forces the Branch to use federal government grant money to pay what are contractually *Ludwig's* portion of the costs under the Affiliation Agreement and thereby, "directly or indirectly subsidizes the foreign parent or branches."

126.   Ludwig has failed to make full disclosure of these facts to the NIH and otherwise has made misleading representations to the NIH to hide the true facts of its wrongful refusal to fund costs of research as it is obligated to do under the Affiliation Agreement.

127.   As a condition for the receipt of NIH grants as a "non-profit", under 35 U.S.C. § 202(c)(7)(C), "the balance of any royalties or income earned by [Ludwig] with respect to subject inventions, after payment of expenses (including payments to inventors) incidental to the administration of subject inventions, [must] be utilized for the support of scientific research or education."  Moreover, the Branch is required by Federal regulation, 45 CFR 75 – Subpart F, to undergo an annual audit to demonstrate its compliance with the statute.  Statements made in the course of such audit must be truthful and complete. The Branch's Annual Audit for the year ending December 31, 2018, which is dated May 2, 2019, includes the following statement:

> During 2018, the Branch was notified that the [Ludwig] board of directors (LICR Board) will cease the Branch's operations at the end of the calendar year 2023.  The LICR board **will support the Branch throughout the expiration of the lease with UCSD** (emphasis added).

128.   In preparing the audit, the auditors relied on representations from Ludwig's management of continued support of the Branch through the Termination Date. This includes a letter dated April 29, 2019, signed by McDermott, and Ludwig's Chief Financial Officer, stating that Ludwig would fund $3.5 million to the Branch from January 1, 2020 through May 3, 2020, which representation the auditors requested to "confirm that the San Diego Branch will be able to continue as a going concern until May 2020."  Prior to making these representations in the audit, however, in February 2019, Ludwig had stated to Plaintiffs that Ludwig intended to drastically cut funding to the Branch unless Plaintiffs each executed the unconscionable "Transition Agreement and Release." Plaintiffs did not sign the Transition Agreement and Release by the April 1, 2019 deadline contained in the agreement.  Further, mere weeks after having certified in the audit that it would "support the Branch," in June 2019, Ludwig repudiated that commitment, stating in a letter to the Branch that

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

**SECOND AMENDED COMPLAINT**

Ludwig's Board of Directors would only provide $6.5 million in funding for the entirety of 2020.  Ludwig has subsequently stated to Plaintiffs that Ludwig will not be funding *any* research at the Branch, starting January 1, 2020.  Ludwig's representations in the audit that it would "support the Branch" through the end of 2023 and would provide $3.5 million in funding for the first four months of 2020 are false and misleading and otherwise failed to make full disclosure of all material facts in the Branch audit, which Ludwig was aware would be submitted to the NIH and that the NIH would rely upon in assessing Ludwig's compliance with the NIH grant conditions. In particular, Ludwig failed to make full disclosure of its intent to cease all funding of further medical research at the Branch.  Ludwig also failed to disclose in the audit that it had announced its (improper) refusal to renew the Plaintiffs' terms as Branch members, although such was material, both to the continuing viability of the Branch as a going concern and to Ludwig's compliance with the terms and conditions of the NIH grants.

129.   Plaintiffs relied upon Ludwig's performance of the Affiliation Agreement in applying for NIH grants, as the "Principal Investigator" thereunder. Under the NIH Grants Policy,[4] a Principal Investigator is the individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award. By agreeing to be a Principal Investigator, such person becomes responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program and are responsible for ensuring compliance with the financial and administrative aspects of the award.  In becoming the Principal Investigator under the NIH grants, Plaintiffs relied upon the Affiliation Agreement, in which Ludwig and UCSD agreed that Ludwig would have the option to administer the NIH grants received by the Branch.  Under the Affiliation Agreement, Ludwig has the right to administer such grants, provided that such research is conducted under Section 1.3.5.1

---

[4] *See* https://grants.nih.gov/grants/policy/nihgps/HTML5/section_2/2.1.2_recipient_staff.htm (last visited January 23, 2020).

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

of the Affiliation Agreement (providing that Ludwig "will bear the costs directly related to conducting the research program at the Premises") and further subject to the requirement that Ludwig "reimburse [UCSD] for services UCSD provides."

130.    In its capacity as the grant administrator, Ludwig has submitted numerous grant applications to NIH resulting in the award of tens of millions of dollars in grant money for Branch research.  In applying for these grants in their capacity as the Principal Investigator, Plaintiffs relied upon representations by Ludwig that it would meet its cost-sharing obligations to the NIH by continuing to support ongoing research at the Branch, as required under the Affiliation Agreement.  By way of example and not limitation, Ludwig submitted two grant applications for more than $5 million in the aggregate for projects in Plaintiff Kolodner's lab expressly extending into 2022 that included numerous representations by Ludwig about the "resources" that Ludwig would make available to support the project, including equipment, lab space, lab facilities and administrative support.  Ludwig's abrupt cessation of research funding for the Branch makes the Branch unable to fulfill its financial obligations under the NIH grants and also places a cloud over Plaintiffs' future NIH funding.

131.   On or about October 31, 2019, Kolodner wrote to McDermott, Notter and John Gordon (the Chair of Ludwig's Audit Committee) explaining that the Branch budget for the years 2020 and 2021 was insufficient to pay even Ludwig's undisputed legal obligations, including that in the absence of Ludwig's breach of other contractual obligations (such as Ludwig's lease with UCSD), the budget was insufficient to pay Plaintiffs' researcher salaries, provide for prudent administration *and to meet Ludwig's cost-sharing obligations to granting institutions, including without limitation, the NIH*. Kolodner stated that his recommendation was that that the Board of Directors fund the Branch and if they failed to do so, that it was the Board of Directors and McDermott that needed to direct the Branch as to which legal obligations to default on.

132.   Four days later, on November 4, 2019, Ludwig replaced Kolodner as the Branch Director with its Deputy Scientific Director, Robert Strausberg ("Strausberg").

**SECOND AMENDED COMPLAINT**

On November 4, Strausberg met with each of the Plaintiffs individually, after refusing to meet with them as a group.  Strausberg informed Plaintiffs that Ludwig would be withdrawing *all* funding for their research in their labs, commencing January 2020.

133.    After only two weeks, Strausberg took an unexpected medical leave, and the Ludwig Board of Directors installed Jonathan Skipper ("Skipper") as Deputy Branch Director on November 15, 2019. On December 31, 2019, Ludwig announced that Skipper would assume the position of Branch Director on January 1, 2020. Skipper is also the Executive Vice President for Technology Development for Ludwig, housed at Ludwig's New York office.  A material precondition for Ludwig being deemed a "domestic institution" and its receipt of NIH grant funds was Ludwig's representation that the Branch would have a "resident" director in San Diego. Skipper's appointment therefore further violated the conditions for Ludwig's receipt of NIH funds.

134.    Moreover, Ludwig began asserting improper direct control over the Branch and operations, in breach of the Affiliation Agreement and in violation of the conditions for Ludwig's receipt of NIH grants.  Within four days of being appointed, Skipper corresponded with a number of the Plaintiffs, directing those Plaintiffs to "invalidate" employment contracts for certain Branch lab personnel previously supported by Ludwig research funding.  Both Skipper and Defendant Dang (who sits on the board of both Ludwig and the Fund) made unsupported threats that Plaintiffs could face "personal liability" if they did not cooperate with Ludwig's "invalidat[ion]" of the Branch's employment contracts.  Skipper and Dang also questioned the Branch's issuance of certain contracts.

135.    In addition to all of the foregoing, subsequent to Ludwig's announcement of its decision to close the Branch, on information and belief, McDermott, Notter and Dang falsely and intentionally communicated to multiple third persons that the reason Ludwig decided to close the Branch was because "the scientists at the Branch," that is, Plaintiffs, "are not engaged in cancer research at a level commensurate with the quality

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1  and seniority of the scientists."  On information and belief, McDermott and Dang made
2  these same or similar false statements to representatives of UCSD at a meeting held in
3  December 2018.  In making these false statements regarding Plaintiffs' research,
4  Ludwig, McDermott, Notter and Dang committed research misconduct, as defined
5  under 42 C.F.R. §93.103

6       136.   As an agency under the Department of Health and Human Services
7  (HHS), NIH requires that any grantee institution must establish written policies and
8  procedures and is responsible for adhering to such standards of conduct. *See* NIH
9  Policies and Procedures for Promoting Scientific Integrity, National Institutes of
10 Health, Office of the Director, Nov. 2012, at 5 ("NIH Policies").  Further, "[a]n
11 integral element of ensuring the integrity of NIH-sponsored research is adherence to
12 specific requirements that foster the safe and ethical conduct of research.  These are
13 articulated in terms and conditions that must be agreed to by institutions receiving NIH
14 Funding." *Id*.  Among others, the NIH Public Policies require grantees to "foster work
15 environments conducive to high-quality research." To that end, the NIH follows the
16 Public Health Service (PHS) Policies on Research Misconduct, set forth at 42 CFR
17 §93.  Among other things, the Policies on Research Misconduct prohibit any recipient
18 of NIH funds from engaging in "Research Misconduct." "Research Misconduct" is
19 defined at §93.103 as, *inter alia*, "fabrication, [or] falsification . . . in . . . reviewing
20 research, or in reporting research results."  As a recipient of NIH grants, Ludwig is
21 required to comply with these Policies on Research Misconduct.  UCSD has also
22 adopted the NIH Policies on Research Misconduct, and Ludwig affirmatively bound
23 itself to such Policy under the Affiliation Agreement.  Moreover, upon an infraction of
24 the NIH Policies on Research Misconduct, Ludwig is required to "inform[ ] the [NIH]
25 chief grants management officer if the infraction is related to an NIH award."  NIH
26 Policies at 5.

27       137.   Defendants committed an infraction under the NIH Policies on Research
28 Misconduct and its own internal policies by, *inter alia*, (i) reporting a false review of

Plaintiffs' research; *e.g.*, the letters of May 21, 2018 asserting that Plaintiffs' had failed a scientific review of their research, although no such review had been conducted and Plaintiffs' work was at the time receiving exemplary peer reviews, (ii) using that false review of Plaintiffs' work as a basis to support their wrongful withdrawal of necessary funding for the Branch, which also is supported by NIH funds, and (iii) imposing a draconian withdrawal of support as economic leverage in order to extract a liability release and non-disparagement covenant for themselves from Plaintiffs, having no concern over the resulting destruction of the fruits of years of Plaintiffs' research that were funded, in substantial part, by tens of millions of dollars in NIH grants entrusted by the NIH to Ludwig for the researchers' benefit.

138.   Ludwig has breached and is continuing to breach its obligations to Plaintiffs under the Affiliation Agreement by, among other things, withdrawing the funding required to continue active and continuous medical research at the Branch. The Operative Punitive Budget imposed upon the Branch by Ludwig fails to provide the Branch with required research support, equipment, and, potentially, lab space that Ludwig is committed to provide the Branch under the Affiliation Agreement and the Laboratory Contracts.  As a result, Ludwig's obligation to conduct of continuous and active medical research under the Affiliation Agreement has been breached, and Ludwig's actions have made it impossible for Plaintiffs to continue their research at the Branch. Moreover, as of July 1, 2019, Ludwig has refused to pay cost of living increases and merit increases is required by the obligation to match member/faculty salaries to the relevant UCSD salary scales.

139.   Further, Ludwig's wrongful conduct diminishes Plaintiffs' ability to earn royalties on research conducted at the Branch.  Under Ludwig's Intellectual Property Policy and Procedure, an inventor is entitled to one-third of the net income received by Ludwig from licensing or granting an option to license Intellectual Property resulting from the collaboration with UCSD under the Affiliation Agreement. Under the Affiliation Agreement, the inventor is required to receive such royalty prior to Ludwig.

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

Ludwig's repudiation of its obligation to fund Plaintiffs' research under the Affiliation Agreement stands to cause irreparable harm to Plaintiffs' research programs and correlatively, their ability to realize royalties as a result of their continued research programs.

140.   Plaintiffs have additionally been personally damaged as a direct and proximate result of McDermott, Notter and Dang's intentionally false statements which have defamed Plaintiffs by publicly impugning Plaintiffs' professional reputations.

141.   Plaintiffs have additionally been personally damaged as a direct and proximate result the false light that has been cast upon Plaintiffs' professional reputations as a result of the untimely and unwarranted closure and defunding of the Branch, due to the reckless breach of the Affiliation Agreement by Ludwig.  The false light placed upon the Plaintiffs is made more onerous in light of Ludwig's public persona as an "eleemosynary" institution, purportedly acting for the public benefit and dedicated to preventing and controlling cancer, for the public good.

142.   Ludwig's 2018 Consolidated Financial Statements, dated as at December 31, 2018, represent that Ludwig "carries out scientific and clinical activities at various branches in conjunction with hospitals in university medical centres."  Ludwig has, however, closed or substantially downsized eight "branches" (which conduct cancer research in conjunction with a 510(c)(3) hospital) since 2012.   By January 2019, the only branches still in operation were San Diego, Lausanne and Oxford. The Branch at UCSD is apparently the latest casualty of Ludwig's changed priorities and changed business model. On information and belief, on the date hereof, the Branch and the branch at Lausanne constitute Ludwig's only "continuous active conduct of medical research" in conjunction with a "hospital," as defined under IRC § 170(b)(1)(A)(iii).  Further, the Branch has, up until recently, conducted the majority of such research.  In 2018 (prior to Ludwig's closure of its branches in Sao Palo, Stockholm, Uppsala and Brussels) the San Diego Branch (together with the Small Molecule Discovery group) constituted approximately 60 percent of Ludwig's total branch funding.

143.   On information and belief, Ludwig has subtly evolved from being a charitable organization existing solely for the purpose of the continuous active conduct of cancer research at one or more 501(c)(3) hospitals, into an organization that, while facially retaining its "charitable" façade, instead principally engages in licensing and investing in for-profit biotechnology startups and receiving royalties and investment returns from these activities. Indeed, Ludwig's public touting of its support of "Ludwig" research "Centres" located at several universities, to strengthen Ludwig's public benefit profile, is misleading.  The Centres are not, in fact, operated by Ludwig. The Centres are instead university endowments, which were funded by an entirely separate grant made to the universities under Mr. Ludwig's will, _not_ by Ludwig or the Fund.  On information and belief, under the Operative Punitive Budget, Ludwig's principal business activity has become investing and licensing, _not_ the "continuous active conduct of medical research in conjunction with a hospital."

144.   On information and belief, Ludwig was motivated, in part, to breach the Affiliation Agreement in furtherance of its changed business model, and to thereby increase its profits and investment returns. Ludwig has recklessly damaged the Plaintiffs in the process. On information and belief, McDermott, Notter and Dang have similarly engaged in wrongful conduct against Plaintiffs, similarly motivated, in part, by their own desire to increase Ludwig and its affiliates' profits so that they personally might profit from increased salaries, fringe benefits, and bonuses from Ludwig and its affiliates, along with opportunities to serve as paid directors or consultants to the for-profit biotechnology companies in which Ludwig invests.

## FIRST CAUSE OF ACTION

(Declaratory Relief Brought by All Plaintiffs Against Ludwig)

(Cal. Code Civ. Proc. §1060)

145.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 144 above as though fully set forth herein.

146.   An actual controversy exists between Plaintiffs and Ludwig concerning the rights, duties, and obligations of Ludwig under Ludwig's contracts with each of the Plaintiffs, including, without limitation, the Intellectual Property Agreements and the policies to which Ludwig was bound, and under the Affiliation Agreement.  Plaintiffs are intended beneficiaries of the Affiliation Agreement and are interested persons under the Affiliation Agreement within the meaning of California Code of Civil Procedure §1060.

147.   Plaintiffs seek a declaration regarding the rights, duties, and obligations of Ludwig under Ludwig's contracts with each of Plaintiffs, and under the Affiliation Agreement including, without limitation,

o   a declaration that each of the Plaintiffs is a third-party beneficiary of the Affiliation Agreement;

o   a declaration that Ludwig's Operative Punitive Budget, which completely eliminates Plaintiffs' research funding starting in 2020, constitutes a breach of Ludwig's obligation to fund Plaintiffs' "continuous, active conduct of medical research" at the Branch throughout the term of the Affiliation Agreement, which terminates on December 31, 2023, at the earliest;

o   a declaration that Ludwig is required under the Affiliation Agreement to provide annual funding to the Branch through December 31, 2023 at an amount consistent with pre-2019 levels and consistent with the parties' course of performance, including support of lab personnel, equipment, adequate administration and the Plaintiffs' salaries, and that the minimum amount of Branch funding required is no less than annual funding of $12,907,884 for 2019, $13,333141 for 2020, $13,383,728 for 2021, $13,862,516 for 2022 and $14,343,795 for 2023, and further that such is the minimum amount required to conduct "continuous active conduct of medical research" at the Branch;

o   a declaration that the all amounts funded to the Branch by Ludwig shall
      be used solely to support the "continuous and active medical research" at
      the Branch, and for no other purposes.

o   a declaration that the May 21, 2018 and February 20, 2019 letters from
      Ludwig to each of Plaintiffs are void *ab initio*;

o   a declaration that Ludwig cannot invoke Section 7 of the Policy as it
      relates to the Branch closure until the occurrence of the Termination Date
      in accordance with the Affiliation Agreement, and that upon such
      Termination Date, the balance of Plaintiffs' respective "then-current"
      terms are calculated as follows: (a) five (5) years following the
      Termination Date as to Plaintiff Cleveland; (b) four (4) years and eight (8)
      months following the Termination Date as to Plaintiff Kolodner; (c) five
      (5) years following the Termination Date as to Plaintiff Oegema; (d) five
      (5) years following the Termination Date as to Plaintiff Desai; (e) four (4)
      years and seven (7) months following the Termination Date as to Plaintiff
      Mischel; (f) four (4) years and nine (9) months following the Termination
      Date as to Plaintiff Ren; and (g) five (5) years following the Termination
      Date as to Plaintiff Furnari;

o   a declaration that as of July 2018 Plaintiffs have no further obligations
      under the Intellectual Property Agreements and shall have rights to any
      and all uses of all intellectual property, technical information, know how,
      discoveries (whether patentable or not) that they may conceive of or
      reduce to practice at the Branch or the Hospital.

## **SECOND CAUSE OF ACTION**

(Breach of Contract - Specific Performance Brought by All Plaintiffs Against
Defendant Ludwig)

148.   Plaintiffs incorporate by reference each and every allegation contained in
Paragraphs 1 through 147 above as though fully set forth herein.

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

149.   Ludwig and UCSD entered into the Affiliation Agreement for the specific purpose of enabling Cavenee to move his laboratory from Montreal to UCSD, and to enable Cavenee to attract other researchers to join him at the Branch and establish their own Laboratories at UCSD.  It was required by law that Ludwig would enter into the Affiliation Agreement with UCSD in order to permit the Laboratories to be located in premises leased by Ludwig at UCSD.

150.   The Affiliation Agreement was expressly intended by UCSD and Ludwig to benefit both Cavenee and the Plaintiffs, by enabling them to establish Laboratories at UCSD under the framework of the affiliation between UCSD and Ludwig and to provide specific protections to Plaintiffs regarding their ownership and ability to profit from the commercialization of the intellectual property developed in the course of the affiliation.

151.   *But for* Cavenee desiring to move his laboratory to UCSD, the Affiliation Agreement would not have been entered into and but for the intent to benefit the Plaintiffs' Laboratories, the Affiliation Agreement would not exist.

152.   On information and belief, UCSD has at all times performed its obligations under the Affiliation Agreement with Ludwig, except any that were excused by Ludwig's breaches and/or other conduct.  The Affiliation Agreement is reasonable and supported by adequate consideration.

153.   Plaintiffs, as professional scientists who moved their Laboratories to the Branch at UCSD, and receiving professorships at UCSD, were intended as third-party beneficiaries of the Affiliation Agreement.  The Affiliation Agreement exists to facilitate the operation of the Laboratories at UCSD, in space leased from UCSD, which could not occur without a formal binding affiliation between UCSD and Ludwig.

154.   Among other things, the Affiliation Agreement obligates each of Ludwig and UCSD to provide express benefits and rights of the class of researchers at the Branch, including the Plaintiffs.  The Affiliation Agreement obligates Ludwig to: (i)

ensure that the research program at that the Branch "be under the immediate direction and control of the professional scientists employed by the Institute and assigned by the Institute to the research programs, and will be conducted by the Institute's employees"; (ii) "bear the costs directly related to conducting the research program" at the Branch including equipment costs and compensation of its employees; (iii) obtain and keep in full force and effect, at its expense, malpractice insurance for all Ludwig scientific personnel performing research under the Affiliation Agreement; (iv) select, employ, supervise and assign employees to the research program at the Branch, including appropriate administrative personnel, and (v) accord Plaintiff with the same intellectual property rights and rights to commercialize inventions as are granted to UCSD faculty. The Affiliation Agreement obligates UCSD to (i) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff of Ludwig working at the UCSD campus; (ii) grant academic recognition and titles to qualified Ludwig employees; and pursuant to the First Amendment to the Affiliation Agreement, executed in August 2000, (iii) make 15 FTE (full time equivalency) positions available for Ludwig employees.  The Affiliation Agreement also requires Ludwig to ensure that Plaintiffs execute certain Intellectual Property Agreements, whereby Plaintiffs assigned to Ludwig rights to intellectual property they conceived of at the Branch or the Hospital, *subject to* the protective provisions of the Affiliation Agreement.  To that same end, the Affiliation Agreement obligates each of Ludwig and UCSD to grant Plaintiffs an "inventor's share of income" received from licensing intellectual property created under the Affiliation Agreement.  Plaintiffs also applied for NIH Grants as the Principal Investigator thereunder, in reliance upon Ludwig's performance of its obligations thereunder as the grant administrator.  Among other things, in connection with such grants, Ludwig was required to comply with Section 1.3.5.1 of the Affiliation Agreement (providing that Ludwig "will bear the costs directly related to conducting the research program at the Premises") and further subject to the requirement that Ludwig "reimburse [UCSD] for services UCSD provides."

155.   Plaintiffs have at all times performed their contractual obligations under the Affiliation Agreement, except any obligations that were excused by Ludwig's breaches and/or other conduct.

156.   Ludwig has breached and is continuing to breach its obligations under the Affiliation Agreement including that Ludwig is required to operate the Branch such that there is "active, continuous medical research" at the Branch during the term of the Affiliation Agreement, which has an expiration date of December 31, 2023, at the earliest.  The fulfillment of this requires that Ludwig continue at historical annual levels to fund equipment and the costs of research, compensate the scientists employed at the Branch and provide for appropriate administrative personnel, along with other costs of the Branch.  These facts are clearly ascertainable by the terms of the Affiliation Agreement. Ludwig has breached and is continuing to breach its obligations to Plaintiffs under the Affiliation Agreement by, among other things, imposing the patently insufficient Operative Punitive Budget, which renders continuous and active conduct of medical research under the Affiliation Agreement impossible.

157.   As a direct and proximate result of Ludwig's breaches, Plaintiffs have been damaged in an amount according to proof at trial.

158.   Ludwig's breach of the Affiliation Agreement is a substantial factor in causing Plaintiffs' harm, including, without limitation, injury to Plaintiffs research programs due to Ludwig's wrongful refusal to fund research at the Branch.  Plaintiffs have no adequate and speedy remedy at law because the research Plaintiffs perform is unique.  Moreover, Plaintiffs' research requires continued funding for its survival. Plaintiffs' research programs will be irreparably injured in the absence of Ludwig's performance under the Affiliation Agreement.

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

## **THIRD CAUSE OF ACTION**

(Breach of Implied Covenant of Good Faith and Fair Dealing Brought by All Plaintiffs Against Defendant Ludwig)

159.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 158 above as though fully set forth herein.

160.   Ludwig entered into the Affiliation Agreement with UCSD.  Plaintiffs are intended beneficiaries of the Affiliation Agreement.  Pursuant to the Affiliation Agreement, Plaintiffs each entered into other contracts with Ludwig, including, without limitation, certain Intellectual Property Agreements, under which Plaintiffs assigned rights to Ludwig respecting intellectual property Plaintiffs conceived of or reduced to practice in the course of their activities at the Branch and in connection with the "continuous, active medical research" Plaintiffs performed pursuant to the terms of the Affiliation Agreement.  Ludwig's contracts with Plaintiffs and the Affiliation Agreement form part of the same transaction and must be construed together.

161.   To facilitate the "continuous active medical research" into cancer cures, as provided for under the Affiliation Agreement, Plaintiffs applied for federal NIH grants and were designated as the Principal Investigator under such grants, which were administered by Ludwig.  Further, as provided under the Affiliation Agreement, as a condition of administering such grants, Ludwig was required to comply with Section 1.3.5.1 of the Affiliation Agreement (providing that Ludwig "will bear the costs directly related to conducting the research program at the Premises") and to "reimburse [UCSD] for services UCSD provides."

162.   Plaintiff each entered into Laboratory Support Agreements, under which Ludwig obligated itself to provide a reasonable and appropriate level of financial and other support to Plaintiffs, in order to facilitate the operation of Plaintiffs' Laboratories.

163.   Plaintiffs have materially complied with all of their obligations under the Intellectual Property Agreements and other contracts that they entered into in

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

connection with the Affiliation Agreement, except any that were or are excused by Ludwig's breaches and/or other conduct.

164.   Plaintiffs have materially complied with all of their obligations under the Laboratory Support Agreements, except any that were or are excused by Ludwig's breaches and/or other conduct.

165.   On information and belief, UCSD has materially complied with all of its obligations under the Affiliation Agreement, except any that were or are excused by Ludwig's breaches and/or other conduct.

166.   Ludwig is required to perform under the Laboratory Support Agreements, the Intellectual Property Agreements, and its other contracts with Plaintiffs, its policies and under the Affiliation Agreement.  Ludwig's performance includes, without limitation, providing an appropriate and necessary amount of funding to enable Plaintiffs' active and continuous medical research at the Branch, and providing the Plaintiffs with the same rights, protections and benefits respecting the ownership, development and commercialization of the intellection property as is provided by UCSD to its own faculty.

167.   Ludwig is obligated to refrain from arbitrary and unreasonable conduct that has the effect of preventing Plaintiffs from receiving the fruits of their bargain. Ludwig has unfairly interfered with Plaintiffs' rights to receive the benefits of the Affiliation Agreement and Plaintiffs' individual contracts by threatening to cut Plaintiffs' funding if they could not guarantee UCSD's "cooperation," eliminating funding for Plaintiffs' research and by affirmatively obstructing Plaintiffs from carrying out the research activities for which they were hired during the remainder of the time the Branch is open. Ludwig has also prevented Plaintiffs from obtaining the economic and professional rewards of the development and commercialization of their intellectual property developments.  Plaintiffs also have an interest in any royalties generated by their work at the Branch during the term of the Affiliation Agreement.

Ludwig has consciously and deliberately acted to unfairly frustrate the agreed common purpose of Plaintiffs' employment.

168.   Ludwig also acted improperly and in extreme bad faith by attempting to extract a release and other oppressive terms from Plaintiffs, in exchange for Ludwig funding a reduced Initial Cut Budget for 2019 through 2023.  Among other things, Ludwig demanded Plaintiffs execute the Transition Agreement and Release, which required Plaintiffs to continue to diligently pursue scientific research at the Branch through 2023, even though Ludwig would not be funding that research in the manner required by the Affiliation Agreement.  Moreover, the Transition Agreement and Release included an all-encompassing unilateral release in Ludwig's favor of "whatever claims you have against the Institute," a broad unilateral non-disparagement clause in Ludwig's favor and required each of the Plaintiffs to ensure that Ludwig received the "cooperation" of UCSD in connection with, *inter alia*, Ludwig's breach of the Affiliation Agreement.  The Transition Agreement and Release also sought to preclude Plaintiffs from using their residual knowledge gained in pursuing cancer research at the Branch. The Transition Agreement and Release also provided that Plaintiffs must keep it confidential, enabling Ludwig to maintain its reputational profile and escape liability for their breach of the Affiliation Agreement.

169.   Ludwig knew that a sudden withdrawal of financial support from the Branch would jeopardize the entire body of Plaintiffs' prior research at the Branch as well as Plaintiffs' ability to conduct research in the future by making it impossible for Plaintiffs to transition their research elsewhere and by endangering Plaintiffs' NIH grant funding, in respect to which Ludwig was obligated to pay certain costs.  Ludwig therefore attempted to extract Plaintiffs' execution of the Transition Agreement and Release by threatening that unless each of the Plaintiffs executed it, all research funding for the Branch would be immediately withdrawn. Ludwig also knew that a sudden withdrawal of funding would place in jeopardy the research scientists that Plaintiffs had engaged to work in their Laboratories. Ludwig was obligated to fund

Plaintiffs' research, and its attempt to extract such oppressive terms from Plaintiffs with threats to immediately withdraw all financial support from the Branch if they did not sign the Transition Agreement and Release was unethical, malicious, fraudulent and a breach of the covenant of good faith and fair dealing.

170.   As a direct and proximate result of Ludwig's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered, are continuing to incur, and will incur, damages in an amount according to proof at trial.

## **FOURTH CAUSE OF ACTION**

(Defamation Per Se Brought by All Plaintiffs Against All Defendants)

171.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 170 above as though fully set forth herein.

172.   Subsequent to announcing the closing of the Branch to Plaintiffs, on information and belief, McDermott, Notter and Dang communicated in a non-public forum to a number of third persons on different occasions that the reason Ludwig is closing the Branch is because the scientists at the Branch, that is Plaintiffs, are not engaged in cancer research at a level commensurate with the quality and seniority of the scientists, including communicating such a statement to representatives of UCSD at a meeting held in December 2018 and in a letter from Notter to UCSD on January 30, 2019.  On information and belief, McDermott, Notter and Dang made it clear in their statements to third persons that the Branch was being closed due to deficiencies in the Plaintiffs' scientific performance.

173.   In addition, on information and belief, McDermott, Notter and Dang made it clear in their statements to third persons that the Branch was being closed because Plaintiffs did not conduct cancer research.

174.   Anyone hearing such statements would reasonably understand that the statement is about each of the Plaintiffs.  Anyone hearing these statements would reasonably understand the statement to mean that each of the Plaintiffs is disqualified with respect to their profession.  The statements made by McDermott, Notter and

Dang, for example, caused UCSD to state to one or more of the Plaintiffs that Plaintiffs were at fault for Ludwig's closure of the Branch, which is untrue. The statements made by McDermott, Notter and Dang have directly injured Plaintiffs in respect to their profession by imputing to each a general disqualification in those respects which the profession peculiarly requires, have a natural tendency to injure Plaintiffs with respect to their occupations and are defamatory of Plaintiffs without the necessity of explanatory matter, and as such, are defamatory *per se*.  Defendants' statements were made after the decision to close the Branch was made, not during the course of ongoing public debate, and involved personal attacks on the Plaintiffs, not statements about public issues.

175.   Plaintiffs are private figures.

176.   The statements made by McDermott, Notter and Dang are false, malicious and unprivileged.  Defendants McDermott, Notter and Dang acted with reckless disregard of the falsity of their statements, including in stating that Plaintiffs are not engaged in cancer research at a level commensurate with the quality and seniority of the scientists when Defendants McDermott, Notter and Dang knew that Ludwig had not performed a scientific review of the Plaintiffs or of the Branch.

177.   The false and defamatory statements made by McDermott, Notter and Dang were motivated by their desire to create a pre-textual explanation for their wrongful cessation of funding and closure of the Branch and breach of the Affiliation Agreement.  Upon information and belief, Ludwig's decision to close the Branch and breach of the Affiliation Agreement was motivated by Defendants' own conflicts of interest and desire for private or financial gain for themselves or others, including, without limitation, those with whom they have family, business, or other ties.

178.   Plaintiffs are each accomplished scientists, performing long-term translational research at the highest level.  When hired by Ludwig, and when reviewed by Ludwig, Plaintiffs each received very favorable reviews.  Had that not been the case, Plaintiffs would not have been hired or promoted as they undisputedly were.

Moreover, when the Branch was reviewed by Ludwig, it received very favorable reviews, so much so that it was slated for expansion, not closure. This would not have been the case if the Branch did not perform cancer related research. Research at the Branch has led to an unprecedented level of recognition by awards, the development of both new early-stage therapies for ovarian cancer, neuroblastoma, Ewing sarcoma and brain cancer and therapeutics in clinical trials, and ranking of the Branch by *Nature* as 42nd in its 2019 index of the Top 100 Non-Profit Research Organizations in Biomedical Sciences that evaluated all Non-Profit Research Organizations in Biomedical Sciences world-wide. This is particularly significant given that the Branch has only 7 investigators, the Plaintiffs, and by comparison, many of the organizations ranking higher have well over 100 investigators.

179. By natural consequence, McDermott, Notter and Dang's wrongful conduct was a substantial factor in causing harm to each Plaintiff's profession and professional reputation. Moreover, the actions of McDermott, Notter and Dang, as alleged herein, constitute oppression, fraud, or malice, as those terms are defined in California Civil Code § 3294, entitling Plaintiffs to an award of punitive damages.

180. Among other things, Defendants' conduct violated the terms and conditions for their receipt of grant funding from the NIH. As an agency under the Department of Health and Human Services (HHS), NIH requires that any grantee institution must establish written policies and procedures that, prevent them from, *inter alia*, "using their positions for purposes that are, or give the appearance of being, motivated by a desire for private or financial gain for themselves or others, such as those with whom they have family, business, or other ties." *See* NIH Policies and Procedures for Promoting Scientific Integrity, National Institutes of Health, Office of the Director, Nov. 2012, at 5. The grantee is responsible for adhering to such standards of conduct, and, in particular, "informing the chief grants management officer if the infraction is related to an NIH award." *Id*. Further, "[a]n integral element of ensuring the integrity of NIH-sponsored research is adherence to specific

requirements that foster the safe and ethical conduct of research.  These are articulated in terms and conditions that must be agreed to by institutions receiving NIH Funding." *Id*.  Among others, the NIH Public Policy Requirements require grantees to "foster work environments conducive to high-quality research." To that end, the NIH follows the Public Health Service (PHS) Policies on Research Misconduct, set forth at 42 CFR 93.  Among other things, the Policies on Research Misconduct prohibit any recipient of NIH funds from engaging in "Research Misconduct." "Research Misconduct" is defined at §93.103 as, *inter alia*, "fabrication, [or] falsification . . . in . . . reviewing research, or in reporting research results."  As a recipient of NIH grants, Ludwig is required to comply with these Policies on Research Misconduct.  Defendants failed to comply with the Public Health Service Policies on Research Misconduct and its own internal policies by (i) reporting a false review of Plaintiffs' research; *e.g*., the letters of May 21, 2018 asserting that Plaintiffs' had failed a scientific review of their work when no such review was conducted, (ii) using that false review of Plaintiffs' work as a basis to support their wrongful withdrawal of necessary funding for the Branch, which also is supported by NIH funds, and (iii) imposing a draconian withdrawal of support as economic leverage in order to extract a liability release and non-disparagement covenant for themselves from Plaintiffs, having no concern over the resulting destruction of the fruits of years of Plaintiffs' research that were funded, in substantial part, by tens of millions of dollars in NIH grants entrusted by the NIH to Ludwig for the researchers' benefit.  Defendants' defamatory statements against Plaintiffs were part and parcel of Defendants' violation of the NIH Policies on Research Misconduct and the terms for their receipt of NIH grant funds. Such conduct was intentional, oppressive, fraudulent and malicious and therefore warrants the imposition of punitive damages.

181.   Defendants McDermott, Notter and Dang's defamatory statements concerned the California activities of California residents, were published to, among

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

**SECOND AMENDED COMPLAINT**

others, individuals in California, and the brunt of the harm caused by their defamatory statements occurred in California.

## FIFTH CAUSE OF ACTION

(False Light Brought by All Plaintiffs Against Defendant Ludwig)

182.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 181 above as though fully set forth herein.

183.   Ludwig's closure of the Branch prior to the Termination Date is a breach of the Affiliation Agreement. Under the Affiliation Agreement, prior to the Termination Date, Ludwig is responsible for providing the funds to facilitate "continuous, active medical research" at the Branch.  Under the Affiliation Agreement, such research is to be directed and controlled by Plaintiffs, in their capacity as Branch members, and Plaintiffs therefore receive Branch funding, which is paid by Ludwig, to facilitate such research.  Nevertheless, in 2019, and contrary to their obligations under the Affiliation Agreement, Ludwig cut all Branch research funding, effective in 2020, thereby ceasing all support for Plaintiffs' research.  On information and belief, Ludwig has publicly disclosed the fact that it has ceased all support for Plaintiffs' research. Ludwig's conduct and publicizing of its elimination of all funding of Plaintiffs' research occurred after the decision to close the Branch was made, not during the course of ongoing public debate, and involved personal attacks on the Plaintiffs, not statements about public issues. Plaintiffs are private figures.

184.   The information that Ludwig has eliminated all of Plaintiffs' research funding shows Plaintiffs in a false light. Ludwig knew that cutting all research funding and making that fact known to others would create the false impression that Plaintiffs' respective research programs are qualitatively flawed.  In doing so, Ludwig acted maliciously with a reckless disregard for the truth, including that Ludwig knew Plaintiffs are highly accomplished scientists whose work is acclaimed by peer reviews. Ludwig also knew it had not performed a scientific review of the Plaintiffs or of the Branch as a prerequisite to eliminating all research funding.  The false light created by

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

64

Ludwig's publicizing of the fact that it is refusing to fund any research by Plaintiffs would be highly offensive to a reasonable person in Plaintiffs' positions, that is dedicated scientists who depend upon their professional standing and reputation for superior research for their livelihood and in order to sustain their research programs. Among other things, as alleged herein, Defendants' conduct violated the terms and conditions for their receipt of grant funding from the NIH, under which Plaintiffs served as the proponent and "principal investigator." As such, Ludwig's wrongful conduct also places Plaintiffs and their research in a false and inappropriate light before the NIH.

185.   By natural consequence, Ludwig's wrongful conduct was a substantial factor in causing harm to each Plaintiff's profession and professional reputation. Moreover, the actions of Ludwig, as alleged herein, constitute oppression, fraud, or malice, as those terms are defined in California Civil Code § 3294, and constitute "Research Misconduct" as defined under Public Health Service (PHS) Policies on Research Misconduct, set forth at 42 CFR §93, each entitling Plaintiffs to an award of punitive damages.

## SIXTH CAUSE OF ACTION

(Breach of Contract – Intellectual Property – Brought by All Plaintiffs Against Defendant Ludwig)

186.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 185 above as though fully set forth herein.

187.   Ludwig's Intellectual Property Policy and Procedure, a true and correct copy of this which attached hereto as Exhibit "E," provides that "In consideration of the research opportunities and support provided by the Institute, and to facilitate the protection and licensing of discoveries, Branch personnel are required to assign to the Institute, either directly or through the Branch's host institution, any rights they may have in Intellectual Property. To that end, upon appointment, an Intellectual Property

Agreement is to be signed by all Branch personnel and returned to the Institute's Administration office in Zurich ('the Zurich Office')."

188.   Ludwig's Code of Ethics and Standards, a true and correct copy of which is attached hereto as Exhibit "F," similarly provides that "In consideration of the research support provided by the Institute, and to facilitate the protection and licensing of discoveries, staff members are required to assign to the Institute any rights they may have in Intellectual Property. To that end, upon engagement by the Institute, an Intellectual Property Agreement is to be signed by each staff member and returned to the Institute's Administration office in Zurich."

189.   In accordance with the Intellectual Property Policy and Procedure and the Code of Ethics and Standards, as well as the Affiliation Agreement, each of Plaintiffs executed an Intellectual Property Agreement with Ludwig, true and correct copies of which are attached hereto as Exhibit "G," assigning to Ludwig Plaintiff's respective rights in "Intellectual Property" defined as all right, title and in and to all commercially results exploitable results obtained by Plaintiffs.

190.   The Intellectual Property Agreements each state that the assignment is given in "consideration of employment by" Ludwig. This phrase must be construed together with the Intellectual Property Policy and Procedure and the Code of Ethics and Standards which specify that Plaintiffs were required to execute the Intellectual Property Agreement in consideration of receiving research opportunities and research support from Ludwig.  This phrase must also be construed in light of the requirement in the Affiliation Agreement that Ludwig fund active, continuous research for the term of that agreement.  The Affiliation Agreement, the policies and the Intellectual Property Agreements are part of the same transaction.  The Intellectual Property Agreements also reference that the sharing of royalties from Intellectual Property is as set out elsewhere, and in turn, royalty sharing is addressed in the Intellectual Property Policy and Procedure and the Affiliation Agreement. Plaintiffs have reasonably relied on Ludwig's policies as part of the terms and conditions of their assignment of the

intellectual property generated by their research.  Before any dispute arose between Plaintiffs and Ludwig, Ludwig funded, in the aggregate, millions in research support annually, to each of the Plaintiffs' labs and such was expended under the direction of each of the Plaintiffs.

191.   The Intellectual Property Agreements are also *subject to* the UCSD University IP Policies and Guidelines, which granted Plaintiffs, *inter alia*, broad protections regarding future use of their research and knowledge and permitted them to engage in third party commercialization projects and receive such benefits as equity ownership and sponsorships.

192.   Plaintiffs have at all times performed their obligations under the Intellectual Property Agreements, and the Intellectual Property Policy and Procedure and the Code of Ethics and Standards as it relates to the assignment of their intellectual property rights, with Ludwig, except any that were excused by Ludwig's breaches and/or other conduct. Ludwig's material breach excuses further performance by Plaintiffs.

193.   Ludwig has materially breached and is continuing to materially breach its obligations under the Intellectual Property Agreements, the Intellectual Property Policy and Procedure and the Code of Ethics and Standards by first repudiating, then cutting and ultimately ceasing all research support funding.  Research support funding is required to, among other things, pay the research teams that work in each of Plaintiffs' labs, purchase biological materials necessary for Plaintiffs' research (as for example, tissue cultures) and to purchase lab supplies and equipment.  Plaintiffs cannot perform their research, which is the essential purpose of their appointments, in the absence of research support funding. Ludwig's research support is essential to Plaintiffs' agreement to assign the rights to the Intellectual Property generated by their research to Ludwig.

194.   As a direct and proximate result of Ludwig's breaches, Plaintiffs have been damaged in an amount according to proof at trial. Ludwig's breach of is a

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

substantial factor in causing Plaintiffs' harm, including, without limitation, injury to Plaintiffs research programs due to Ludwig's wrongful refusal to fund research in Plaintiffs' labs.  Plaintiffs' research requires continued funding for its survival. Plaintiffs' research programs will be irreparably injured in the absence of Ludwig's performance of its obligation to fund research support.

### SEVENTH CAUSE OF ACTION

(Breach of Implied Covenant of Good Faith and Fair Dealing – Intellectual Property – Brought by All Plaintiffs Against Defendant Ludwig)

195.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 194 above as though fully set forth herein.

196.   In accordance with the Intellectual Property Policy and Procedure and the Code of Ethics and Standards, as well as the Affiliation Agreement, when Plaintiffs were hired by Ludwig to pursue their respective research programs, each of the Plaintiffs executed an Intellectual Property Agreement with Ludwig, under which Plaintiffs assigned rights to Ludwig respecting the intellectual property Plaintiffs conceived of or reduced to practice in the course of their research activities at the Branch. Pursuant to the Intellectual Property Policy and Procedure, Plaintiffs are entitled to share in the royalties generated by the assigned intellectual property.

197.   In addition, Ludwig's Intellectual Property Policy and Procedure and the Code of Ethics and Standards both provide that Ludwig "must make its research findings available to the research community and the world at large through publication, public presentation and through the effective transfer to commercial entities for development and potential availability to the public. Patenting and licensing of [Ludwig's] discoveries play an important role in this overall strategy and [Ludwig] assumes full responsibility for both."

198.   The Intellectual Property Agreements are also *subject to* the UCSD University IP Policies and Guidelines, which granted Plaintiffs, *inter alia*, broad protections regarding future use of their research and knowledge and permitted them to

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

engage in third party commercialization projects and receive such benefits as equity ownership and sponsorships.

199.   Plaintiffs have materially complied with all of their obligations under the Intellectual Property Agreements, the Intellectual Property Policy and Procedure and the Code of Ethics and Standards with Ludwig, except any that were excused by Ludwig's breaches and/or other conduct.

200.   Ludwig is required to perform under its contracts and policies with Plaintiffs.  Ludwig's performance includes, without limitation, providing an appropriate and necessary amount of research support funding to enable Plaintiffs' to continue their research programs through end of 2023.

201.   Ludwig is obligated to refrain from arbitrary and unreasonable conduct that has the effect of preventing Plaintiffs from receiving the fruits of their bargain. Ludwig is also obligated to exercise any discretion with respect to the research opportunities and research support it promised in consideration for Plaintiffs' assignments of intellectual property in good faith.

202.   Ludwig has unfairly interfered with Plaintiffs' rights to receive the benefits of the Intellectual Property Agreements, the Intellectual Property Policy and Procedure and the Code of Ethics and Standards by eliminating funding for Plaintiffs' research and by affirmatively obstructing Plaintiffs from carrying out the research activities for which they were hired during the remainder of the time the Branch is required to be open and operating. Plaintiffs have an interest in any royalties generated by their work at the Branch. Ludwig has consciously and deliberately acted to unfairly frustrate the agreed common purpose of Plaintiffs' appointments and the intellectual property assignments in Ludwig's favor given in connection with those appointments.

203.   Ludwig's management has conceded Ludwig cannot close the Branch prior to 2024. For years, up until 2019, research support funding was determined as part of a budget process based upon information from the Branch, and was built upon the previous year's budget, with upward adjustment for inflation and promotion.

Ludwig failed to perform its funding obligation in good faith when it unilaterally ceased all research support funding for Plaintiffs' labs. Plaintiffs' ability to run their research programs, share in royalties generated by such research, and join in the commercialization of their research, including with respect to participating in outside companies, were thereby injured. Further, under the Intellectual Property Policy and Procedure, in addition to Plaintiffs' individual royalty share, the Branch as a whole is entitled to a share of the royalties from the licensing of Plaintiffs' work, which funds are to be reinvested in Plaintiffs' Laboratories.  However, if royalties are not generated until after the Branch is closed, Ludwig is able to capture this additional royalty share for itself.

204.   Ludwig also acted improperly and in extreme bad faith when it attempted to capitalize upon Plaintiffs' injury by trying to extract an unconscionable, one-sided release and non-disparagement agreement from Plaintiffs. When Plaintiffs properly refused to execute the Transition Agreement and Releases, Ludwig maliciously cut funding even further than it already had.  Ludwig knew that a sudden withdrawal of financial support would jeopardize the entire body of Plaintiffs' prior research at the Branch as well as Plaintiffs' ability to conduct research in the future by making it impossible for Plaintiffs to transition their research elsewhere and by endangering Plaintiffs' NIH grant funding, in respect to which Ludwig was obligated to pay certain costs.  Ludwig therefore attempted to extract Plaintiffs' execution of the unconscionable release by threatening that unless each of the Plaintiffs executed it, even more of their funding would be immediately withdrawn. Ludwig was obligated to fund Plaintiffs' research, and its attempt to extract such oppressive terms from Plaintiffs with threats to immediately withdraw all financial support, on which Ludwig followed through, from the Branch if they did not sign the agreement was unethical, malicious, fraudulent and a breach of the covenant of good faith and fair dealing.

205.   As a direct and proximate result of Ludwig's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered, are continuing to incur, and will incur, damages in an amount according to proof at trial.

## EIGHTH CAUSE OF ACTION

(Promissory Estoppel; Brought by All Plaintiffs Against Ludwig)

206.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 205 above as though fully set forth herein.

207.   Under the Affiliation Agreement, Defendants clearly and unambiguously promised to conduct "continuous, active medical research" at UCSD for the term of the Affiliation Agreement.

208.   Ludwig's conducting of continuous, active medical research at UCSD required that Ludwig provide a level of funds for research that was consistent with the level of funding provided, per capita, to the Plaintiffs in past years.

209.   Ludwig failed to fund Plaintiffs' research, beginning in 2019.  Absent their receipt of a comparable level of funding from Ludwig, the Plaintiffs were unable to continue their medical research and had to either shut down or dramatically decrease their Laboratory operation.

210.   Ludwig has ceased to conduct continuous, active medical research at UCSD and thereby breached the Affiliation Agreement.

211.   UCSD informed Ludwig in writing on June 12, 2018 that its decision to close the Branch and ending of the research program under the Affiliation Agreement was a breach of the Affiliation Agreement.

212.   Plaintiffs relied on Ludwig's performance of its promises under the Affiliation Agreement to both keep the Branch open and to continue the research program at the Branch through the term of the Affiliation Agreement, including without limitation, by funding Plaintiffs' research and providing the necessary and appropriate equipment and professional personnel.  In reliance, Plaintiffs (i) left their previous employment to join Ludwig to work at the Branch; (ii) established research

laboratories at UCSD and commencing long-term cancer research projects at the Branch through such laboratories, which were staffed with UCSD pre-doctoral and post-doctoral trainees that Plaintiffs recruited to work at the Branch; (iii) applied for grants from third parties, including NIH grants, to fund the research at their laboratories located at UCSD, and requested that such grants be administered by Ludwig; (iv) agreed to take no compensation from UCSD for their professorship role, as outlined in the Affiliation Agreement; (v) executed the Intellectual Property Agreements under which their Branch inventions were to be governed; and (vi) entered into discussions with third parties in for-profit ventures regarding the commercialization of Plaintiffs research and developments, as permitted under the UCSD University IP Policies and Guidelines, which under the Affiliation Agreement, were extended to Plaintiffs and entitled them to, *inter alia*, broad protections regarding future use of their research and knowledge and permitted them to engage in third party commercialization projects and receive such benefits as equity ownership and sponsorships.

213.   Plaintiffs' reliance on Ludwig abiding by its promise to conduct continuous, active medical research at UCSD for the entire term of the Affiliation Agreement was reasonable, because parties are normally expected to not breach their agreements.  Plaintiffs' reliance on Ludwig abiding by its promises was especially warranted, in that Ludwig is an extraordinarily well-funded charitable institution dedicated to finding a cure for cancer.  As such, Ludwig would normally be expected to have been held to a higher standard of conduct respecting its commitment to maintaining the research required under the Affiliation Agreement than would a for-profit institution.

214.   Ludwig deliberately intended to induce the Plaintiffs' reliance on its performance of the Affiliation Agreement, because it was in this manner that Ludwig induced the Plaintiffs to come to the Branch.  Ludwig knew that Plaintiffs are renowned research scientists and would have opportunities elsewhere, and thus

induced Plaintiffs to join the Branch by pointing to the secure funding and long-term commitment under the Affiliation Agreement, which would enable Plaintiffs' long-term translational research.  Ludwig knew that Plaintiffs left their previous employment, investing their life's work and moving their research to the Branch, and had set up laboratories at the Branch to enable Ludwig to perform under terms of the Affiliation Agreement. Ludwig watched these efforts by Plaintiffs, encouraged them, approved of the results and encouraged Plaintiffs to embark on long-term research projects, relying on the term of the Affiliation Agreement.  Defendants also encouraged Plaintiffs to solicit grant funds from third parties to supplement the research funds that were be provided by Ludwig.

215.   Plaintiffs have been injured by Ludwig's breach of its promise to conduct continuous, active medical research at UCSD for the entire term of the Affiliation Agreement by (i) the Plaintiffs have not received the funding that they relied upon to support their laboratories through the term of the Affiliation Agreement; (ii) the Plaintiffs' research has been halted mid-stream, preventing Plaintiffs from ever receiving royalties for the commercialization of these inventions; (iii) Plaintiffs have foregone other opportunities for commercializing their research, including, without limitation, opportunities to develop their inventions at other research institutions and opportunities to participate as equity owners and/or in initial public offerings of companies that would commercialize their inventions.

216.   It would be a blemish on the face of justice to allow Ludwig to disclaim any responsibility to fund continuous, active medical research for the full term of the Affiliation Agreement because then Ludwig would profit from its breach and would be unjustly enriched.  Moreover, only by enforcement of Ludwig's promise to conduct continuous, active medical research for the entire term of the Affiliation Agreement can the injury to Plaintiffs be avoided.

## NINTH CAUSE OF ACTION

(Breach of Mischel Lab Contract; Brought by Plaintiff Paul Mischel Against Ludwig)

217.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 216 above as though fully set forth herein.

218.   In a March 12, 2012 letter from Ludwig Plaintiff Mischel was informed that he would "be receiving a Member Contract from the New York Office in the near future for your consideration.  In addition you will be receiving a detailed offer from your prospective Branch Director, Web Cavenee, with the details of the support and conditions of employment that come with your appointment."

219.   Web Cavenee extended a written offer on Ludwig's behalf, dated March 11, 2012, to Plaintiff Mischel to establish a laboratory at the Branch and to join the San Diego Branch as the Head, Laboratory of Molecular Pathology and establishing such laboratory at the Branch (the "Mischel Lab").  In that offer, Ludwig affirmed again that Plaintiff Mischel would be receiving a "separate . . . Member contract" respecting his Member appointment to be "bestowed by the LICR Board of Directors."

220.   Plaintiff Mischel accepted the written offer in writing, forming a binding bilateral contract (the "Mischel Lab Contract").  A true and complete copy of the Mischel Lab Contract is attached hereto as the Exhibit "H" and is incorporated herein by reference.

221.   The Mischel Lab Contract promised that Plaintiff Mischel would be provided with a core budget of up to $600,000 each year, which may be freely allocated by Plaintiff Mischel in operating the Mischel Lab. The core budget funding for Plaintiff Mischel's Lab included Plaintiff Mischel's salary/benefits, salaries/benefits of others in the Mischel Lab, supplies, travel and other expenses of operating the Mischel Lab.  In addition, Plaintiff Mischel was promised a variable percentage (at that time 10%) of overhead costs from grants carrying full overhead would be rebated to him, for use in the Mischel Lab. These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

living increases and merit increases, among other reasons. A proportionate share of the Branch Director's budget was also expended to benefit the Mischel Lab each year.

222.   At or about the same time as the Mischel Lab Contract was accepted by Plaintiff Mischel, Ludwig assured Plaintiff Mischel that the level of funding that would be provided as part of the "core budget" would be in an amount reasonably sufficient for him to conduct an ongoing translational research program at the Mischel Lab, and that at a minimum, such funding would be sufficient to enable Plaintiff Mischel to conduct the continuous active research that Ludwig was obligated to conduct at the Branch under the Affiliation Agreement.

223.   The Mischel Lab Contract promised that to facilitate the formation of the Mischel Lab, Ludwig would assign Plaintiff Mischel 5 lab bays (sufficient for 15 people) in the southwest portion of the second floor of the Branch, associated equipment and tissue culture space, shared cold room space as well as an office in the Ludwig office core on the second floor.

224.   The Mischel Lab Contract also promised that Plaintiff Mischel would be given the opportunity to develop a collation of translational research groups, including two or three laboratory heads.  Ludwig promised to "provide our usual package of set-up and ongoing resources to each of these groups."

225.   The term of the Mischel Lab Contract is concurrent with Plaintiff Mischel's five year rolling tenure as a Member of Ludwig.

226.   Plaintiff Mischel received a separate Member Appointment Agreement dated March 13, 2012 ("Mischel Member Appointment Agreement").  The Mischel Member Appointment Agreement did not address the establishment or operation of the Mischel Laboratory, but only provided the "terms and conditions under which [Plaintiff Mischel] will serve as Member of the Ludwig Institute for Cancer Research."

227.   Plaintiff Mischel performed his obligations under the Mischel Lab Contract by moving his research to the Branch and establishing the Mischel Lab at the

Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Mischel Lab as set out in the Mischel Lab Contract.

228.   Ludwig unjustifiably breached its obligation to provide a core budget for the Mischel Laboratory, limiting the amount it funded to Plaintiff Mischel's own salary and benefits, but refusing to provide funds for salaries/benefits of others performing services in the Mischel Lab, supplies, travel and other expenses of operating the Mischel Lab.  Because of Ludwig's failure to fund the expenses of operating the Mischel Lab, Plaintiff Mischel was prevented from performing further research at the Mischel Lab.  Plaintiff Mischel is therefore excused from rendering such further performance.

229.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial.  As a result of Ludwig's breach of the Mischel Lab Contract, and Mischel Lab's inability to continue its research, Plaintiff Mischel has been damaged by, among other things, the destruction of the research program he built at the Branch, the forfeiture of royalties Plaintiff Mischel would have received from the fruits of the research by the Mischel Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Mischel Lab would have come to fruition.

## TENTH CAUSE OF ACTION

(Breach of Oegema Lab Contract; Brought by Plaintiff Oegema Against Ludwig)

230.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 229 above as though fully set forth herein.

231.   Web Cavenee extended a written offer on Ludwig's behalf, dated May 6, 2002, to Plaintiff Oegema to establish a laboratory at the Branch and confirming "a faculty position with us" as the "Head, Laboratory of Mitotic Mechanisms," and outlining the terms for establishing such laboratory at the Branch (the "Oegema Lab").

232.   Plaintiff Oegema accepted the written offer in writing, forming a binding bilateral contract (the "Oegema Lab Contract").  A true and complete copy of the

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

Oegema Lab Contract is attached hereto as the Exhibit "I" and is incorporated herein by reference.

233.   The Oegema Lab Contract promised that Plaintiff Oegema would be provided with a core budget of $300,000 each year (to be increased upon her promotion), which may be freely allocated by Plaintiff Oegema in operating the Oegema Lab. The core budget funding for Plaintiff Oegema's Lab included Plaintiff Oegema's salary/benefits, salaries/benefits of others in the Oegema Lab, supplies, travel and other expenses of operating the Oegema Lab.  In addition, Plaintiff Oegema was promised a percentage of overhead costs from federal grants administered by Ludwig, for use in the Oegema Lab. These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases, among other reasons, including that Oegema's core budget was increased upon promotion. A proportionate share of the Branch Director's budget was also expended to benefit the Oegema Lab each year.

234.   The Oegema Lab Contract promised that to facilitate the formation of the Oegema Lab, Ludwig would assign Plaintiff Oegema 3 lab bays (sufficient for 9 people) in the northwest portion of the Branch, associated equipment space, shared coldroom/darkroom/microscope-image analysis computer space as well as an office in the same area as the rest of the faculty and full access to shared equipment and animal space.

235.   The Oegema Lab Contract promised that Ludwig would "do everything we can to make sure that you have the best possible situation for continued success."

236.   The term of the Oegema Lab Contract is concurrent with Plaintiff Oegema's rolling tenure as a Member of Ludwig.  Initially, Ludwig provided Plaintiff Oegema with a 3-year renewable term, corresponding to her being an Assistant member of Ludwig.

237.   Upon her subsequent appointment as a Member, Plaintiff Oegema received a separate Member Appointment Agreement dated February 1, 2012

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

("Oegema Member Appointment Agreement").  The Oegema Member Appointment Agreement did not address the establishment or operation of the Oegema Laboratory, which was already in existence, but only provided the "terms and conditions under which [Plaintiff Oegema] will serve as Member of the Ludwig Institute for Cancer Research."

238.   Plaintiff Oegema performed her obligations under the Oegema Lab Contract by moving her research to the Branch and establishing the Oegema Lab at the Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Oegema Lab as set out in the Oegema Lab Contract.

239.   Ludwig unjustifiably breached its obligation to provide a core budget (which had been increased upon her promotion to full Membership) for the Oegema Laboratory, limiting the amount it funded to Plaintiff Oegema's own salary and benefits, but refusing to provide funds for salaries/benefits of others performing services in the Oegema Lab, supplies, travel and other expenses of operating the Oegema Lab.

240.   Because of Ludwig's failure to fund the expenses of operating the Oegema Lab, Plaintiff Oegema was prevented from performing further research at the Oegema Lab.  Plaintiff Oegema is therefore excused from rendering such further performance.

241.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Oegema Lab Contract, and Oegema Lab's inability to continue its research, Plaintiff Oegema has been damaged by, among other things, the destruction of the research program she built at the Branch, the forfeiture of royalties Plaintiff Oegema would have received from the fruits of the research by the Oegema Lab, and the business opportunities that she could have participated in, if the inventions that were ongoing at the Oegema Lab would have come to fruition.

**SECOND AMENDED COMPLAINT**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

## ELEVENTH CAUSE OF ACTION

(Breach of Ren Lab Contract; Brought by Plaintiff Ren Against Ludwig)

242.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 241 above as though fully set forth herein.

243.   Web Cavenee extended a written offer on Ludwig's behalf, dated April 17, 2001, to Plaintiff Ren to establish a laboratory at the Branch and confirming "a faculty position with us" as the "Head, Laboratory of Gene Regulation," and outlining the terms for establishing such laboratory at the Branch (the "Ren Lab").

244.   Plaintiff Ren accepted the written offer in writing, forming a binding bilateral contract (the "Ren Lab Contract").  A true and complete copy of the Ren Lab Contract is attached hereto as the Exhibit "J" and is incorporated herein by reference.

245.   The Ren Lab Contract promised that Plaintiff Ren would be provided with a core budget of $250,000 each year (to be increased upon promotion), which may be freely allocated by Plaintiff Ren in operating the Ren Lab. The core budget funding for Plaintiff Ren's Lab included Plaintiff Ren's salary/benefits, salaries/benefits of others in the Ren Lab, supplies, travel and other expenses of operating the Ren Lab.  In addition, Plaintiff Ren was promised 15% of overhead costs from federal grants administered by Ludwig, for use in the Ren Lab. These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases, among other reasons, including that Ren's core budget was increased upon promotion. A proportionate share of the Branch Director's budget was also expended to benefit the Ren Lab each year.

246.   The Ren Lab Contract promised that to facilitate the formation of the Ren Lab, Ludwig would assign Plaintiff Ren 3 lab bays (sufficient for 9 people) in the southwest portion of the Branch, associated equipment space, shared coldroom/darkroom/microscope-image analysis computer space as well as an office in the same area as the rest of the faculty and full access to shared equipment and animal space.

247.   The Ren Lab Contract promised that Ludwig would "do everything we can to make sure that you have the best possible situation for continued success."

248.   The term of the Ren Lab Contract is concurrent with Plaintiff Ren's rolling tenure as a Member of Ludwig.  Initially, Ludwig provided Plaintiff Ren with a 3-year renewable term, corresponding to his initially joining as an Assistant member of Ludwig.

249.   Upon his subsequent appointment as a Member, Plaintiff Ren received a separate letter dated September 25, 2009 ("Ren Member Appointment Letter").  The Ren Member Appointment Letter did not address the establishment or operation of the Ren Laboratory, which was already in existence, but only summarized Ren's promotion to Member and associated five-year rolling term as Member of the Ludwig Institute for Cancer Research.

250.   Plaintiff Ren performed his obligations under the Ren Lab Contract by moving his research to the Branch and establishing the Ren Lab at the Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Ren Lab as set out in the Ren Lab Contract.

251.   Ludwig unjustifiably breached its obligation to provide a core budget each year for the Ren Laboratory (as had been increased upon Plaintiff Ren's promotion to Member), limiting the amount it funded to merely Plaintiff Ren's own salary and benefits, and refusing to provide funds for salaries/benefits of others performing services in the Ren Lab, supplies, travel and other expenses of operating the Ren Lab.

252.   Because of Ludwig's failure to fund the expenses of operating the Ren Lab, Plaintiff Ren was prevented from performing further research at the Ren Lab. Plaintiff Ren is therefore excused from rendering such further performance.

253.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Ren Lab Contract, and the Ren Lab's inability to continue research, Plaintiff Ren has been damaged by, among other things, the destruction of the research program he built

at the Branch, the forfeiture of royalties Plaintiff Ren would have received from the fruits of the research by the Ren Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Ren Lab would have come to fruition.

## **TWELFTH CAUSE OF ACTION**

(Breach of Desai Lab Contract; Brought by Plaintiff Desai Against Ludwig)

254.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 253 above as though fully set forth herein.

255.   Web Cavenee extended a written offer on Ludwig's behalf, dated May 6, 2002, to Plaintiff Desai to establish a laboratory at the Branch and confirming "a faculty position with us" as the "Head, Laboratory of Chromosome Biology," and outlining the terms for establishing such laboratory at the Branch (the "Desai Lab").

256.   Plaintiff Desai accepted the written offer in writing, forming a binding bilateral contract (the "Desai Lab Contract").  A true and complete copy of the Desai Lab Contract is attached hereto as the Exhibit "K" and is incorporated herein by reference.

257.   The Desai Lab Contract promised that Plaintiff Desai would be provided with a core budget of $300,000 each year (to be increased upon promotion), which may be freely allocated by Plaintiff Desai in operating the Desai Lab. The core budget funding for Plaintiff Desai's Lab included Plaintiff Desai's salary/benefits, salaries/benefits of others in the Desai Lab, supplies, travel and other expenses of operating the Desai Lab.  In addition, Plaintiff Desai was promised a percentage of overhead costs from federal grants administered by Ludwig, for use in the Desai Lab. These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases, among other reasons, including that Desai's core budget was increased upon promotion. A proportionate share of the Branch Director's budget was also expended to benefit the Desai Lab each year.

258.   The Desai Lab Contract promised that to facilitate the formation of the Desai Lab, Ludwig would assign Plaintiff Desai 3 lab bays (sufficient for 9 people) in the northeast portion of the Branch, associated equipment space, shared coldroom/darkroom/microscope-image analysis computer space as well as an office in the same area as the rest of the faculty and full access to shared equipment and animal space.

259.   The Desai Lab Contract promised that Ludwig would "do everything we can to make sure that you have the best possible situation for continued success."

260.   The term of the Desai Lab Contract is concurrent with Plaintiff Desai's rolling tenure as a Member of Ludwig.  Initially, Ludwig provided Plaintiff Desai with a 3-year rewable term, corresponding to his initially joining as an Assistant member of Ludwig.

261.   Upon his subsequent appointment as a Member, Plaintiff Desai received a separate letter dated February 1, 2012, and effective January 1, 2011 ("Desai Member Appointment Letter").  The Desai Member Appointment Letter did not address the establishment or operation of the Desai Laboratory, which was already in existence, but only summarized Desai's promotion to Member and associated five-year rolling term as Member of the Ludwig Institute for Cancer Research.

262.   Plaintiff Desai performed his obligations under the Desai Lab Contract by moving his research to the Branch and establishing the Desai Lab at the Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Desai Lab as set out in the Desai Lab Contract.

263.   Ludwig unjustifiably breached its obligation to provide a core budget each year for the Desai Laboratory (as had been increased upon Plaintiff Desai's promotion to Member), limiting the amount it funded to merely Plaintiff Desai's own salary and benefits, and refusing to provide necessary funds for salaries/benefits of others performing services in the Desai Lab, supplies, travel and other expenses of operating the Desai Lab.

264.   Because of Ludwig's failure to fund the necessary expenses of operating the Desai Lab, Plaintiff Desai was prevented from performing further research at the Desai Lab.  Plaintiff Desai is therefore excused from rendering such further performance.

265.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Desai Lab Contract, and the Desai Lab's resulting inability to continue research, Plaintiff Desai has been damaged by, among other things, the destruction of the research program he built at the Branch, the forfeiture of royalties Plaintiff Desai would have received from the fruits of the research by the Desai Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Desai Lab would have come to fruition.

## THIRTEENTH CAUSE OF ACTION

(Breach of Kolodner Lab Contract; Brought by Plaintiff Kolodner Against Ludwig)

266.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 265 above as though fully set forth herein.

267.   Web Cavenee extended a written offer on Ludwig's behalf, dated December 18, 1996, to Plaintiff Kolodner to establish a laboratory at the Branch and confirming his position as "Head, Laboratory of Cancer Genetics," and outlining the terms for establishing such laboratory at the Branch (the "Kolodner Lab").

268.   Plaintiff Kolodner accepted the written offer in writing, forming a binding bilateral contract (the "Kolodner Lab Contract").  A true and complete copy of the Kolodner Lab Contract is attached hereto as the Exhibit "L" and is incorporated herein by reference.

269.   The Kolodner Lab Contract provided that a separate letter regarding his appointment as a Member and associated rolling five-year term, would be pursuant to a separate letter agreement, which was to "come directly from Dr. Old."  The letter

confirming Plaintiff Kolodner's appointment as a Member did not issue until July 31, 1997, and was effective September 1, 1997.

270.    The Kolodner Lab Contract provided that Plaintiff Kolodner would move certain equipment from Boston, but that he would be provided additional monies to set up "his group."

271.    The Kolodner Lab Contract promised that, "assuming a constant budget at this year's level, I would expect to provide you with US$ 465,000 each year in core support and $135,000 each year in salary . . . for a total of $600,000 per year."  The Kolodner Lab Contract also stated that, "[o]f course, in our annual budget discussion a greater or lesser need may be justified and I will expect you to be constructive in the best use of any such funds for the Branch." These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases, among other reasons. A proportionate share of the Branch Director's budget was also expended to benefit the Kolodner Lab each year.

272.    At or about the same time as the Kolodner Lab Contract was accepted by Plaintiff Kolodner, Ludwig assured Plaintiff Kolodner that the level of funding that would be provided as part of the "core budget," which would pay for his salary and benefits, along with salaries of others in the Kolodner Lab, supplies, travel and other necessary expenses incurred in operating the Kolodner Lab, would be in an amount reasonably sufficient for him to conduct an ongoing translational research program at the Kolodner Lab, and that at a minimum, such funding would be sufficient to enable Plaintiff Kolodner to conduct the continuous active research that Ludwig was obligated to conduct at the Branch under the Affiliation Agreement.

273.    The Kolodner Lab Contract also promised that the Kolodner Lab would be assigned up to 3 bays on the north side and six bays on the south side of the third floor of the Molecular Biology Research Facility III.  The Kolodner Lab Contract also promises that Plaintiff Kolodner and the other members of the Kolodner Lab would have full access to common Branch equipment, core facilities and administrative

support.  The Kolodner Lab Contract promised that Plaintiff Kolodner would be assigned two of the offices in MBRF III (one in Ludwig's core suite and one as negotiated by Plaintiff Kolodner with UCSD) and some of the equipment space adjacent to Plaintiff Kolodner's lab modules.

274.   The term of the Kolodner Lab Contract is concurrent with Plaintiff Kolodner's rolling tenure as a Member of Ludwig, as separately outlined in the letter that was to come from Dr. Old.

275.   Plaintiff Kolodner performed his obligations under the Kolodner Lab Contract by moving his research to the Branch and establishing the Kolodner Lab at the Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Kolodner Lab as set out in the Kolodner Lab Contract.

276.   Ludwig unjustifiably breached its obligation to provide a core budget each year for the Kolodner Laboratory, limiting the amount it funded to merely Plaintiff Kolodner's own salary and benefits, and refusing to provide necessary funds for salaries/benefits of others performing services in the Kolodner Lab, supplies, travel and other necessary expenses of operating the Kolodner Lab.

277.   Because of Ludwig's failure to fund the necessary expenses of operating the Kolodner Lab, Plaintiff Kolodner was prevented from performing further research at the Kolodner Lab.  Plaintiff Kolodner is therefore excused from rendering such further performance

278.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Kolodner Lab Contract, and the Kolodner Lab's resulting inability to continue research, Plaintiff Kolodner has been damaged by, among other things, the destruction of the research program he built at the Branch, the forfeiture of royalties Plaintiff Kolodner would have received from the fruits of the research by the Kolodner Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Kolodner Lab would have come to fruition.

## FOURTEENTH CAUSE OF ACTION

(Breach of Cleveland Lab Contract; Brought by Plaintiff Cleveland Against Ludwig)

279.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 278 above as though fully set forth herein.

280.   Web Cavenee extended a written offer on Ludwig's behalf, dated December 1, 1993, to Plaintiff Cleveland to establish a laboratory at the Branch and confirming his position as "Head, Laboratory for Cellular Biology," and outlining the terms for establishing such laboratory at the Branch (the "Cleveland Lab").

281.   Plaintiff Cleveland accepted the written offer in writing, forming a binding bilateral contract (the "Cleveland Lab Contract").  A true and complete copy of the Cleveland Lab Contract is attached hereto as the Exhibit "M" and is incorporated herein by reference.

282.   The Cleveland Lab Contract provided that a separate letter regarding his appointment as a Member and associated rolling five-year term, would be pursuant to a separate letter agreement, which was to "come directly from Dr. Old."  Such separate letter agreement that outlined the Member appointment was not received until March 14, 1996, effective January 1, 1996.

283.   The Cleveland Lab Contract provided that Plaintiff Cleveland would move certain equipment from Baltimore, but that he would be provided additional monies to set up "his group."

284.   The Cleveland Lab Contract promised that, "assuming a constant budget at this year's level, I would expect to provide you with US$325,000 each year in core support."  In addition, the Cleveland Lab Contract noted that Plaintiff Cleveland would receive a Base Salary of $125,000 each year."  The Cleveland Lab Contract also stated that, "[o]f course, in our annual budget discussion a greater or lesser need may be justified and I will expect you to be constructive in the best use of any such funds for the Branch." These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases,

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

86

1  among other reasons. A proportionate share of the Branch Director's budget was also
2  expended to benefit the Cleveland Lab each year.

3  285.   At or about the same time as the Cleveland Lab Contract was accepted by
4  Plaintiff Cleveland, Ludwig assured Plaintiff Cleveland that the level of funding that
5  would be provided as part of the "core budget," which would pay for his salary and
6  benefits, along with salaries of others in the Cleveland Lab, supplies, travel and other
7  necessary expenses incurred in operating the Cleveland Lab, would be in an amount
8  reasonably sufficient for him to conduct an ongoing translational research program at
9  the Cleveland Lab, and that at a minimum, such funding would be sufficient to enable
10 Plaintiff Cleveland to conduct the continuous active research that Ludwig was
11 obligated to conduct at the Branch under the Affiliation Agreement.

12 286.   The Cleveland Lab Contract also promised that the Cleveland Lab would
13 be assigned up to 15 bench/desk positions in the Ludwig space on the third floor of the
14 Molecular Biology Research Facility III.  The Cleveland Lab Contract also promises
15 that Plaintiff Cleveland and the other members of the Cleveland Lab would have full
16 access to common Branch equipment, core facilities and administrative support.  The
17 Cleveland Lab Contract promised that Plaintiff Cleveland would be assigned one of
18 the offices in MBRF III and some of the equipment space adjacent to Plaintiff
19 Cleveland's lab module.

20 287.   The term of the Cleveland's Lab Contract is concurrent with Plaintiff
21 Cleveland's rolling tenure as a Member of Ludwig, as was separately outlined by the
22 letter that was to come from Dr. Old.

23 288.   Plaintiff Cleveland performed his obligations under the Cleveland Lab
24 Contract by moving his research to the Branch and establishing the Cleveland Lab at
25 the Branch on or about April 1995, conducting medical research at the Branch and
26 otherwise complying with the requirements for the Cleveland Lab as set out in the
27 Cleveland Lab Contract.

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

SECOND AMENDED COMPLAINT

289.   Ludwig unjustifiably breached its obligation to provide a core budget each year for the Cleveland Laboratory, refusing to provide necessary funds for salaries/benefits of those persons performing services in the Cleveland Lab, supplies, travel and other necessary expenses of operating the Cleveland Lab.

290.   Because of Ludwig's failure to fund the necessary expenses of operating the Cleveland Lab, Plaintiff Cleveland was prevented from performing further research at the Cleveland Lab.  Plaintiff Cleveland is therefore excused from rendering such further performance.

291.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Cleveland Lab Contract, and the Cleveland Lab's resulting inability to continue research, Plaintiff Cleveland has been damaged by, among other things, the destruction of the research program he built at the Branch, the forfeiture of royalties Plaintiff Cleveland would have received from the fruits of the research by the Cleveland Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Cleveland Lab would have come to fruition.

## FIFTEENTH CAUSE OF ACTION

(Breach of Furnari Lab Contract; Brought by Plaintiff Furnari Against Ludwig)

292.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 through 291 above as though fully set forth herein.

293.   Richard Kolodner extended a written offer on Ludwig's behalf, dated December 10, 2015, to Plaintiff Furnari to establish a laboratory at the Branch as the "Head, Laboratory of Tumor Biology," and outlining the terms for establishing such laboratory at the Branch (the "Furnari Lab").

294.   Plaintiff Furnari accepted the written offer in writing, forming a binding bilateral contract (the "Furnari Lab Contract").  A true and complete copy of the Furnari Lab Contract is attached hereto as the Exhibit "N" and is incorporated herein by reference.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

SECOND AMENDED COMPLAINT

295.   The Furnari Lab Contract promised that Plaintiff Furnari would be provided with a core budget of up to $650,700 each year, which may be freely allocated by Plaintiff Furnari in operating the Furnari Lab. The core budget funding for Plaintiff Furnari's Lab included Plaintiff Furnari's salary/benefits, salaries/benefits of others in the Furnari Lab, supplies, travel and other expenses of operating the Furnari Lab.  In addition, Plaintiff Furnari was promised a percentage of overhead costs from federal grants administered by Ludwig, for use in the Furnari Lab. These budgets were adjusted upward on a yearly basis to account for inflation, salary scale changes due to cost of living increases and merit increases, among other reasons. A proportionate share of the Branch Director's budget was also expended to benefit the Furnari Lab each year.

296.   The Furnari Lab Contract promised that to facilitate the formation of the Furnari Lab, Ludwig would assign Plaintiff Furnari 6 lab bays in the southwest portion of the Branch, associated equipment and tissue culture space, shared cold room space as well as an office.

297.   The Furnari Lab Contract promised that Ludwig would "do everything we can to make sure that you have the best possible situation for continued success."

298.   The term of the Furnari Lab Contract is concurrent with Plaintiff Furnari's rolling tenure as a Member of Ludwig.

299.   Plaintiff Furnari received a separate letter dated December 10, 2015, and effective January 1, 2016 ("Furnari Member Appointment Letter").  The Furnari Member Appointment Letter did not address the establishment or operation of the Furnari Laboratory, but only summarized Furnari's five-year rolling term as Member of the Ludwig Institute for Cancer Research.

300.   Plaintiff Furnari performed his obligations under the Furnari Lab Contract by moving his research to the Branch and establishing the Furnari Lab at the Branch, conducting medical research at the Branch and otherwise complying with the requirements for the Furnari Lab as set out in the Furnari Lab Contract.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

301.   Ludwig unjustifiably breached its obligation to provide a core budget each year for the Furnari Laboratory, limiting the amount it funded to merely Plaintiff Furnari's own salary and benefits, and refusing to provide necessary funds for salaries/benefits of others performing services in the Furnari Lab, supplies, travel and other expenses of operating the Desai Lab.

302.   Because of Ludwig's failure to fund the necessary expenses of operating the Furnari Lab, Plaintiff Furnari was prevented from performing further research at the Furnari Lab.  Plaintiff Furnari is therefore excused from rendering such further performance.

303.   As a direct and proximate result of Ludwig's breaches, Plaintiff has been damaged in an amount according to proof at trial. As a result of Ludwig's breach of the Furnari Lab Contract, and the Furnari Lab's resulting inability to continue research, Plaintiff Furnari has been damaged by, among other things, the destruction of the research program he built at the Branch, the forfeiture of royalties Plaintiff Furnari would have received from the fruits of the research by the Furnari Lab, and the business opportunities that he could have participated in, if the inventions that were ongoing at the Furnari Lab would have come to fruition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.   For preliminary and permanent injunctive relief pursuant to California Code of Civil Procedure §526 on grounds that Plaintiffs are entitled to the relief requested, Ludwig's commission and continuance of its breaches during the litigation would produce great or irreparable injury to Plaintiffs, and pecuniary compensation alone will not afford adequate relief. Plaintiffs seek issuance of an order, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, preliminarily and permanently enjoining Ludwig and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, enjoining them from closing the Branch prior to the Termination Date and ordering

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

such persons to, in good faith, adequately fund and support Plaintiffs' continuous active medical research at the Branch through the Termination Date, in an amount no less than annual funding of $12,907,884 for 2019, $13,333,141 for 2020, $13,383,728 for 2021, $13,862,516 for 2022, and $14,343,795 for 2023.

2.  Under the First Cause of Action, for declaratory relief, including a declaration regarding the rights, duties, and obligations of Ludwig under Ludwig's contracts with each of Plaintiffs, including, without limitation, the Intellectual Property Agreements and the policies to which Ludwig was bound, and under the Affiliation Agreement, including, without limitation**:**

- o a declaration that each of the Plaintiffs is a third-party beneficiary of the Affiliation Agreement;

- o a declaration that Ludwig's Operative Punitive Budget, which completely eliminates Plaintiffs' research funding starting in 2020, constitutes a breach of Ludwig's obligation to fund Plaintiffs' "continuous, active conduct of medical research" at the Branch throughout the term of the Affiliation Agreement, which terminates on December 31, 2023, at the earliest;

- o a declaration that Ludwig is required under the Affiliation Agreement to provide annual funding to the Branch through December 31, 2023 at an amount consistent with pre-2019 levels and consistent with the parties' course of performance, including support of lab personnel, equipment, adequate administration and the Plaintiffs' salaries, and that the minimum amount of Branch funding required is no less than annual funding of $12,907,884 for 2019, $13,333141 for 2020, $13,383,728 for 2021, $13,862,516 for 2022 and $14,343,795 for 2023, and further that such is the minimum amount required to conduct "continuous active conduct of medical research" at the Branch;

- o  a declaration that the all amounts funded to the Branch by Ludwig shall be used solely to support the "continuous and active medical research" at the Branch, and for no other purposes.
- o  a declaration that the May 21, 2018 and February 20, 2019 letters from Ludwig to each of Plaintiffs are void *ab initio*;
- o  a declaration that Ludwig cannot invoke Section 7 of the Policy as it relates to the Branch closure until the occurrence of the Termination Date in accordance with the Affiliation Agreement, and that upon such Termination Date, the balance of Plaintiffs' respective "then-current" terms are calculated as follows: (a) five (5) years following the Termination Date as to Plaintiff Cleveland; (b) four (4) years and eight (8) months following the Termination Date as to Plaintiff Kolodner; (c) five (5) years following the Termination Date as to Plaintiff Oegema; (d) five (5) years following the Termination Date as to Plaintiff Desai; (e) four (4) years and seven (7) months following the Termination Date as to Plaintiff Mischel; (f) four (4) years and nine (9) months following the Termination Date as to Plaintiff Ren; and (g) five (5) years following the Termination Date as to Plaintiff Furnari;
- o  a declaration that as of July 2018 Plaintiffs have no further obligations under the Intellectual Property Agreements and shall have rights to any and all uses of all intellectual property, technical information, know how, discoveries (whether patentable or not) that they may conceive of or reduce to practice at the Branch or the Hospital.

3.  Under the Second Cause of Action, for specific performance;

4.  Under the Third Cause of Action, for compensatory damages in an amount according to proof;

5.  Under the Fourth Cause of Action, for damages in amount according to proof and/or assumed damages, and for exemplary damages;

6.    Under the Fifth Cause of Action, for damages in amount according to proof and/or assumed damages, and for exemplary damages;

7.    Under the Sixth Cause of Action, for compensatory damages in an amount according to proof;

8.    Under the Seventh Cause of Action, for compensatory damages in an amount according to proof;

9.    Under the Eighth Cause of Action, for compensatory damages stemming from Plaintiffs' justifiable reliance, for lost profits, each according to proof, and for exemplary damages;

10.   Under the Ninth Cause of Action, for compensatory damages to compensate Plaintiff Mischel for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

11.   Under the Tenth Cause of Action, for compensatory damages to compensate Plaintiff Oegema for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

12.   Under the Eleventh Cause of Action, for compensatory damages to compensate Plaintiff Ren for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

13.   Under the Twelfth Cause of Action, for compensatory damages to compensate Plaintiff Desai for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

14.   Under the Thirteenth Cause of Action, for compensatory damages to compensate Plaintiff Kolodner for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

15.   Under the Fourteenth Cause of Action, for compensatory damages to compensate Plaintiff Cleveland for all detriment proximately caused by the breach, according to proof, and for exemplary damages;

16.   Under the Fifteenth Cause of Action, for compensatory damages to

1   compensate Plaintiff Furnari for all detriment proximately caused by the breach,

2   according to proof, and for exemplary damages;

3       17.    For pre-judgment interest in accordance with law;

4       18.    For expenses and costs incurred herein; and

5       19.    For such other and further relief as this Court deems just and proper.

6

7                                    **BARNES & THORNBURG LLP**

8

9   Dated:  July 8, 2020          By:    /s/ Ali M.M. Mojdehi
                                          Ali M.M. Mojdehi
10

11                                  Attorneys for Plaintiffs Doctors Don
                                    Cleveland, Arshad Desai, Frank Furnari,
                                    Richard Kolodner, Paul Mischel, Karen
12                                  Oegema, and Bing Ren

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28