UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND et al., | Case No.: 19cv2141 JM (JLB) |
| Plaintiffs, | |
| v. | **ORDER ON DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH PREJUDICE** |
| LUDWIG INSTITUTE FOR CANCER RESEARCH LTD. et al., | |
| Defendant. | |

Defendants Ludwig Institute for Cancer Research ("Ludwig"), Chi Van Dang, Edward A. McDermott, Jr., and John L. Notter ("Defendants") move to dismiss portions of the Second Amended Complaint ("the SAC") (Doc. No. 26) pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 28.) The motion has been fully briefed and the court finds it suitable for submission without oral argument in accordance with Civil Local Rule 7.1(d)(1). For the below reasons, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART.**

## I.    BACKGROUND

According to the SAC, Plaintiffs Don Cleveland, Arshad Desai, Frank Furnari, Richard Kolodner, Paul Mischel, Karen Oegema, and Bing Ren ("Plaintiffs") are

internationally acclaimed cancer research scientists and physicians.  (¶ 1.)[1]  Ludwig is an international nonprofit organization dedicated to finding a cure for cancer that operates multiple cancer research branches.  (¶¶ 1, 142.)  In 1991, Ludwig entered into an "Affiliation Agreement" ("the AA") with the University of California at San Diego (UCSD) to establish a San Diego Branch ("the Branch").  (¶ 51.) Ludwig agreed to conduct "active" and "continuous" medical research to "discover, develop, or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer." (¶ 53.)  Ludwig also agreed to "bear the costs directly related to conducting the research program." (¶ 62.) The term of the AA is coterminous with a lease agreement for research facilities between Ludwig and UCSD, which allows Ludwig to terminate the lease no earlier than December 31, 2023.  (¶¶ 4, 16, 56.)  In addition to leasing its facilities to Ludwig, UCSD agreed to: (1) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff at the Branch; (2) grant "academic recognition and titles" to qualified Ludwig employees; and (3) make full time equivalency positions available for Ludwig employees. (¶ 154.)

Between 1996 and 2016, Ludwig hired Plaintiffs to work at the Branch.  (¶¶ 26-32.) In 2018, Ludwig announced that it would "cease funding the Branch and otherwise halt the 'continuous active conduct of medical research' at the Branch." (¶ 15.)  Effective January 1, 2020, Ludwig "terminated all funding for Plaintiffs' laboratories." (¶ 18.)  However, "Ludwig continues to fund at least part of the rent due [to UCSD] and it continues to pay the Plaintiffs' own salaries and benefits, but nothing more." (¶ 18.)  As a result, Plaintiffs' "[l]aboratories and ongoing translational research programs have ceased or substantially curtailed ongoing research projects, except to the extent that they have access to outside grants." (*Id.*)

---

[1] Citations to "¶" refer to the SAC, (Doc. No. 26).

Plaintiffs filed their initial Complaint on November 7, 2019.  On June 17, 2020, this court partially granted Defendants' motion to dismiss Plaintiffs' First Amended Complaint. (Doc. No. 25.)  On July 8, 2020, Plaintiffs filed the SAC, which contains claims against Ludwig for: (1) breach of the AA; (2) breach of Plaintiffs' IP agreements; (3) breach of Plaintiffs' lab contracts; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel under the AA; and (5) declaratory relief.  Plaintiffs also bring claims against all Defendants for defamation per se  and false light invasion of privacy, but Defendants do not move to dismiss those claims.

## II.   LEGAL STANDARDS

A complaint may be dismissed under for failure to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be based on the lack of a cognizable legal theory or on the absence of facts that would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint "'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its

1  face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the
2  court to draw the reasonable inference that the defendant is liable for the misconduct
3  alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

4  **III.   DISCUSSION**

5      **A.   Third Party Beneficiaries**

6      For the second time, Plaintiffs bring claims for breach of the AA.  Plaintiffs allege
7  that Ludwig has a duty to fund "active, continuous medical research" at the Branch until at
8  least December 31, 2023, when the AA expires, and that Ludwig breached this duty
9  because its current funding renders active, continuous research under the AA "impossible."
10  (¶ 156.)  Because they are not parties to the AA, Plaintiffs again allege they are third party
11  beneficiaries of the AA.  (¶ 153.)  Ludwig argues that Plaintiffs fail to allege sufficient
12  facts supporting their theory that Plaintiffs were intended third party beneficiaries of the
13  AA.  (Doc. No. 28-1 at 11.)

14      Under California law, courts determine third party beneficiary status based on:

15
16  (1) whether the third party would in fact benefit from the contract, . . . (2)
    whether a motivating purpose of the contracting parties was to provide a
    benefit to the third party, and (3) whether permitting a third party to bring its
17      own breach of contract action against a contracting party is consistent with
    the objectives of the contract and the reasonable expectations of the
18      contracting parties.
19

20  *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 829-30 (2019).  Courts determine whether
21  these elements are met by "carefully examine[ing] the express provisions of the contract at
22  issue, as well as all of the relevant circumstances under which the contract was agreed to."
23  *Id.* at 829.  "All three elements must be satisfied to permit the third party action to go
24  forward." *Id.* at 830.

25      **1.   Benefit in Fact**

26      In its previous motion to dismiss, Ludwig did not dispute that Plaintiffs would in
27  fact benefit from the AA.  (*See* Doc. No. 14-1.)  This court nonetheless noted that "[t]o the
28  extent that Plaintiffs have received compensation from Ludwig (and continue to do so), as

well as opportunities to practice medicine, teach at UCSD, and conduct adequately funded research for multiple years, Plaintiffs have benefited from the AA."  (Doc. No. 25 at 9.) The court also noted, however, that "the few cases applying the first element of the *Goonewardene* test suggest that, in order to establish that a third party 'would in fact benefit from the contract,' the third party must have been at least somewhat identifiable at the time when the contract was executed."  (*Id.* at 9-10.)

This time around, Ludwig again does not dispute that Plaintiffs have benefited in fact from the AA by receiving compensation and professional opportunities.  Instead, Ludwig argues that Plaintiffs were not even somewhat identifiable at the time the AA was executed because Plaintiffs do not allege they were being considered or recruited when the AA was first executed in 1991.  (Doc. No. 28 at 11.)  Ludwig notes that the longest-tenured Plaintiff, Dr. Cleveland, was not hired until December 1993.  (*Id.*)  As this court previously found, however, "to the extent that the 1991 AA was amended and/or renewed in 2000, 2004, 2012, and 2015, (Doc. No. 21-1 at 35-48), at least some of the Plaintiffs were employed by Ludwig at those later points in time."  (Doc. No. 25 at 9.)  Although Plaintiffs do not address the post-*Goonewardene* cases suggesting that the Plaintiffs must have been at least somewhat identifiable in 1991, Ludwig does not dispute that some of the Plaintiffs were identifiable because they were working for Ludwig when the AA was amended and/or renewed.[2]  *See also City of Oakland v. Oakland Raiders*, Case No. 18-cv-07444-JCS, 2019 WL 3344624, at *14 (N.D. Cal. July 25, 2019) (describing the benefit in fact element as a "relatively low hurdle").  Accordingly, Ludwig has not met its burden of showing that

---

[2] This court also previously found that "*Goonewardene* instructs that when an employer executes a contract that will 'generally' benefit its employees, but its employees are not signatories to the contract, that fact is insufficient to find those employees would 'in fact' benefit from the contract in a way that supports their status as third party beneficiaries[.]" (Doc. No. 25 at 9-10.)  Plaintiffs do not dispute that, as employees, they merely "generally benefited" from the AA.  In its motion, however, Ludwig does not challenge the SAC on this basis.

19cv2141 JM (JLB)

Plaintiffs fail to plausibly allege they benefited in fact from the AA.

## 2.    Motivating Purpose

With respect to whether "a motivating purpose of the contracting parties was to provide a benefit to the third party," *Goonewardene* explained "the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract." 6 Cal. 5th at 835. The court emphasized that it is the contracting parties' intent to benefit the third party that controls. *Id.* at 835 (citations omitted). In its first motion to dismiss, Ludwig argued the AA was not intended to benefit the Plaintiffs because the AA did not mention Plaintiffs "individually or as a class." (Doc. No. 14-1 at 15-16.) Ludwig argued that the AA "simply allocate[d] costs and responsibilities between the Institute and UCSD." (*Id.* at 16.) In opposition, Plaintiffs argued they were intended beneficiaries because, even though they were not individually mentioned in the AA, they were within the class of "professional scientists" the AA required Ludwig to employ.[3] (Doc. No. 15 at 13.) This court nonetheless found that the "acquisition of necessary personnel" was merely the means by which Ludwig and UCSD agreed to achieve their mutual mission. (Doc. No. 25 at 16-17.)

This time around, Ludwig again argues that nothing in the AA indicates a motivating purpose to benefit Plaintiffs. (Doc. No. 28-1 at 12.) Ludwig also argues that the new facts alleged in the SAC do not show an intent to benefit Plaintiffs. (Doc. No. 28-1 at 13-14.) In opposition, Plaintiffs again argue they are within the class of persons the AA was intended to benefit, (Doc. No. 29 at 13-14), but this time they emphasize that a recital in the AA recognizes that "the research . . . . will provide the academic and scientific environment needed to attract and retain . . . . scientific personnel of the high caliber and

---

[3] The only support Plaintiffs provided for this argument was a citation to *Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1232 (2004), which this court did not find controlling or persuasive because the plaintiffs there were identifiable at the time the agreement at issue was executed. (*See* Doc. No. 25 at 13.)

recognized international scientific reputation required for the most effective conduct of said research." (Doc. Nos. 29 at 14; 26-1 at 64.)  Plaintiffs also argue that the new facts alleged in its SAC concerning Dr. Cavenee's involvement in the formation of the AA support that "the anticipated arrival of and the parties' desire to induce others like him" was a motivating purpose for executing the AA. (Doc. No. 29 at 10.)  Plaintiffs also cite several additional pre-*Goonewardene* cases finding that unidentifiable parties were third party beneficiaries to contracts because they were within the class of persons expressly intended to benefit from those contracts. *See Harper v. Wausau Ins. Co.*, 56 Cal. App. 4th 1079, 1087 (1997) (allowing a direct action against an insurance company to enforce the terms of an insurance policy by the injured third party); *Steve Schmidt & Co. v. Berry*, 183 Cal. App. 3d 1299, 1313 (Ct. App. 1986) (finding the plaintiff had enforceable rights against the defendant under a theory that the plaintiff was a member of a class that was intended to be directly benefited by the defendant's promise); *Outdoor Servs., Inc. v. Pabagold, Inc.*, 185 Cal. App. 3d 676, 681 (Ct. App. 1986) ("It is not necessary that an express beneficiary be specifically identified in the contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created.").

Again, however, nothing in the SAC,[4] the AA, or the additional cases cited by Plaintiffs cuts against this court's previous finding that the agreement in the AA to acquire necessary personnel was more than a means to an end.  Although Ludwig and UCSD clearly intended, when they executed the AA, to attract and retain scientific personnel who, like Plaintiffs, were of internationally recognized high caliber, this does not, as Plaintiffs essentially argue, automatically make them third party beneficiaries of the AA.  The fact that a fellow scientist, Dr. Cavenee, who is not a party in the instant lawsuit, was involved in the formation of the AA and subsequent hiring of some Plaintiffs suggests, at most, that

---

[4] Plaintiffs' new allegation that the AA was executed "for the specific purpose of funding Cavenee," (¶ 51), is conclusory and not based on any facts materially distinguishable from those allegedly supporting the same conclusion for Plaintiffs.

a motivating purpose of the AA was to benefit Dr. Cavenee.  But the same cannot be said of Plaintiffs, who were all hired years later.  To find otherwise would suggest, unless disclaimed otherwise, that when institutions join forces to achieve an end that necessitates the subsequent hiring of qualified personnel, that those future employees, whoever they turn out to be, were intended beneficiaries of the agreement.  Certainly, the advancement towards a treatment and cure for cancer contemplated in the AA necessitated not only the resources of institutions like Ludwig and UCSD, but the commitment of reputable scientists like Plaintiffs.  As a matter of California contract law, however, Plaintiffs' claims are not afforded special status over any other employee plaintiffs whose jobs exist because of an earlier agreement made by their employer to which they were not a party, and in which they were not specifically identified.  Accordingly, Plaintiffs have not sufficiently alleged that a motivating purpose of the AA was to benefit them.

### 3.    Objectives and Reasonable Expectations

As noted above, the third element in the *Goonewardene* test is whether "permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties."  6 Cal. 5th at 830.  This court previously found this element was not satisfied because: (1) Plaintiffs could bring suit against Ludwig under their individual employment agreements; (2) as a party to the AA, UCSD could bring suit against Ludwig to enforce the terms of the AA; and (3) permitting Plaintiffs to sue potentially undermines nonprofit organizations' incentive to affiliate with universities to conduct socially beneficial research for their mutual benefit.  (Doc. No. 25 at 18-19.)  Additionally, as pointed out by Ludwig, the dispute resolution provision in the AA, which requires an initial informal attempt at resolution followed by binding arbitration, is inconsistent with an intent to permit Plaintiffs to bring suit to enforce the AA.  (Doc. No. 28-1 at 15.)  Accordingly, this court determined that "there exists nothing in the AA evidencing a reasonable expectation of the parties that third party enforcement rights by Ludwig's lead researchers against Ludwig for funding shortfalls were being created or contemplated in 1991."  (Doc.

No. 25 at 19.)

This time around, Plaintiffs do not resolve, or attempt to resolve, these particular issues based on facts alleged in their SAC.  Instead, Plaintiffs make several piecemeal arguments, none of which are availing.  First, Plaintiffs argue "there is nothing in the terms of the AA that would suggest that UCSD is better situated to enforce the terms of the AA, where it is the Plaintiffs that have been primarily damaged."  (Doc. No. 28 at 15.)  As a party to the AA, however, UCSD is obviously in a better position than Plaintiffs to sue Ludwig for breach of the AA.  Also, whether it was UCSD or Plaintiffs that were "primarily" damaged is not the standard for determining Plaintiffs' third party beneficiary status, and it cannot reasonably be inferred that UCSD's potential damages, though different, were less significant than Plaintiffs' alleged damages.

Second, Plaintiffs argue that in *Goonewardene* the absent employer, not the plaintiff third party employee, was better situated to sue the defendant payroll processing company because the "employer was primarily liable for a violation of wage and hour statutes and could sue [the defendant] for indemnity if it was sued."  (Doc. No. 29 at 15.)  These particular facts in *Goonewardene* do not, however, suggest that UCSD is somehow in a worse position to sue Ludwig than Plaintiffs.  Key to *Goonewardene's* holding that the plaintiff was not a third party beneficiary was that a party to the contract was "available" and "fully capable" of bringing a breach of contract claim, and that it was "not necessary to effectuate the objectives of the contract" to allow the third party to the contract to sue to enforce it.  *See* 6 Cal. 5th at 836.

Third, Plaintiffs argue they are the only party that can "effectively" enforce the AA because: (1) the "principal financial benefits of the AA flowed to Plaintiffs;" (2) UCSD is not liable to Plaintiffs for Ludwig's performance; and (3) although UCSD has rights under the lease, "it is not clear what economic damages UCSD could assert."  (Doc. No. 29 at 16.)  That Plaintiffs may have more *incentive* to enforce the AA does not necessarily mean they are the only party that can effectively enforce the AA.  Additionally, this argument unreasonably presumes the only benefit UCSD gained by associating with Ludwig was

rent.  As discussed in this court's previous order, UCSD, as an educational and medical institution, reasonably benefited from Ludwig's performance under the AA in a variety of ways at least some of which overlapped with Plaintiffs' interests, (*see* Doc. No. 26 at 15-16), yet UCSD has not joined the instant suit.  Regardless, even if Plaintiffs are in a position to more "effectively" enforce the provisions in the AA that benefit both Plaintiffs and UCSD, this does not suggest that Ludwig intended to allow Plaintiffs to enforce the AA.

Fourth, Plaintiffs argue that ensuring ongoing cancer research and protecting contractual rights are important policy reasons to allow Plaintiffs to sue under the AA. (Doc. No. 29 at 16-17.)  While these are indeed important policy reasons, public benefit is not determinative of third party beneficiary status.  *See Raiders*, 2019 WL 3344624, at \*16 ("This Court is bound by the test set by the California Supreme Court [in *Goonewardene*], which does not consider whether allowing suit by a third party would serve public interests separate from the interests of the contracting parties.").  Plaintiffs' policy argument also ignores other potentially desirable policies, such as encouraging professional employees to carefully consider their employment contracts, and encouraging research institutions and universities to enter into flexible affiliation agreements.

Finally, Plaintiffs argue that "[t]he structure [of the AA] is . . . . precisely what one would expect to find in a contract benefitting one or more donee beneficiaries [which are] recognized as properly enforceable by the donee."  (Doc. No. 29 at 14.)  In support of this argument, Plaintiffs rely on *Goonewardene* while at the same time acknowledging that *Goonewardene* "indicat[ed] that [the donee-creditor] categories were not themselves the test."  (*Id.* at 15.)  Indeed, Plaintiffs are correct that *Goonewardene* relegated the "donee-creditor" distinction in third-party beneficiary jurisprudence.  *See* 6 Cal. 5th at 829 ("[T]his court has not relied primarily on those categories . . . . in the numerous cases in which we have discussed and applied the third party beneficiary doctrine.").  Regardless, the facts do not suggest that Plaintiffs are donees.  As explained in *Goonewardene*, "[t]he classic donee-beneficiary case involved a contract in which party A, in return for some consideration, promised party B that it would pay nonparty T a sum that B wished to give to T as a gift[.]"

*Id.* at 828 n.3.  There is nothing in the record to suggest, of course, that Ludwig, in return for some consideration, promised UCSD that it would pay Plaintiffs a sum that UCSD wished to give Plaintiffs as a gift.  Plaintiffs make no allegation in their SAC even implying that either Ludwig or UCSD ever intended to give Plaintiffs a gift.

Accordingly, Plaintiffs have not sufficiently alleged that permitting them to bring their own breach of contract action against Ludwig under the AA is consistent with the objectives of the AA and the reasonable expectations of the contracting parties.  Moreover, for the foregoing reasons, Plaintiffs have not sufficiently alleged they are third party beneficiaries of the AA.  Therefore, Plaintiffs have not alleged a plausible claim for breach of the AA (Count II).

## B.      Breach of IP Agreements

Plaintiffs allege that by "first repudiating, then cutting and ultimately ceasing all research support funding" Ludwig is continually breaching its obligation under their IP agreements.  (¶ 193.)  For several reasons, Plaintiffs allege that a promise by Ludwig to fund active, continuous research was incorporated into their IP agreements with Ludwig.  (¶ 190.)  First, Plaintiffs allege that because the IP agreements were made in "consideration of employment by" Ludwig, Ludwig's policies were incorporated into the IP agreements.  (*Id.*)  Second, Plaintiffs allege that Ludwig's IP policy provides that Plaintiffs assigned their IP rights to Ludwig "[i]n consideration of the research opportunities and support provided by [Ludwig]."  (¶¶ 187-88, 190.)  Third, Plaintiffs argue that Ludwig's promise to UCSD in the AA to fund active, continuous research was incorporated into the IP agreements because the IP agreements "reference that the sharing of royalties from [IP] is as set out elsewhere, and in turn, royalty sharing is addressed in the [IP policy] and [AA]."  (¶ 190.)

"For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal[.]"  *R.W.L. Enters. v. Oldcastle, Inc.*, 17 Cal. App. 5th 1019, 1027-28 (2017) (quotation marks and citation omitted).  Here, the acknowledgment in the IP agreements that they were made "in consideration of

employment" is not a clear and unequivocal reference to Ludwig's IP policy indicating an intent to incorporate the policy, or any Ludwig policy, into the IP agreements. Regardless, almost all of Plaintiffs' IP agreements specifically provide that royalties will be shared "as set out" in the IP policy.[5] (*See*, *e.g.*, Doc. No. 26-7 at 4 ¶ 2.) This shows intent to incorporate the IP policy into the IP agreements. The IP policy, however, merely states that Plaintiffs give up their IP rights in exchange for "research opportunities and support provided by [Ludwig]." (*See* Doc. No. 26-5 at 23.) As Ludwig points out, Plaintiffs' allegations make clear they have already been provided with "research opportunities and support." (Doc. No. 28-1 at 25.) Contrary to Plaintiffs' argument otherwise, (*see* Doc. No. 29 at 28), it cannot be reasonably inferred that Ludwig's promise to provide "research opportunities and support" was a promise to do so perpetually, even if Ludwig had done so for years without interruption.

Additionally, in contrast to the IP policy, nothing in the IP agreements suggests the parties intended to incorporate any of the terms of the AA, especially terms that do not directly implicate IP. That the IP agreements specifically reference the IP policy, but not the AA, indicates an intent *not* to incorporated the AA. Accordingly, it cannot be reasonably inferred that the parties intended to incorporate Ludwig's promise in the AA to conduct active, continuous research into Plaintiffs' IP agreements.

In opposition, Plaintiffs cite *Boyd v. Oscar Fisher Co.*, 210 Cal. App. 3d 368, 378 (Ct. App. 1989), in which the court held that (1) "[c]ourts will construe together several documents concerning the same subject and made as part of the same transaction even though the documents were not executed contemporaneously and do not refer to each other," and (2) "[i]t is generally a factual question whether several documents were intended to govern the same transaction." *Id.* (citations omitted). As recognized in *Boyd*,

---

[5] The sole exception is the IP agreement for Dr. Cleveland, which states more generally that royalties will be shared "on such terms and conditions as [Ludwig] will from time to time establish." (Doc. No. 26-7 at 2 ¶ 2.)

however, under California law "[s]everal contracts relating to the same matters, *between the same parties*, and made as parts of substantially one transaction, are to be taken together." CAL. CIV. CODE § 1642 (emphasis added). Here, the AA and IP agreements do not refer to each other, were not executed contemporaneously, and were not executed by the same parties. Plaintiffs nonetheless point to *Holguin v. Dish Network LLC*, 229 Cal. App. 4th 1310, 1322 (2014) in which the court found that "[w]here . . . . the written instruments are all part of the same transaction, they may be considered together even when the counterparties to each instrument are different." *Holguin* is distinguishable and unpersuasive, however, because in *Holguin* the court found that purchasing cable, telephone, and internet services through AT&T was all part of the same transaction, even though the plaintiffs were required to sign agreements with multiple vendors. *Id.* at 1315-15. The court reasoned: (1) most of the multiple documents signed by the plaintiffs referenced each other and were executed mostly at the same time; (2) the vendors were in "substantial interrelationships;" and (3) the plaintiff customer initiated the order for bundled services in a single document. *Id.* at 1320-22. Although the execution of the AA in 1991 and the execution, years later, of Plaintiffs' IP agreements are related transactions,[6] they are not reasonably part of the same transaction, at least not to the extent that the purchase of bundled home cable, internet, and phone services through a singled company

---

[6] As stated by Plaintiffs, the initial term of the 1991 AA, which was dependent on the term of the lease with UCSD, was six years, but the AA automatically renewed until 2009. (Doc. No. 29 at 24.) The term of the AA was subsequently extended to February 28, 2026, but Ludwig exercised its option to an early termination so that the term would expire December 31, 2023. (*Id.*) Plaintiffs entered into the IP agreements in 1995 (Cleveland), 1997 (Kolodner), 2001 (Ren), 2003 (Desai and Oegema), and 2012 (Mischel). (*See* Doc. No. 21-3 at 94-105.) Although Ludwig and UCSD amended and/or renewed the AA in 2000, 2004, 2012, and 2015, (Doc. No. 21-1 at 35-48), including amendments that addressed the Plaintiffs' IP rights, the lengthy and incongruent periods between hiring Plaintiffs and amending/extending the AA (and the fact that the agreements involved different parties) do not allow for a finding, inferred or otherwise, that the AA and IP agreements were part of the same transaction.

is part of the same transaction.  Accordingly, Plaintiffs have not pled a plausible breach of their IP agreements (Count VI).

### D.    Breach of Lab Contracts

In their SAC, Plaintiffs allege that Ludwig breached their respective "lab contracts" by not providing them with sufficient funding.  (¶¶ 217-303.)  Attached to the SAC are seven letters from Ludwig, drafted between 1993 and 2015, offering employment to each Plaintiff individually.  (Doc. Nos. 26-8 to 26-14.)  Five of the letters contain an offer to provide "a core budget each year" for "laboratory support."  The letters to Drs. Oegema, Ren, and Desai offer between $250,000 and $300,000.  (Doc. Nos. 26-9 to 26-11.)  The letters to Dr. Mischel and Dr. Furnari offer "up to" $600,000 and $650,700, respectively.  (Doc. Nos. 26-8, 26-14.)  The letters state that "laboratory support" includes "your salary/benefits, salaries/benefits of others in your group, supplies, travel, and so on."  (*See*, *e.g.*, Doc. No. 26-8 at 3.)  The remaining two letters to Dr. Cleveland and Dr. Kolodner offer "core support" in an "expected" amount of $325,000 and $600,000, respectively, "[a]ssuming a constant budget."  (Doc. Nos. 26-12, 26-13.)  Plaintiffs allege, and Ludwig apparently does not dispute, that these offers were accepted in writing thereby forming binding bilateral contracts.[7]  (¶¶ 220, 232, 244, 256, 268, 281, 294.)  Additionally, with respect to the offers to Drs. Mischel, Kolodner, and Cleveland, Plaintiffs allege that "[a]t or about the same time" as the offers were accepted Ludwig "assured" them that the amount of the "core" budget would be "sufficient" for them to conduct "ongoing translational research" and "continuous active research."  (¶¶ 222, 272, 285.)  Plaintiffs allege that Ludwig breached its obligation to provide a "core" budget to each Plaintiff by "limiting the amount it funded to [the respective Plaintiff's] own salary and benefits, but refusing to provide funds for salaries/benefits of others performing services in [their labs], supplies, travel and other expenses of operating [their labs]."  (¶¶ 228, 239, 251, 263, 276, 289, 301.)

_____

[7] (*See* Doc. No. 28-1 at 28 n.11) ("[F]or purposes of this motion, Defendants will assume that the Membership Agreements and [offer letters] may be read together.").)

In other words, Plaintiffs allege Ludwig breached their respective lab contracts because (1) Ludwig is not paying for anything other than their own salaries and benefits, and/or (2) Ludwig is not providing funding that is "sufficient" for "ongoing translational research" and "continuous active research."

Ludwig argues that "contrary to Plaintiffs' claims, the [lab contracts] do not amount to binding agreements by [Ludwig] to never reduce research funding, or even to provide a minimum amount of funding each year."[8]  (Doc. No. 28-1 at 28.)  Although Plaintiffs do not concede that Ludwig was empowered to reduce funding, they do not explicitly allege that Ludwig can never reduce funding.  As described above, Plaintiffs' claims are primarily based on the "core" budgets promised to them in their offer letters.  Drs. Oegema, Ren, and Desai were expressly promised a specific amount of "core budget" each year.  Dr. Mischel and Dr. Furnari were promised "up to" a specific amount of "core budget," which necessarily implies some minimum level of funding.  Additionally, Drs. Kolodner and Cleveland were allegedly promised, outside of their written lab contracts, a "core" budget that would be "sufficient" to conduct "ongoing translational research" and "continuous active research," which also necessarily implies some minimum level of funding.  Finally, five Plaintiffs were expressly promised lab budgets that "include" more than just their own salary and benefits.  Although Plaintiffs conspicuously fail to allege that they are not being funded, or will not be funded, at the specific amounts promised to them in their lab contracts, all Plaintiffs allege they are only being funded at an amount that is sufficient to cover their own salaries and benefits, but not for other expenses of "operating" the labs.  (*See* ¶¶ 228, 239, 251, 263, 276, 289, 301.)  Plaintiffs also allege the "required" total annual budgets, and the total amount Ludwig is paying or has informed Plaintiffs it will be paying,

---

[8] In support of this argument, Defendants point out that offer letters for Dr. Kolodner and Dr. Cleveland acknowledge that budgets are negotiated yearly.  (Doc. No. 28-1 at 28 (citing Doc. Nos. 26-12 and 26-13).)  However, the remaining offer letters contain no such acknowledgement.

fall short by millions of dollars.  (*See* ¶ 120.)

Certainly, there are questions as to why, for example, providing $6.5 million in 2020 instead of Plaintiffs' desired $13 million, or continuing to pay Plaintiffs' salaries through 2023, is insufficient for any of the Plaintiffs to conduct any "ongoing translational research" or "continuous active research."  Plaintiffs' artfully worded SAC also raises questions as to whether all *research* has stopped, as opposed to just all research *funding* from *Ludwig*.  (*See*, *e.g.*, ¶¶ 18 (alleging that ongoing translational research programs have ceased *or* have been "substantially curtailed . . .  to the extent that they have access to outside grants"); 19 ("Ludwig's conduct in cutting research funding . . . . forc[ed] a shutdown of the Branch's activities"); 121 ("The retaliatory cuts . . . . made it impossible for the Plaintiffs to continue to operate their [l]aboratories . . . . [T]he budgeted amounts for 2020 and 2021 are not even sufficient to pay Ludwig's lease with UCSD and Plaintiffs' salaries, much less fund the cost of research in the [l]aboratories[.]"); 138 ("Ludwig's actions have made it impossible for Plaintiffs to continue their research at the Branch"); 215 ("Plaintiffs' research has been halted mid-stream").)  At the very least, however, Plaintiffs sufficiently allege a plausible breach of their lab contracts because they allege that Ludwig is not paying for anything other than their own salaries and benefits, and that Ludwig is not providing funding that is "sufficient" for "ongoing translational research" and "continuous active research."

## E.    Breach of the Implied Covenant

Every contract contains an implied covenant of good faith and fair dealing.  *Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 43 (1999).  The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000).  The covenant requires "that neither party do anything that will injure the right of the other to receive the benefits of the contract."  *Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1332 (2009).  Whether conduct meets this criteria is determined on a "case by case basis" depending on the "contractual purposes and

reasonably justified expectations of the parties." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).  "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Id.*

### 1.    Affiliation Agreement

Because Plaintiffs have not pled they are "parties" to the AA, and have not sufficiently pled they are, third party beneficiaries to the AA, Plaintiffs cannot allege they have rights under the AA that could be injured.  Plaintiffs plead no additional facts to support their conclusory allegation, upon which their implied covenant claim depends, that they are intended beneficiaries of the AA.  (*See* ¶ 160.)  The allegations also appear to be superfluous with Plaintiffs' breach of contract claim.  Thus, Plaintiffs had no reasonably justifiable expectation under the AA that Ludwig would fund active, continuous research at a particular level.  Accordingly, Plaintiffs have not sufficiently pled a claim for breach of the implied covenant with respect to the AA.

### 2.    Lab Contracts

In their opposition to the instant motion, Plaintiffs argue they have brought a claim for breach of the implied covenant with respect to their lab contracts.  (Doc. No. 29 at 17.)  In their SAC, however, Plaintiffs merely allege that they entered into lab contracts, performed under the lab contracts, and that Ludwig is required to perform under the lab contracts.  (¶¶ 162-65, 166.)  Plaintiffs plead no facts to support a claim that Ludwig injured, as opposed to simply breached, its obligations under Plaintiffs' lab contracts.  The allegations are thus clearly superfluous with Plaintiffs' breach of contract claim.  *See also Guz*, 24 Cal. 4th at 352 ("To the extent the implied covenant claim seeks simply to invoke terms to which the parties did agree, it is superfluous.").  Accordingly, Plaintiffs have not sufficiently pled a claim for breach of the implied covenant with respect to the lab contracts.

### 3.      IP Agreements

Plaintiffs allege that under the implied covenant in the IP agreements Ludwig had a duty to refrain from "arbitrary and unreasonable conduct" that has the effect of preventing Plaintiffs from receiving the fruits of their bargain under their IP agreements.  (¶ 201.)  Plaintiffs further allege that by "eliminating" research funding Ludwig "unfairly interfered with" Plaintiffs' royalty rights under the IP agreements.  (¶ 202.)  For three unavailing reasons, Ludwig argues this claim should be dismissed.

First, Ludwig argues that Plaintiffs' allegations that Ludwig engaged in "arbitrary" and "unfair" behavior are conclusory.  (Doc. No. 28-1 at 26.)  While the terms "arbitrary" and "unfair" might be conclusory, Plaintiffs' allegations that Ludwig interfered with Plaintiffs' potential future royalties by "eliminating" funding for the research (¶ 202) and by "unilaterally ceas[ing] all research support funding for Plaintiffs' labs" (¶ 203) are specific and factual.  Second, Ludwig argues that "Plaintiffs cannot use the implied covenant to manufacture an obligation for [Ludwig] to provide funding at pre-2019 levels when such an obligation is nowhere to be found in the IP [a]greements." (*Id.*)  In their implied covenant claim, however, Plaintiffs do not allege that Ludwig agreed, expressly or impliedly, to keep funding at pre-2019 levels.  Rather, Plaintiffs allege that Ludwig breached the implied covenant in their IP agreements by "eliminating" research funding. (¶¶ 202-03.)  Third, Ludwig argues that under Ludwig's IP policy, as well as federal law regarding NIH grants, Plaintiffs are required to assign their inventions to Ludwig, and therefore Ludwig cannot "renege" on its obligations in the IP agreements.  (Doc. No. 28-1 at 26-27.)  Ludwig does not dispute, however, that it is obligated to share some IP royalties with Plaintiffs regardless of the assignment of IP rights to Ludwig.  Therefore, this argument is not particularly relevant to Plaintiffs' allegation that by ceasing its own research funding, Ludwig interfered with IP development, which in turn interfered with Plaintiffs' potential future royalties under their IP agreements.  Accordingly, Ludwig has not met its burden of showing that Plaintiffs fail to plead a plausible breach of the implied covenant in their IP agreements.

### F.     Promissory Estoppel

Plaintiffs allege that Ludwig should be estopped under the AA from discontinuing to fund active, continuous research at the Branch.  (¶¶ 206-16.)  "In California, under the doctrine of promissory estoppel, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  *Kajima/Ray Wilson v. L.A. Cty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000).   The elements of promissory estoppel are: (1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) reasonable and foreseeable reliance; and (4) injury to the party asserting estoppel.  *US Ecology Inc. v. State of California*, 129 Cal. App. 4th 887, 901 (2005).

#### 1.     Threshold Matters

##### a.     Third Party Beneficiaries

As a threshold matter, Ludwig argues that Plaintiffs' promissory estoppel claim fails because Plaintiffs are not intended third party beneficiaries of the AA.  (Doc. No. 30 at 28-1 at 21.)   District courts have dismissed promissory estoppel claims where the plaintiffs were not third party beneficiaries of the agreement in which the promise was allegedly made.  For example, in *Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.*, 972 F. Supp. 1275, 1287 (C.D. Cal. 1997), the court found, without discussion, that "only expressly intended beneficiaries may recover on a promissory estoppel claim."[9]  As Plaintiffs point out, however, in *Aronowicz v. Nalley's, Inc.*, 30 Cal. App. 3d 27, 44 (Ct. App. 1972), the

---

[9] *See also hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1119 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 (9th Cir. 2019); *Sacramento E.D.M., Inc. v. Hynes Aviat'n Indus.*, No. 2:13-CV-0288-KJN, 2017 WL 1383289, at *39 (E.D. Cal. Apr. 18, 2017), *aff'd in part, rev'd in part and remanded sub nom. Sacramento E.D.M., Inc. v. Hynes Aviat'n Indus., Inc.*, 761 F. App'x 678 (9th Cir. 2019); *Bond v. Cal W. Reconvey. Corp.*, No. C12-01523 HRL, 2012 WL 2150313, at *4 (N.D. Cal. June 12, 2012); *Cleveland v. Aurora Loan Servs., LLC*, No. C 11-0773 PJH, 2011 WL 2020565, at *5 (N.D. Cal. May 24, 2011).

court rejected the defendant's argument that there is no cause of action based on promissory estoppel where there is no "gratuitous promise" to the plaintiffs.  *See also Shuler v. Walter E. Heller W. Inc.*, 956 F.2d 1168 n.7 (9th Cir. 1992) (noting that *Aronowicz* "might conceivably support a promissory estoppel claim" even though the plaintiffs were not third party beneficiaries).  Additionally, in *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 803 (2013), the court expressly stated that promissory estoppel applies not only to promisees, but to third persons.[10]  *See also Flextronics Int'l USA, Inc. v. Sparkling Drink Sys. Innovation Ctr. Ltd*, 186 F. Supp. 3d 852, 868 (N.D. Ill. 2016) (citing *Aronowicz* to support its finding that "California law follows the Restatement (Second) of Contracts, which allows persons other than the promisee to recover for promissory estoppel, provided that the promisor reasonably should have expected the non-promisee plaintiff to rely on the promise.").  Ludwig argues that *Aronowicz* is distinguishable because, in a concurring opinion, Judge Merrill cited *Aronowicz* as an example of a case "[w]here third parties have been permitted to assert rights flowing from a promise [because] the third party has been . . . . an alter ego of the promisee[.]"  *See C. R. Fedrick, Inc. v. Sterling-Salem Corp.*, 507 F.2d 319, 323 (9th Cir. 1974) (Merrill, J., concurring).  Ludwig cites no authority, however, supporting that third party beneficiary status depends on an alter ego analysis.  Moreover, Judge Merrill went on to find that, under California law, third parties should be able to enforce promises under a promissory estoppel theory as long as "a promisor knows that a third party may reasonably rely on his offer."  *Id.*  Based on the above, Plaintiffs are not

---

[10] The *West* court stated:

> The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee *or a third person*, (3) the promise induces action or forbearance by the promisee *or a third person* (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise.

214 Cal. 4th at 803 (emphasis added).

precluded from bringing a claim for promissory estoppel under the AA simply because they are not third party beneficiaries of the AA.  As discussed below, Plaintiffs allege, and it is reasonable to infer, that Ludwig knew that Plaintiffs would rely on its promise to UCSD to conduct active, continuous research.

### b.     Consideration

As another threshold matter, Ludwig argues that "it is well settled that promissory estoppel applies only 'when no actual consideration was given' for the alleged promise." (Doc. No. 28-1 at 20.)  Ludwig argues that Plaintiffs received consideration in the form of salaries and employment.  (*Id.* at 21.)  Plaintiffs do not dispute they received consideration for their work for Ludwig at UCSD.  Rather, they argue that promissory estoppel is foreclosed only where consideration is *given*, not received, by a plaintiff promisee.  (Doc. No. 29 at 21.)  Plaintiffs argue "[t]he only consideration Plaintiffs gave under the AA for Ludwig's promises of research funding for the duration of the AA was reliance."  (*Id.*)

Plaintiffs are correct that in cases where the plaintiffs are promisees, promissory estoppel is foreclosed if the plaintiffs provide consideration to the promisor.  "Cases have characterized promissory estoppel claims as being basically the same as contract actions, but only missing the consideration element[.]"  *US Ecology*, 129 Cal. App. 4th at 906.  The purpose of promissory estoppel "is to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange."  *Youngman v. Nev. Irr. Dist.*, 70 Cal. 2d 240, 249 (1969).  "If the promisee's performance was requested at the time the promisor made his promise and that performance was bargained for, the doctrine is inapplicable."  *Id.*  Thus, "where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel."  *Id.*  In other words, "[i]f actual consideration was given by the promisee, promissory estoppel does not apply."  *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1413 (2014); *see also Anthony v. Iron Mountain, Inc.*, Case No. CV 20-05932-AB (ASx), 2020 WL 5793449, at *13 (C.D. Cal. Sept. 25, 2020).

Although Plaintiffs allege they relied on Ludwig's promise to conduct active, continuous research in deciding to work for Ludwig, Plaintiffs' commitment to work for Ludwig was not requested at the time Ludwig promised to conduct active, continuous research.  Additionally, Plaintiffs' commitment was clearly not bargained-for in exchange for this promise because Plaintiffs did not agree to work for Ludwig until years later.  Moreover, Ludwig did not make the promise to Plaintiffs, so Plaintiffs are not promisees of that particular promise.   The only point at which Ludwig requested Plaintiffs' performance, and that performance was bargained-for, was when Ludwig made promises to Plaintiffs in their individual employment agreements.  Here, however, Plaintiffs seek promissory estoppel based on the AA, not their employment agreements.  Ludwig does not address this distinction, and Ludwig cites no authority suggesting that a non-party to a promise can give bargained-for consideration in exchange for that promise.  Accordingly, because Plaintiffs did not give bargained-for consideration in exchange for Ludwig's promise under the AA, Plaintiffs' promissory estoppel claim under the AA is not foreclosed on this ground.

## 2.    Clear and Unambiguous Promise

With respect to the first element to a promissory estoppel claim, Plaintiffs allege (1) "[u]nder the [AA], Ludwig clearly and unambiguously promised to conduct 'continuous, active medical research' at UCSD for the term of the [AA]," and (2) this "required that Ludwig provide a level of funds for research that was consistent with the level of funding provided, per capita, to the Plaintiffs in past years."  (¶ 207-08.)  Ludwig argues that in order to be clear and unambiguous, the promise must be made "expressly."  (Doc. No. 28-1 at 21 (citing *Salsgiver v. Am. Online, Inc.*, 147 F. Supp. 2d 1022, 1029 (C.D. Cal. 2000), *aff'd*, 32 F. App'x 894 (9th Cir. 2002)).)  Here, the promise Ludwig made to UCSD to conduct active, continuous medical research was made "expressly" in the AA.  Although the promise was not made to Plaintiffs, Ludwig does not argue that the promise needed to be made directly to Plaintiffs.

Ludwig also argues that in order to be clear and unambiguous, the promise cannot

be based on past practice, custom, or inference.  (Doc. No. 28-1 at 21-22 (citing, inter alia, *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 409 (9th Cir. 1992)).) Plaintiffs' allegation that Ludwig was required to provide funding at historical levels is likely based on past practice, custom, and inference.  Indeed, Plaintiffs concede "[t]here is . . . . clearly no specific funding level."  (Doc. No. 27 at 32:18-19.)  However, the promise to conduct active, continuous research is not necessarily based on past practice, custom, and inference.  While there is certainly some ambiguity as to what "active, continuous research" entails, as discussed above, arguably, it may reasonably be inferred to mean something other than "clos[ing] the Branch and ending . . . . the research program."  (*See* ¶ 211.)  Although a close call, at this stage in the litigation, Plaintiffs sufficiently allege a clear and unambiguous promise.

### 3.     Actual Reliance

Plaintiffs allege they relied on Ludwig's "performance of its promises under the [AA]" by leaving their previous jobs, establishing labs at UCSD, recruiting UCSD students to work at the labs, applying for research grants, serving as professors without additional compensation, giving up IP rights, and "enter[ing] into discussions with third parties in for-profit ventures regarding the commercialization of Plaintiffs' research."  (¶ 212.)  Ludwig argues that Plaintiffs fail to plead actual reliance because Plaintiffs negotiated their own individual employment agreements and do not even allege they read the AA before joining the Branch.  (Doc. No. 28-1 at 22-23.)  Here, Plaintiffs do not allege any facts supporting how or why they specifically relied on the AA instead of solely relying on their individual employment agreements.  But they do specifically allege that they relied on Ludwig's promise in the AA to conduct active, continuous research.  (¶ 212.)  Additionally, at this stage in the litigation, it is reasonable to infer that when Plaintiffs were first offered employment with Ludwig in San Diego, they were aware that Ludwig entered into an agreement with UCSD to conduct long-term research at UCSD's facility.  Accordingly, Plaintiffs sufficiently allege reliance.

### 4.    Reasonable and Foreseeable Reliance

Plaintiffs allege their reliance was reasonable because "Ludwig is an extraordinarily well-funded charitable institution" and "would normally be expected to have been held to a higher standard of conduct respecting its commitment to maintaining the research required under the [AA] than would a for profit institution." (¶ 213.)  Plaintiffs also allege their reliance was foreseeable because Ludwig knew they were renowned research scientists with other opportunities, and by "pointing to the secure funding and long-term commitment under the [AA]" and "encouraging" them to apply for grants and embark on long-term research projects.  (¶ 214.)  Ludwig argues Plaintiffs' alleged reliance was not reasonable because: (1) Plaintiffs admit the AA required no guaranteed level of funding; (2) even if they relied on the AA, the AA gives Ludwig discretion over the research; (3) Plaintiffs could not have relied on a promise to continue funding at historical levels through 2023 because when they were hired, the term of the AA expired well before 2023; and (4) Plaintiffs allege no fact supporting the reasonability or foreseeability of their reliance. (Doc. No. 28-1 at 23-24.)  Overall, at this early stage in the litigation, Plaintiffs sufficiently plead it was reasonably foreseeable to Ludwig, or that Ludwig knew, that Plaintiffs would rely on Ludwig's promise to UCSD to conduct active, continuous research, at least to the extent that Plaintiffs expected Ludwig would not, as alleged, "close the Branch and end. . . . the research program." (*See* ¶ 211.)  Accordingly, Plaintiffs sufficiently plead reasonable and foreseeable reliance.  Based on the above, Plaintiffs have sufficiently alleged a claim for promissory estoppel under the AA.[11]

### G.    Declaratory Relief

Plaintiffs again bring a claim, under California Code of Civil Procedure § 1060, for a declaration regarding the parties' rights, duties, and obligations under the AA and IP agreements.  (¶ 145-47.)  California's declaratory relief statute provides that "[a]ny person

---

[11] Ludwig does not dispute that Plaintiffs sufficiently plead injury.

interested . . . . under a contract, or who desires a declaration of his or her rights or duties with respect to another . . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties . . . . ask for a declaration of rights or duties. CAL. CIV. PROC. CODE § 1060. "To qualify for declaratory relief, [a plaintiff] would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the plaintiff's] rights or obligations.'" *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 909 (Cal. Ct. App. 2013) (quoting *Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 4th 1559, 1582 (Cal. Ct. App. 2011)). However, a claim for declaratory relief "may be refused . . . . in the discretion of the trial court if it appears that the determination is not necessary or proper at the time and under all the circumstances." *Moss v. Moss*, 20 Cal. 2d 640, 642 (1942); CAL. CIV. PROC. CODE § 1061. Additionally, a court may dismiss a declaratory relief claim if the claim is duplicative of, substantially similar to, or commensurate with relief sought under another cause of action. *See Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 707-08 (N.D. Cal. 2009); *City of Cotati v. Cashman*, 29 Cal. 4th 69, 80 (2002).

### 1. Affiliation Agreement

Ludwig argues that Plaintiffs' claim for declaratory relief under the AA fails because under California law a party who is not "legally interested" in a contract lacks standing to seek declaratory relief.[12] (Doc. No. 28-1 at 20.) In support of this argument, Plaintiffs cite several cases in which the court dismissed claims for declaratory relief where the plaintiffs

---

[12] Ludwig also argues, for the first time, that Plaintiffs lack Article III standing to bring their claim for declaratory relief under the AA because they are not third party beneficiaries of the AA. (Doc. No. 28-1 at 18-19.) Unfortunately, Ludwig provides almost no substantive analysis on the issue, and cites no case in which a federal court found that a plaintiff lacked Article III standing to bring a claim for declaratory relief under California law with respect to a contract under which the plaintiff was not a party or third party beneficiary. Regardless, Ludwig's motion to dismiss Plaintiffs' declaratory relief claim can be resolved based on its arguments under California law.

were not parties to, or third party beneficiaries of, the contract at issue. *See D. Cummins Corp. v. U.S. Fid. & Guar. Co.*, 246 Cal. App. 4th 1484, 1493 (2016) (finding that an "indirect interest" in the contract was insufficient); *Richter v. CC-Palo Alto, Inc.*, 176 F. Supp. 3d 877, 901 (N.D. Cal. 2016) (plaintiffs must allege a legally protected interest or right relating to their legal rights, not just a controversy over the legal duties of the defendants); *Blank v. Kirwan*, 39 Cal. 3d 311, 331 (1985) (no legal interest in a contract to which the plaintiff was not a party); *Gillies v. La Mesa Lemon Grove & Spring Val. Irr. Dist.*, 54 Cal. App. 2d 756, 762 (1942) (judiciable contract disputes require an "enforceable contractual right in the plaintiffs"); *see also Lafferty v. Wells Fargo Bank*, 213 Cal. App. 4th 545, 570 (2013) (no standing where the contract was not made "made for the benefit" of the plaintiffs); *Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 55 (2007). Plaintiffs do not dispute that without third party beneficiary status, their claims for declaratory relief under the AA fail.[13]  (*See* Doc. No. 29 at 9 n.2.)

Here, Plaintiffs are undoubtably interested in Ludwig's duty to UCSD to fund active, continuous research under the AA.  As discussed above, however, Plaintiffs fail to plead that this interest is more than an indirect one, or that Plaintiffs can enforce the AA. Plaintiffs' interest is also distinguishable from those in cases involving trusts, insurance policies, or regulations where the court found that a party can have sufficient interest even when not directly affected by the contract or regulation that is the subject of the action.  *See D. Cummins*, 246 Cal. App. 4th at 1493 (distinguishing these cases because "all of the parties included in the declaratory relief actions had a legal interest in, or would be directly affected by, any interpretation of the terms of the insurance policies or regulation in question").  Furthermore, Plaintiffs' claims for declarations regarding Ludwig's funding

---

[13] Plaintiffs' opposition consists of a footnote that contains a citation to a case that had nothing to do with injunctive relief or third party beneficiary law, and an unsupported assertion that Ludwig is barred under Rule 12(g)(2) from challenging subject matter jurisdiction.  (Doc. No. 29 at 9 n.2.)

obligations under the AA are essentially that Ludwig breached the AA, which is duplicative of and substantially similar to their breach of contract claim. Finally, it does not appear necessary or proper at this stage to determine the contours of Ludwig's obligation to UCSD to fund active, continuous research under the AA given that the issue of Ludwig's research funding obligations to Plaintiffs can be resolved, at least in part, by litigating Plaintiffs' claims related to the breach of their lab contracts. Accordingly, Plaintiffs have not sufficiently alleged a plausible claim for declaratory relief under the AA.[14]

## 2.    IP Agreements

Plaintiffs also seek a declaration that they have "no further obligations" under their IP agreements, and have the right to "all uses" of their IP. (Doc. No. 26 at 54.) This is duplicative of, substantially similar to, and commensurate with the relief sought under Plaintiffs' previously dismissed recission claim, (*see* Doc. No. 25 at 36), as well as Plaintiffs' claim for breach of the covenant of good faith and fair dealing under the IP agreements. The contours of Ludwig's obligations with respect to Plaintiffs' royalty rights under the IP agreements can be resolved, at least in part, by litigating Plaintiffs' implied covenant claim. Indeed, Plaintiffs allege no facts to support their declaratory relief claim beyond those used to support their implied covenant claim. (*See* ¶¶ 145-47.) Under the circumstances, therefore, Plaintiffs' rights under the IP agreements do not appear to be a proper subject for declaratory relief. *See Gen. of Am. Ins. Co. v. Lilly*, 258 Cal. App. 2d 465, 470 (1968) ("The object of the statute is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues."). Accordingly, Plaintiffs fail to allege a plausible claim for declaratory relief regarding their IP agreements.

---

[14] Plaintiffs also seek declaratory relief with respect to Plaintiffs' terms of employment. (*See* ¶ 147:6-18 (clause six); *see also* ¶¶ 84-85 (discussing Section 7 of Ludwig's Member-Track Appointment and Promotion Policy).) Ludwig does not challenge this particular part of Plaintiffs' declaratory relief claim.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Partial Motion to Dismiss is **GRANTED IN PART**.  Plaintiffs' claim for declaratory relief (Count I) is **DISMISSED** with respect to Plaintiffs' claims based on the AA and IP agreements.  As noted above, Defendants do not move to dismiss Plaintiffs' claim for declaratory relief regarding the length of their terms of employment.  (*See* ¶ 147:6-18.)  Plaintiffs' claim for breach of the AA (Count II) is **DISMISSED**.  Plaintiffs' claim for breach of the implied covenant in the AA and lab agreements (Count III) is **DISMISSED**.  Defendants do not move to dismiss Plaintiffs' claims against all Defendants for defamation per se (Count IV) or false light (Count V).  Plaintiffs' claim for breach of the IP agreements (Count VI) is **DISMISSED**.    All dismissals are without prejudice.  Defendants' motion to dismiss Plaintiffs' claim for breach of the implied covenant in their IP agreements (Count VII), Plaintiffs' claim for promissory estoppel under the AA (Count VIII), and Plaintiffs' claims for breach of their lab contracts (Counts IX-XV) is **DENIED**.  Accordingly, Plaintiffs claim for breach of the implied covenant in their IP agreements (Count VII),  promissory estoppel under the AA (Count VII), and breach of their lab contracts (Counts IX-XV) are **NOT DISMISSED**.  Plaintiffs do not request leave to amend the SAC.  Accordingly, Defendants are to file their Answer to the SAC within 21 days of the date of this order.

IT IS SO ORDERED.

DATED: November 25, 2020.

JEFFREY T. MILLER
United States District Judge