UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>LUDWIG INSTITUTE FOR CANCER RESEARCH LTD, et al.,<br><br>                              Defendants.<br><br>AND RELATED COUNTERCLAIM. | Case No.: 19-cv-02141-JM (JLB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'/COUNTER-DEFENDANTS' MOTION TO COMPEL**<br><br>**[ECF No. 58]** |

Before the Court is a motion to compel filed by Plaintiffs/Counter-Defendants Don Cleveland, Arshad Desai, Frank Furnari, Richard Kolodner, Paul Mischel, Karen Oegema, and Bing Ren (collectively "Plaintiffs"). (ECF No. 58.) Defendants/Counter-Claimants Ludwig Institute for Cancer Research Ltd. ("Ludwig"), Chi Van Dang ("Dang"), Edward A. McDermott, Jr. ("McDermott"), and John L. Notter (collectively "Defendants") oppose. (ECF No. 62.) Plaintiffs were given leave to file a reply, which they did. (ECF No. 77.) For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to compel.

1

## I. BACKGROUND

Plaintiffs are internationally acclaimed cancer research scientists and physicians. (Second Amended Complaint ("SAC"), ECF No. 26 ¶ 1.) Ludwig is an international nonprofit organization dedicated to finding a cure for cancer that operates multiple cancer research branches. (*Id.* ¶¶ 1, 142.) In 1991, Ludwig entered into an "Affiliation Agreement" ("the AA") with the University of California at San Diego ("UCSD") to establish a San Diego Branch ("the Branch"). (*Id.* ¶ 51.) Ludwig agreed to conduct "active" and "continuous" medical research to "discover, develop, or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer." (*Id.* ¶ 53.) Ludwig also agreed to "bear the costs directly related to conducting the research program." (*Id.* ¶ 62.) The term of the AA is coterminous with a lease agreement for research facilities between Ludwig and UCSD, which allows Ludwig to terminate the lease no earlier than December 31, 2023. (*Id.* ¶¶ 4, 16, 56.) In addition to leasing its facilities to Ludwig, UCSD agreed to: (1) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff at the Branch; (2) grant "academic recognition and titles" to qualified Ludwig employees; and (3) make full time equivalency positions available for Ludwig employees. (*Id.* ¶ 154.)

Between 1996 and 2016, Ludwig hired Plaintiffs to work at the Branch. (*Id.* ¶¶ 26–32.) In 2018, Ludwig announced that it would "cease funding the Branch and otherwise halt the 'continuous active conduct of medical research' at the Branch." (*Id.* ¶ 15.) Effective January 1, 2020, Ludwig "terminated all funding for Plaintiffs' laboratories." (*Id.* ¶ 18.) However, "Ludwig continues to fund at least part of the rent due [to UCSD] and it continues to pay the Plaintiffs' own salaries and benefits, but nothing more." (*Id.*) As a result, Plaintiffs' "[l]aboratories and ongoing translational research programs have ceased or substantially curtailed ongoing research projects, except to the extent that they have access to outside grants." (*Id.*)

Plaintiffs filed their initial Complaint on November 7, 2019. (ECF No. 1.) On July 8, 2020, Plaintiffs filed the SAC, which contains claims against Ludwig for: (1) breach

of the AA; (2) breach of Plaintiffs' Intellectual Property ("IP") agreements; (3) breach of Plaintiffs' lab contracts; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel under the AA; (5) declaratory relief; and (6) false light. (*Id.* ¶¶ 145–70, 182–303.) Plaintiffs also bring a claim against all Defendants for defamation per se. (*Id.* ¶¶ 171–81.) On November 25, 2020, the Honorable Jeffrey T. Miller dismissed Plaintiffs' claims for breach of the AA and breach of Plaintiffs' IP agreements. (ECF No. 32 at 28.) He also dismissed Plaintiffs' declaratory relief claim with respect to Plaintiffs' claims based on the AA and IP agreements, and their claim for breach of the implied covenant in the AA and lab contracts. (*Id.*)

Accordingly, the following claims remain at issue in this case: (1) Plaintiffs' claims against Ludwig for (a) breach of their lab contracts (SAC ¶¶ 217–303), (b) promissory estoppel under the AA (*id.* ¶¶ 209–16), (c) breach of the implied covenant in their IP agreements (*id.* ¶¶ 195–205), (d) declaratory relief regarding the length of Plaintiffs' terms of employment (*id.* at 54:6-18), and (e) false light (*id.* ¶¶ 182–85); and (2) Plaintiffs' claim against all Defendants for defamation per se (*id.* ¶¶ 171–81).

Here, Plaintiffs move to compel the production of documents responsive to Plaintiffs' Requests for Production ("RFP") 138 and 139, and the production of minutes relating to the cutting of the budget for the Branch for 2020–21. (ECF No. 58.) Defendants oppose. (ECF No. 62.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26 provides that parties:

> may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). The December 2015 amendment to Rule 26 reinforced the proportionality factors for defining the scope of discovery and, thus, under Rule 26,

relevancy alone is not sufficient to obtain discovery. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. Discovery must also be proportional to the needs of the case. *Doherty v. Comenity Capital Bank*, No. 16cv1321-H-BGS, 2017 WL 1885677, at *2 (S.D. Cal. May 9, 2017) (citing *Mora v. Zeta Interactive Corp.*, No. 1:16-cv-00198-DAD-SAB, 2017 WL 1187710, at *3 (E.D. Cal. Feb. 10, 2017)). Rule 26 requires that courts "limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

The relevance standard is commonly recognized as one that is necessarily broad in scope in order "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Doherty*, 2017 WL 1885677, at *2 (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Regardless of its broad nature, however, relevancy is not without "ultimate and necessary boundaries." *Id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Accordingly, district courts have broad discretion to determine relevancy for discovery purposes. *Id.* (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).

## III. DISCUSSION

### A. Requests for Production 138 and 139

#### 1. RFPs and Responses

Plaintiffs' RFP 138 states:

> 138. All DOCUMENTS that refer or relate to the BRANCH qualifying as a domestic institution with the National Institutes of Health.
>
> BRANCH means and refers to the San Diego Branch of the Ludwig Institute for Cancer Research, which Ludwig historically operated on the campus of the University of California at San Diego since the fall of 1991 in premises leased from The Regents of the University of California, acting on behalf of the University of California, San Diego, in conjunction with the UCSD Medical Center.

(ECF No. 58 at 11.)

///

Defendants responded to RFP 138 as follows:

> The Institute incorporates the forgoing responses and also objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeking production of documents that are neither relevant to any claim or defense nor proportional to the needs of the case. The Institute also objects to this Request to the extent that it seeks information subject to the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

(*Id.*)

Plaintiffs' RFP 139 states:

> 139. All DOCUMENTS that refer or relate to LUDWIG'S cost-sharing obligations with respect to grants from National Institutes of Health relating to any of the PLAINTIFFS.

(*Id.*)

Defendants initially responded to Plaintiffs' RFP 139 as follows:

> The Institute incorporates the forgoing responses and also objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeking production of documents that are neither relevant to any claim or defense nor proportional to the needs of the case. The Institute also objects to this Request to the extent that it seeks information subject to the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

(*Id.*) After meet and confer efforts, Defendants subsequently stated that Ludwig will consider producing a small set of "accounting" documents.

### 2. Parties' Arguments

Plaintiffs contend that their claims arise, in part, from Ludwig's refusal to fund the cost of their research, as allegedly required by their lab contracts and the AA, and their requests for documents relating to the National Institutes of Health ("NIH") are directly relevant to disproving Ludwig's denial of this obligation. (ECF No. 58 at 3–8.) Specifically, Plaintiffs assert that the requested documents are relevant to their claims for breach of their lab contracts. (*Id.* at 5.) Plaintiffs further contend that Ludwig likely made

representations to the NIH about its funding commitments to Plaintiffs, and those communications and Ludwig's accounting thereof, are relevant to disproving Ludwig's assertion that it never had an obligation to fund Plaintiffs' research as Plaintiffs assert in this case. (*Id.* at 3–4, 7–8.)

In response, Defendants argue that the documents Plaintiffs seek are not relevant to any claim and would be unduly burdensome to identify and produce. (ECF No. 62 at 2.) Defendants contend that the "domestic institution requirement has nothing to do with any 'obligation to fund Plaintiffs' research,' and communications regarding that requirement can neither disprove nor prove such an obligation." (*Id.* at 4.) Defendants further point out that the AA and IP agreements say nothing about NIH cost-sharing obligations and Plaintiffs' lab contracts do not mention the NIH. (*Id.* at 5.) Defendants assert that Plaintiffs' claims are based on an alleged failure of Defendants to fully fund Plaintiffs' "core budgets" which do not include overhead from grants. (*Id.*) And Defendants point out that Plaintiffs have not alleged that Ludwig has failed to rebate any overheard or that Ludwig failed to meet any obligations to the NIH. (*Id.* at 5–6.)

In reply, Plaintiffs aver that Defendants have conflated the concepts of cost-sharing and overhead rebate. (ECF No. 77 at 2.) Plaintiffs acknowledge that Defendants alleged failure to meet their obligations to fund Plaintiffs "core budget" under their lab contracts is separate from their overhead rebate obligation but assert that this does not render Plaintiffs' discovery requests irrelevant. (*Id.* at 2–3) Plaintiffs urge that their requests go to Defendants' "cost-sharing" obligations. (*Id.* at 3.)

    3. <u>Relevant Allegations in the SAC</u>

      a. *Breach of Lab Contracts*

In their SAC, Plaintiffs allege that Ludwig breached their respective lab contracts by not providing them with sufficient funding. (SAC ¶¶ 217–303.) Attached to the SAC are seven letters from Ludwig, drafted between 1993 and 2015, offering employment to each Plaintiff individually. (ECF Nos. 26-8 to 26-14.) Five of the letters contain an offer to provide "a core budget each year" for "laboratory support." The letters to Drs. Oegema,

Ren, and Desai offer between $250,000 and $300,000. (ECF Nos. 26-9 to 26-11.) The letters to Dr. Mischel and Dr. Furnari offer "up to" $600,000 and $650,700, respectively. (ECF Nos. 26-8, 26-14.) The letters state that "laboratory support" includes "your salary/benefits, salaries/benefits of others in your group, supplies, travel, and so on." (*See, e.g.*, ECF No. 26-8 at 3.) The remaining two letters to Dr. Cleveland and Dr. Kolodner offer "core support" in an "expected" amount of $325,000 and $600,000, respectively, "[a]ssuming a constant budget." (ECF Nos. 26-12, 26-13.)

Plaintiffs allege that these offers were accepted in writing thereby forming binding bilateral contracts. (SAC ¶¶ 220, 232, 244, 256, 268, 281, 294.) Additionally, with respect to the offers to Drs. Mischel, Kolodner, and Cleveland, Plaintiffs allege that "[a]t or about the same time" as the offers were accepted, Ludwig "assured" them that the amount of the "core" budget would be "sufficient" for them to conduct "ongoing translational research" and "continuous active research." (*Id.* ¶¶ 222, 272, 285.) Plaintiffs allege that Ludwig breached its obligation to provide a "core" budget to each Plaintiff by "limiting the amount it funded to [the respective Plaintiff's] own salary and benefits, but refusing to provide funds for salaries/benefits of others performing services in [their labs], supplies, travel and other expenses of operating [their labs]." (*Id.* ¶¶ 228, 239, 251, 263, 276, 289, 301.) In other words, Plaintiffs allege Ludwig breached their respective lab contracts because (1) Ludwig is not paying for anything other than their own salaries and benefits, and/or (2) Ludwig is not providing funding that is "sufficient" for "ongoing translational research" and "continuous active research." (*See* ECF No. 32 at 15.)

        b.    *NIH*

Plaintiffs allege that their lab contracts advised them "that they would 'be expected to successfully apply for external grants' that would be 'managed and accounted by the Branch.'" (SAC ¶ 75; *see also* ECF Nos. 26-8 to 26-11, 26-14.) Certain contracts entered by Plaintiffs also provide that they are to receive a return/rebate of a "proportion" or "variable percentage" of overhead costs from federal grants administered by the Branch. (*See* ECF Nos. 26-8 to 26-11, 26-14.) Plaintiffs allege that they assisted Ludwig in

submitting grant applications to the NIH. (SAC ¶¶ 6, 129.) Plaintiffs further allege that Ludwig, in its capacity as the grant administrator, has submitted numerous grant applications to the NIH resulting in tens of millions of dollars in grant money for research at the Branch. (*Id.* ¶ 130.) Plaintiffs allege that "much" of the funding for their research programs comes from the NIH as well as other granting agencies and foundations. (*Id.* ¶ 19.)

Plaintiffs allege the Branch is obligated to fund specific costs under its NIH grants in connection with Ludwig's performance of the AA. (*Id.* ¶ 124.) Plaintiffs allege that "[a]s a condition of receiving these NIH grants, Ludwig . . . represented to the NIH that it would adequately support ongoing cancer research at the Branch during the entire term of such grants, including, without limitation, by being responsible for payment of all of Ludwig's cost sharing obligations undertaken by negotiation with NIH and/or specifically detailed in submitted grant applications." (*Id.* ¶ 6.)

In applying for NIH grants "in their capacity as the Principal Investigator," Plaintiffs allege they "relied upon representations by Ludwig that it would meet its cost-sharing obligations to the NIH by continuing to support ongoing research at the Branch[.]" (*Id.* ¶ 130.) For example, Plaintiffs allege that "Ludwig submitted two grant applications for more than $5 million in the aggregate for projects in Plaintiff Kolodner's lab expressly extending into 2022 that included numerous representations by Ludwig about the 'resources' that Ludwig would make available to support the project, including equipment, lab space, lab facilities and administrative support." (*Id.*) Plaintiffs allege that "Ludwig's abrupt cessation of research funding for the Branch makes the Branch unable to fulfill its financial obligations under the NIH grants and also places a cloud over Plaintiffs' future NIH funding." (*Id.*)

Plaintiffs further allege:

> As a foreign institution, Ludwig is not legally permitted to recover "indirect costs" (including costs paid by the grantor to the grantee to cover facilities, administrative costs, etc.) from NIH in the same manner as a domestic institution. As a result, in and around 2001, Ludwig was required to

qualify the Branch as a "domestic institution" before it could receive grants from the NIH that allowed for indirect cost recovery. In a letter from PricewaterhouseCoopers LLP ("PWC") to McDermott, PWC expressly advised McDermott that "indirect and direct cost recoveries from the federal government *must not directly or indirectly subsidize the foreign parent or branches*. Therefore, neither indirect nor direct cost recoveries can be used to reduce or offset the [Ludwig] budget or [Ludwig] cash disbursements (*i.e.*, periodical fund transfers from Zurich to the San Diego Branch cannot be reduced by cash available due to indirect cost recoveries)." In addition, Ludwig represented to the NIH that the Branch Director would be "resident" in San Diego.

Ludwig's refusal to fund the costs of research at the Branch effectively forces the Branch to use federal government grant money to pay what are contractually *Ludwig's* portion of the costs under the [AA] and thereby, "directly or indirectly subsidizes the foreign parent or branches."

Ludwig has failed to make full disclosure of these facts to the NIH and otherwise has made misleading representations to the NIH to hide the true facts of its wrongful refusal to fund costs of research as it is obligated to do under the [AA].

(*Id.* ¶¶ 124–26.)

Plaintiffs further allege that Ludwig violated the conditions for its receipt of NIH funds by, *inter alia*, making material misrepresentations and/or omissions in the Branch's 2018 audit, and by appointing a Branch Director who was not a "resident" in San Diego, which was a material precondition for Ludwig to be deemed a "domestic institution." (*Id.* ¶¶ 128, 133.) Plaintiffs allege that Ludwig also began asserting improper direct control in early 2020 over the Branch in violation of the conditions for Ludwig's receipt of NIH grants. (*Id.* ¶ 134.)

    4. <u>Analysis</u>

Based on the foregoing, the Court agrees with Defendants that RFP 138, which requests *all* documents relating to the Branch qualifying as a domestic institution with the NIH, is overbroad and seeks information that is not relevant to Plaintiffs' claims. Plaintiffs contend the requested documents are directly relevant to disproving Ludwig's denial of its obligation to fund Plaintiffs' research as alleged. In that regard, Plaintiffs contend that

1  Ludwig made representations to the NIH about its funding commitments to Plaintiffs in
2  seeking to qualify as a domestic institution.  The Court finds that any such representations
3  are relevant to Plaintiffs' claims, even if the NIH is not explicitly mentioned in Plaintiffs'
4  lab contracts or the AA.  However, this is a smaller set of documents than those requested
5  in RFP 138.  Accordingly, the Court finds that Defendants must only produce documents
6  "that refer or relate to the BRANCH qualifying as a domestic institution with the [NIH]"
7  to the extent they contain or reflect representations by Ludwig about its funding obligations
8  to Plaintiffs pursuant to their lab contracts and/or the AA.[1]

9        The Court finds RFP 139 to be similarly overbroad.  With respect to this RFP,
10 Plaintiffs similarly contend that Ludwig, in seeking grants, made representations to the
11 NIH about its funding commitments to Plaintiffs, and these representations and the
12 accounting thereof are relevant to disproving Ludwig's denial of its obligation to fund
13 Plaintiffs' research as alleged.  As set forth in the analysis with respect to RFP 138,
14 Plaintiffs have established relevance only as to *representations made by Ludwig* about its
15 funding obligations *to* Plaintiffs.  Therefore, the Court finds that Defendants must only
16 produce all documents containing or reflecting representations by Ludwig about its cost-
17 sharing obligations to any of the Plaintiffs with respect to grants from the NIH.

18       With these modifications, the Court finds the requests to be proportional to the needs
19 of the case and not overly burdensome.

20       **B.**    **Minutes of the June 24, 2019 Meeting of Ludwig's Board of Directors**
21           1.    Parties' Arguments

22 Plaintiffs also move to compel the production of an unredacted version of the
23 minutes from the June 24, 2019 meeting of Ludwig's Board of Directors (the "Minutes"),

---

[1] As Defendants note, Ludwig's alleged promise under the AA to fully fund continuous, active medical research at UCSD for the term of the AA is the basis for Plaintiffs' promissory estoppel claim. (*See* ECF No. 62 at 5; *see also* ECF No. 32 at 19–24.)

which discusses the cutting of the Branch budget for 2020–21. (ECF No. 58 at 4, 8–10.) Plaintiffs challenge Defendants' claim of work product protection as to the redacted portion of the Minutes "wherein the decision to cut the (already reduced) budget to Plaintiffs' laboratories at the San Diego Branch was made." (*Id.* at 4.) The redacted portion was entitled "To review and approve the San Diego Branch budget for the years 2020 and 2021." (*Id.* at 8.) Plaintiffs contend that the Minutes were "created in the ordinary course of business and serv[ed] a business purpose" and are therefore not entitled to work product protection. (*Id.* at 4, 9–10.)

Defendants contend Plaintiffs' motion should be denied with respect to the Minutes because the "redacted text reflects a discussion about Plaintiffs' legal claims regarding the San Diego Branch budget and Defendants' mediation strategy prepared in anticipation of litigation." (ECF No. 62 at 7.) Defendants contend that the portion of the Minutes at issue is "quintessential work product." (*Id.* at 8.)

2. <u>Legal Standard</u>

The work-product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), is a "qualified" privilege that protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)); *see also United States v. Nobles*, 422 U.S. 225, 237–38 (1975). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case," and protects both "material prepared by agents for the attorney as well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 238–39. The primary purpose of the work-product rule is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co.*, 881 F.2d at 1494. Documents covered by the work product doctrine may only be ordered produced upon an adverse party's demonstration of "substantial need [for] the materials" and "undue hardship [in obtaining] the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3).

In order to qualify for protection against discovery under Rule 26(b)(3), "documents must have two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." *In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004) (quoting *In re Cal. Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir. 1989)) (internal quotation marks and citations omitted). A document is deemed "prepared in anticipation of litigation . . . if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Id.* (citation and internal quotation marks omitted).

To determine whether a document was prepared in anticipation of litigation, courts require evidence of "[t]he circumstances surrounding the document's preparation," including "the nature of the document *and* the factual situation of the particular case." *Id.* at 908 (emphasis in original) (citation omitted). The party claiming work product protection has the burden of proving the applicability of the doctrine. *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 192 (C.D. Cal. 2006).

### 3. Relevant Allegations in the SAC

In their SAC, Plaintiffs allege that McDermott and Dang announced on May 4, 2018 that Ludwig would be closing the Branch in the next four to five years and would provide some minimal funding to enable a transition period. (SAC ¶ 90.) Plaintiffs further allege that in July 2018, Ludwig set out the reduced research budget it was prepared to provide the Branch over the next five years. (*Id.* ¶¶ 101–02.) The proposed research budget "tapered" Ludwig's annual financial commitment from $12 million in 2019 to $4.5 million in 2023. (*Id.* ¶ 103.) Plaintiffs allege that at a meeting on February 12, 2019, Ludwig stated that the reduced funding was contingent upon each of the Plaintiffs executing and complying with a Transition Agreement and Release. (*Id.* at ¶¶ 104–09.) Plaintiffs allege they declined to sign the Transition Agreement and Release by the April 1, 2019 deadline

and "continued to advise Ludwig that it was breaching its contractual obligations and violating its own policies." (*Id.* ¶¶ 113–15, 128; *see also* ECF No. 1 ¶ 57.)

Plaintiffs allege that Ludwig retaliated in June 2019 by cutting the budget for the Branch even further for the years 2020 and 2021. (*Id.* ¶¶ 120, 128.) On June 26, 2019, Ludwig stated in a letter to the Branch that Ludwig's Board of Directors had approved a budget of $6.5 million for 2020 and $6.3 million for 2021. (*Id.* ¶ 128; *see also* ECF No. 58-1 at 4.) Plaintiffs allege that the retaliatory budget cuts render it impossible for Plaintiffs to continue to operate their laboratories. (*Id.* ¶ 121.)

### 4. Analysis

Defendants lodged the single unredacted page of the Minutes for *in camera* review. The single page does not identify the attendees at the Board meeting or the preparer of the Minutes, and Defendants do not identify such persons in their opposition. They simply state that "[i]t is undisputed that the minute entry in question was created by or for the Defendants." (ECF No. 62 at 8 n4.) Plaintiffs, who appear to know the attendees, represent that no attorneys for Defendants were present at the meeting, but a representative of Ludwig's outside auditor (KPMG Ltd.) was present. (*See* ECF No. 58 at 9–10.) However, Plaintiffs do not contend that the Minutes were prepared by or for anyone other than Defendants. Thus, for purposes of this motion, the Court finds that Defendants have established that the Minutes were prepared by or for them.

Defendants contend that the redacted portion of the Minutes was prepared in anticipation of litigation, which they claim to have reasonably anticipated by at least June 2019, because Plaintiffs had already taken steps signaling the prospect of imminent litigation. (ECF No. 62 at 8.) Specifically, Defendants identify the following steps taken by Plaintiffs: "(1) sending Defendants an early draft of Plaintiffs' later-filed complaint,[2] (2) issuing a litigation hold notice, and (3) requesting formal mediation based on their

---

[2] Plaintiffs initiated this litigation by filing a complaint on November 7, 2019. (ECF No. 1.)

claims, which was set for October 29, 2019." (*Id.* at 8.) Defendants claim that in response, they "(1) engaged outside counsel for representation in this dispute, (2) exchanged letters with Plaintiffs' counsel regarding Plaintiffs' claims, (3) provided updates to the Board on Plaintiffs' claims and the prospect of litigation, (4) instituted a litigation hold, and (5) reviewed an early draft of Plaintiffs' later-filed complaint." (*Id.* at 8–9.)

Plaintiffs argue that the Minutes must have been prepared in the ordinary course of business for a business purpose because Ludwig regularly prepared Board minutes in the ordinary course of business for business purposes and produced copies of regular Board minutes going back to 2014. (ECF No. 58 at 9.) However, the fact that Board minutes were regularly created in the ordinary course of business does not preclude a discussion arising at some point during a Board meeting which may be protected by the work-product doctrine, even if attorneys are not present, where litigation has been reasonably anticipated. *See, e.g.*, *Orthopaedic Hosp. v. DJO Glob., Inc.*, No. 3:19-CV-00970-JLS (AHG), 2020 WL 7625123, at *2 (S.D. Cal. Dec. 22, 2020) ("[T]the Court is cognizant of the fact that discussions in board meetings may be intertwined with discussions of legal advice rendered by counsel (who may or may not be present at the meeting)[.])"; *Newmark Realty Cap., Inc. v. BGC Partners, Inc.*, No. 16-CV-01702-BLF-SVK, 2018 WL 2357742, at *3 (N.D. Cal. May 24, 2018) ("The Court finds it plausible that privileged and work product information may have been discussed at Plaintiff's board meetings [even if the board minutes indicate that no attorneys were present at the meetings]."); *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW (EDL), 2006 WL 2850049, at *1–3 (N.D. Cal. Oct. 5, 2006) (finding redactions based on the work product doctrine "well-taken" after *in camera* review of disputed Board minutes).

Plaintiffs do not contend that Defendants had no reason to anticipate litigation at the time of the June 24, 2019 Board meeting. Instead, Plaintiffs dispute Defendants' contention that the redacted portion of the Minutes is "actually a discussion of mediation strategy" because the budget cuts reflected in the June 26, 2019 letter sent to Plaintiffs are "not discussed anywhere else in [the] Minutes." (*Id.* at 8–9.) Plaintiffs note that

Defendants "produced a Memorandum dated in May 2019 from Defendants McDermott and Dang to the Ludwig Board that, in general terms, urged the Board to promptly cut the Branch budget as a consequence for Plaintiffs not agreeing to the budget initially identified by Ludwig." (*Id.* at 9.)  Plaintiffs, who admittedly have not seen the redacted portion of the Minutes (*id.* at 9), argue that even if the Minutes had a "dual purpose," they are subject to production.  (ECF No. 58 at 10.)

Upon review of the Minutes submitted for *in camera* review, the Court finds that given the nature of the document and the factual situation, most of the redacted text was prepared in anticipation of litigation by or for Defendants.  As represented, the text largely "reflects a discussion about Plaintiffs' legal claims regarding the San Diego Branch budget and Defendants' mediation strategy." (*See* ECF No. 62 at 7.)  However, the Court finds that the second-to-last sentence of the redacted Minutes, beginning with "The Board unanimously RESOLVES," shall be unredacted.  The language does not reflect Plaintiffs' legal claims and mediation strategy.  Moreover, the contents were disclosed, nearly verbatim, in the June 26, 2019 letter sent to the Branch (ECF No. 58-1 at 4), and therefore any work product protection of that portion has been waived.  *See United States v. Sanmina Corp.*, 968 F.3d 1107, 1121 (9th Cir. 2020) (holding that disclosure of work product to an adversary in litigation waives the protection).[3]

///

---

[3]   The Court does not find any waiver based on the fact Ludwig's auditor was present at the Board meeting.  "[D]isclosure of work product to a third party does not waive the protection unless such disclosure is made to an adversary in litigation or 'has substantially increased the opportunities for potential adversaries to obtain the information.'" *Sanmina Corp.*, 968 F.3d at 1121 (citation omitted).  Plaintiffs admit that the auditor present was Ludwig's *own* outside auditor and does not suggest that the auditor was adversarial to Ludwig in any way.  *See id.* at 1122 ("As [*United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010)] and other courts have held, a taxpayer's disclosure of its attorney work product to an independent auditor does not constitute disclosure to an adversary sufficient to waive the protection.").

## IV. CONCLUSION

Based on the foregoing, Plaintiffs' motion to compel is **GRANTED IN PART** and **DENIED IN PART**. Defendants shall produce documents in response to Plaintiffs' RFPs 138 and 139, as modified above, no later than **September 30, 2021**. Defendants shall also produce a newly redacted version of the Minutes, as discussed above, no later than **September 10, 2021**.

**IT IS SO ORDERED.**

Dated: September 1, 2021

_____
Hon. Jill L. Burkhardt
United States Magistrate Judge