UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND, et al.,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>LUDWIG INSTITUTE FOR CANCER RESEARCH LTD, et al.,<br><br>　　　　　　　　　　Defendants.<br><br>AND RELATED COUNTERCLAIM. | Case No.: 19-cv-02141-JM-JLB<br><br>**ORDER GRANTING PLAINTIFFS/COUNTER-DEFENDANTS MOTION TO DE-DESIGNATE ONE PORTION OF ONE DOCUMENT**<br><br>**[ECF Nos. 111, 112]** |

　　　Before the Court is a Motion to De-Designate One Portion of One Document filed by Plaintiffs/Counter-Defendants Don Cleveland, Arshad Desai, Frank Furnari, Richard Kolodner, Paul Mischel, Karen Oegema and Bing Ren (collectively, "Plaintiffs"). (ECF Nos. 111, 112.) Plaintiffs seek to de-designate one portion of one document (LUDWIG0001443), specifically the statement that "overall the Branch is being seen as post-mature." (ECF No. 111-1 at 2.)

　　　Defendants Ludwig Institute for Cancer Research Ltd. (the "Institute" or "Ludwig"), Chi Van Dang, Edward A. McDermott, Jr., and John L. Notter (collectively, "Defendants") filed an opposition. (ECF No. 116.) Plaintiffs filed a reply. (ECF No. 117.) Upon review

of the motion, the opposition, the reply, and all supporting documents, the Court **GRANTS** the Motion to De-Designate.

# I. BACKGROUND

## A. *Ludwig I*

On November 7, 2019, Plaintiffs commenced the above-captioned action, *Cleveland, et al. v. Ludwig Institute for Cancer Research Ltd, et al.*, Case No. 19-cv-02141-JM-JLB (S.D. Cal.) ("*Ludwig I*"). (ECF No. 1.) On July 8, 2020, Plaintiffs filed a Second Amended Complaint ("SAC"), the operative complaint. (ECF No. 26.)

According to the SAC, Plaintiffs are internationally acclaimed cancer research scientists and physicians. (SAC ¶ 1.) Ludwig is an international nonprofit organization dedicated to finding a cure for cancer that operates multiple cancer research branches. (*Id.* ¶¶ 1, 142.) In 1991, Ludwig entered into an "Affiliation Agreement" ("the AA") with the University of California at San Diego ("UCSD") to establish a San Diego Branch ("the Branch"). (*Id.* ¶ 51.) Ludwig agreed to conduct "active" and "continuous" medical research to "discover, develop, or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer." (*Id.* ¶ 53.) Ludwig also agreed to "bear the costs directly related to conducting the research program." (*Id.* ¶ 62.) The term of the AA is coterminous with a lease agreement for research facilities between Ludwig and UCSD, which allows Ludwig to terminate the lease no earlier than December 31, 2023. (*Id.* ¶¶ 4, 16, 56.) In addition to leasing its facilities to Ludwig, UCSD agreed to: (1) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff at the Branch; (2) grant "academic recognition and titles" to qualified Ludwig employees; and (3) make full time equivalency positions available for Ludwig employees. (*Id.* ¶ 154.)

Between 1996 and 2016, Ludwig hired Plaintiffs to work at the Branch. (*Id.* ¶¶ 26–32.) In 2018, Ludwig announced that it would "cease funding the Branch and otherwise halt the 'continuous active conduct of medical research' at the Branch." (*Id.* ¶ 15.) Effective January 1, 2020, Ludwig "terminated all funding for Plaintiffs' laboratories." (*Id.* ¶ 18.) However, "Ludwig continues to fund at least part of the rent due [to UCSD] and it

continues to pay the Plaintiffs' own salaries and benefits, but nothing more." (*Id.*)  As a result, Plaintiffs' "[l]aboratories and ongoing translational research programs have ceased or substantially curtailed ongoing research projects, except to the extent that they have access to outside grants." (*Id.*)

In their SAC, Plaintiffs asserted the following claims against Ludwig: (1) breach of the AA; (2) breach of Plaintiffs' Intellectual Property ("IP") agreements; (3) breach of Plaintiffs' lab contracts; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel under the AA; (5) declaratory relief; and (6) false light. (SAC ¶¶ 145–70, 182–303.)  Plaintiffs also bring a claim against all Defendants for defamation per se. (*Id.* ¶¶ 171–81.)  On November 25, 2020, the Honorable Jeffrey T. Miller dismissed Plaintiffs' claims for breach of the AA and breach of Plaintiffs' IP agreements. (ECF No. 32 at 28.)  He also dismissed Plaintiffs' declaratory relief claim with respect to Plaintiffs' claims based on the AA and IP agreements, and their claim for breach of the implied covenant in the AA and lab contracts. (*Id.*)

**B.** *Ludwig II*

On May 5, 2021, Plaintiffs filed a separate lawsuit against Ludwig: *Cleveland, et al. v. Ludwig Institute for Cancer Research Ltd.*, Case No. 21-cv-00871-JM-JLB (S.D. Cal.) ("*Ludwig II*"). (*Ludwig II*, ECF No. 1.)  In *Ludwig II*, Plaintiffs bring claims against Ludwig for: (1) retaliation in violation of California Government Code § 12940(h); (2) age discrimination under the Fair Employment and Housing Act ("FEHA"); (3) wrongful adverse employment action in violation of public policy; (4) failure to timely pay wages; and (5) violation of California's unfair competition laws. (*Id.* at 13–21.)  Kolodner also brings a separate claim for retaliation in violation of California Labor Code § 1102.5. (*Id.* at 12–13.)

On May 12, 2021, *Ludwig II* was low number transferred to Judge Miller and the undersigned judge for all further proceedings. (*Ludwig II*, ECF No. 4.)  On July 2, 2021, Judge Miller denied Plaintiffs' motion to consolidate *Ludwig I* and *Ludwig II*. (*Ludwig II*, ECF No. 13.)  On July 6, 2021, Ludwig filed a motion to dismiss all claims in the *Ludwig II*

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*Id.*, ECF No. 14.)  On January 7, 2022, Judge Miller granted in part and denied in part Ludwig's motion to dismiss.  (*Id.*, ECF No. 18.)  As pertinent here, Judge Miller granted Ludwig's motion to dismiss Plaintiff's age discrimination claim under FEHA, with leave to amend.  (*Id.*)

### C. Protective Order

On February 19, 2021, the parties filed a joint motion for entry of stipulated protective order in *Ludwig I*.  (ECF No. 44.)  The proposed protective order was largely based on the Southern District of California's model protective order, which is available on the district court's website.  The proposed protective order also contained the undersigned judge's required language, as set forth in her Civil Chambers Rules.  *See* J. Burkhardt Civ. Chambers R. § VI.B.  On February 22, 2021, the Court granted the joint motion and entered the parties' stipulated protective order ("Protective Order").  (ECF No. 45.)

### D. April 2018 Minutes

On January 14, 2020, Ludwig initially produced the minutes of an April 24, 2018 meeting of Ludwig's Board of Directors (the "April 2018 Minutes"), with the designation of "Outside Counsel Eyes Only."  (ECF No. 105 at 8–9.)  At Plaintiffs' request, Defendants reproduced the April 2018 Minutes with a reduced "Confidential" designation on March 8, 2021.  (*Id.* at 9.)  The April 2018 Minutes contain the statement that "overall the Branch is being seen as post-mature."  (ECF No. 111-1 at 2.)

On May 5, 2021, Plaintiffs commenced *Ludwig II* and referenced, as well as quoted from, the April 2018 Minutes in their Complaint.  (*Ludwig II*, ECF No. 1.)  Specifically, Plaintiffs stated the following in their Complaint under "General Allegations":

> Plaintiffs Kolodner and Cleveland first began their work at the Branch in 1997 and 1995, respectively and have been closely identified with the Branch and have led its efforts for decades.  Plaintiffs Kolodner and Cleveland were each more than 40 years old at all times in 2018 and later.  **The Board of Ludwig made a decision to close the Branch at a meeting held in April 2018.  Minutes of that board disclose the Board's discussion that the Branch (which is made up only of Plaintiffs' laboratories) was viewed**

> **negatively as "post-mature."** On information and belief, the Board's reference to the Branch being **"post-mature"** referred to the Plaintiffs' ages, in particular, the Board deemed that following the retirement of Webster Cavenee, the Branch's founding Director, the remaining founding Branch leadership, Kolodner and Cleveland, were **"post-mature,"** that is, older than Ludwig found to be desirable. Thus, a principal motivating factor for the Board's decision to close the Branch and to convert the Plaintiffs' membership terms from rolling terms to fixed terms was predicated upon wrongful discriminatory intent.

(*Ludwig II*, ECF No. 1, ¶ 29 (emphasis added).)

In support of their age discrimination claim against Ludwig, Plaintiffs further stated:

> Plaintiffs, each of whom was more than 40 years old at all times in 2018 and later, are informed and believed that Ludwig sought to terminate each of their rolling term appointments, and convert them to fixed terms resulting in their employment ending before the Closure Date, because of their age. **Minutes of Ludwig's Board from April 2018 precipitating the decision to close the Branch cited that the Branch (which is made up only of Plaintiffs' laboratories) is seen as "post-mature."** On information and belief, the reference to the Board being **"post-mature"** in fact referred to the Plaintiffs, and in particular the leaders of the Branch, Mssrs. Kolodner and Cleveland, and that they were over forty years old, which was deemed undesirable by the Board. On information and belief, the Board's decision to close the Branch was motivated, in part, by discriminatory intent.

(*Id.* ¶ 62 (emphasis added).)

On July 6, 2021, in its motion to dismiss, Ludwig used the term from the April 2018 Minutes, "post-mature," on multiple occasions. (*Ludwig II*, ECF No. 14.) With respect to the April 2018 Minutes, Ludwig stated:

> Third, Plaintiffs' discrimination claim fails because their theory of discrimination is based on a single, **standalone comment made during a board meeting that the San Diego Branch (not any individuals associated with it) as "post-mature."** While Plaintiffs try to recast this remark as having something to do with their ages, even Plaintiffs concede that the statement was a "reference to the Branch," which had been in operation for nearly 30 years since its opening in 1991. Compl. ¶ 62. Plaintiffs have therefore failed to allege facts to suggest a discriminatory motive and cannot satisfy the prima

facie elements for this cause of action. *See Ryan v. Santa Clara Valley Transp. Auth.*, No. 20-CV-02981-LB, 2017 WL 1175596, at *13-14 (N.D. Cal. Mar. 30, 2017).

. . .

Here, Plaintiffs allege that the Institute discriminated against them by seeking to convert their rolling term appointments to fixed-term appointments based on their age. Plaintiffs have not alleged (nor can they) that they had a right to perpetual employment for the remainder of their natural lives; just because an end-date to their contracts was put in place does not mean that they were the victims of age discrimination. In fact, their only allegation of alleged discriminatory animus by Ludwig is **an out-of-context comment in the minutes of Ludwig's April 2018 Board meeting, remarking "that the Branch . . . is seen as 'post-mature.'"** Compl. ¶ 62. Accordingly, Plaintiffs' age discrimination claim rests wholly on the use of the phrase **"post-mature"** in the April 2018 Board Minutes. But Plaintiffs plead no facts explaining what that term means, much less facts that its use here supports an inference of discriminatory intent directed at Plaintiffs.[8]

[Footnote 8: Indeed, the only widely available definition of the term **"post-mature"** refers to newborn *babies* who are born more than 42 weeks after conception—i.e., after the "late term" of 41 to 42 weeks. *See* https://www.stanfordchildrens.org/en/topic/default?id=postmaturity-in-thenewborn-90-P02399 (June 24, 2021).]

(*Ludwig II*, ECF No. 14 at 14, 25 (emphasis added).)

Although Plaintiffs did not use the term "post-mature" in their opposition, Ludwig used it eight times in its reply:

The Opposition's argument that the phrase **"post-mature"** is inherently ageist fares no better. A single stray remark about a decades-old research branch (the San Diego Branch) is plainly insufficient to support an inference of age discrimination under FEHA, and the Opposition points to no authority to the contrary.

. . .

The parties agree that, to raise a *prima facie* case of age discrimination, Plaintiffs needed to allege circumstances reasonably suggesting age discrimination—whether replacement by younger employees or otherwise. They unquestionably fail to do so. Instead, the ***only*** fact on which Plaintiffs rely is a single stray remark in Board minutes to the effect that the Branch was "seen as **'post-mature.'**" Compl. ¶ 62. Plaintiffs contend that Ludwig's

> reference to a medical definition of the term **"post-mature"** in its Memorandum is somehow a concession by Ludwig that the "Board referred to the San Diego Branch as past its maturity." Opp. at 21. That makes no sense and, in any event, does not support Plaintiffs' claim. Ludwig merely observed that "the only widely available definition of the term **'post-mature'** refers to newborn babies who are born more than 42 weeks after conception." Memo. at 15 n.8. Plaintiffs provide no explanation, much less authority, as to how this definition supports their claims of age discrimination, other than to observe (bizarrely and without citation) that babies born late have "wrinkled skin and other abnormalities." Opp. at 21.[] Of course, FEHA does not protect newborns. *See, e.g.*, *Ryan v. Santa Clara Valley Transp. Auth.*, 2017 WL 1175596, at *13 (N.D. Cal. Mar. 30, 2017) (prima facie FEHA age discrimination requires plaintiff to be forty or over).
>
> Nor can Plaintiffs resuscitate their age discrimination claim with conspiracy theories about to whom the term **"post-mature"** applied or what it means because the Complaint alleges no facts as to the meaning or application. On this front, Plaintiffs contend that because "the Branch is not a sentient being" (Opp. at 21), the remark about its being **"post-mature"** must have pertained to them. This is absurd. The Branch was opened in 1991. *See* Compl. ¶ 1. Calling it **post-mature**, mature, or even old is not discriminatory. It is an accurate statement about a nearly 30-year old institution—not a reference to the ages of the people who worked there. In any event, Plaintiffs' reliance on the ambiguous term **"post-mature"** as their sole factual basis in support of a *prima facie* case of age discrimination cannot carry the day. *See* Memo. at 4. That single remark, without any further factual allegations of disparate treatment versus younger workers, replacement by younger workers, or some other indication of discriminatory conduct and intent, cannot support Plaintiffs' claim.

(*Ludwig II*, ECF No. 16 at 5–6, 12–13.)

In ruling on Ludwig's motion to dismiss, Judge Miller stated the following with respect to Plaintiffs' age discrimination claim:

> The FEHA makes it unlawful for an employer, because of "age . . . to discharge [a] person from employment . . . or to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a).
>
> Generally, to establish a *prima facie* case of age discrimination under the FEHA, a plaintiff must provide evidence that: "(1) he [or she] was a

member of a protected class, (2) he [or she] was qualified for the position . . . sought or was performing competently in the position . . . held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000). "The specific elements of a prima facie case may vary depending on the particular facts." *Id.* at 355.

In their Complaint, Plaintiffs allege that they were all 40 years or older when they were informed, in 2018, that Defendant was seeking to convert their rolling employment appointments to fixed terms. Compl. at ¶ 62. As evidence of discriminatory motive, **Plaintiffs allege that in a 2018 Board meeting, Defendant's Board "cited" the San Diego Branch as being "seen as 'post-mature.'"** *Id.* Plaintiffs further allege "[o]n information and belief" this reference to **"post-mature"** was directed to the leaders of the San Diego Branch being over 40 years old, "which was deemed undesirable by the Board." *Id.*

In their briefings, the crux of the Parties' dispute regarding Plaintiffs' age discrimination claims revolves around whether Plaintiffs have plausibly alleged Defendant acted with discriminatory motive. Specifically, Defendant contends Plaintiffs have not pled any facts explaining what the term **"post-mature"** means or how the usage of this term can support an inference of discriminatory intent directed at Plaintiffs. (Doc. No. 14 at 25).

The court agrees. Here, Plaintiffs have not alleged sufficient facts to give rise to a plausible claim of age-based discrimination under the FEHA. Plaintiffs' vague allegation Defendant's Board perceived the San Diego Branch as **"post-mature,"** without more, does not give rise to a plausible inference of discriminatory motive. Centrally, Plaintiffs do not identify who made this comment, whether those individuals had any role in converting Plaintiffs' rolling employment terms to fixed terms, the context in which these comments were made, or even whether these purportedly age-related statements were directed at Plaintiffs. Instead, Plaintiffs merely hazard the Board's comment was made about them before taking yet another leap of logic and concluding the Board's comment plausibly demonstrates Defendant considered Plaintiffs' ages "undesirable."

In this case, the inferences Plaintiffs request that the court draw between the Board's view the San Diego Branch was "seen as **'post-mature'"** and Defendant's alleged discriminatory animus is simply too speculative, even on a motion to dismiss. *See Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536 F.3d 1049, 1055 (9th Cir. 2008) (the court is not required

> to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").
>
> For these reasons, the court **GRANTS** Defendant's Motion to Dismiss Plaintiffs' Third Cause of Action.

(*Ludwig II*, ECF No. 18 at 11–13 (emphasis added).)

## II. LEGAL STANDARD

As a general rule, the public is permitted "access to litigation documents and information produced during discovery." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002); *see also San Jose Mercury News, Inc. v. U.S. Dist. Ct.—N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public."). Under Federal Rule of Civil Procedure 26, however, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed .R .Civ. P. 26(c)(1). The party opposing disclosure has the burden of proving "good cause," which requires a showing, for each particular document the party seeks to protect, that "specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003).

While courts may make a finding of good cause before issuing a protective order, a court need not do so where, as here, the parties stipulate to such an order. *See In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011). "When the protective order was a stipulated order and no party ha[s] made a good cause showing, then the burden of proof . . . remain[s] with the party seeking protection." *Id.* (internal quotation marks and citation omitted) (alteration in original). "If a party takes steps to release documents subject to a stipulated order, the party opposing disclosure has the burden of establishing that there is good cause to continue the protection of the discovery material." *Id.*

///

In considering whether a document should continue to receive protection under the protective order, a court must proceed in two steps. *Id.* First, the court must determine whether "particularized harm will result from disclosure" to the public of information in the document. *Id.* (citing *Phillips*, 307 F.3d at 1211). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986)). Rather, the person seeking protection from disclosure must "allege specific prejudice or harm." *See id.* Second, if the court finds particularized harm will result from disclosure of the discovery documents, then it must proceed to balance "the public and private interests to decide whether [maintaining] a protective order is necessary." *Phillips*, 307 F.3d at 1211. The Ninth Circuit has directed courts doing this balancing to consider the factors identified by the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). *See In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d at 424.

"But even when the factors in this two-part test weigh in favor of protecting the discovery material (i.e., where the court determines that disclosure of information may result in 'particularized harm,' and the private interest in protecting the discovery material outweighs the public interest in disclosure), a court must still consider whether redacting portions of the discovery material will nevertheless allow disclosure." *Id.* at 425 (citing *Foltz*, 331 F.3d at 1136–37). "Accordingly, in determining whether to protect discovery materials from disclosure under Rule 26(c), a court must not only consider whether the party seeking protection has shown particularized harm, and whether the balance of public and private interests weighs in favor, but also keep in mind the possibility of redacting sensitive material." *Id.*

### III.   DISCUSSION

In their motion to de-designate, Plaintiffs ask the Court to remove Defendants' confidentiality designation from "one portion" of the April 2018 Minutes, particularly the statement that "overall the Branch is being seen as post-mature." (ECF No. 111-1 at 2.)

Here, the parties stipulated to a blanket protective order. (*See* ECF Nos. 44, 45.) As such, Defendants have never made a specific showing of good cause with respect to the April 2018 Minutes. Therefore, as the party opposing disclosure, they have the burden of showing that "specific prejudice or harm will result" if the Protective Order is not maintained with respect to the disputed portion of the April 2018 Minutes. *See Foltz*, 331 F.3d at 1130.

Defendants argue that the Institute's Minutes generally "contain confidential business information the public disclosure of which would cause harm to the Institute." (ECF No. 116 at 5.) Mr. McDermott, the Institute's CEO, states that the Institute's board meetings are conducted under a "generally understood expectation of confidentiality to encourage open and frank discussion." (ECF No. 116-1, Supp. Decl. of Edward A. McDermott, Jr. ("McDermott Decl."), ¶ 6.) Mr. McDermott fears that if the Institute's Board members, the majority of whom are independent and held in very high regard in their fields, believed the meetings would not be kept confidential, it would "chill the candid discussion." (*Id.* ¶ 7.) Mr. McDermott further explains that the Board is advised by a Scientific Advisory Committee ("SAC"), which "reviews and assesses the impact of the research being conducted at its labs all over the world." (*Id.* ¶ 8.) The SAC review process is kept confidential to encourage open and candid engagement. (*Id.*) In addition to the need to protect frank discussion, Mr. McDermott claims the Institute has an economic interest in keeping the minutes of its Board meetings confidential. (*Id.* ¶ 9.) Mr. McDermott states that the "Board's decisions regarding setting budgets, allocating resources among branches and other endeavors, and the like is highly sensitive." (*Id.*)

With respect to the April 2018 Minutes specifically, Mr. McDermott states that they contain a detailed discussion of the SAC's 2018 review of the Institute's Branches, which is "highly sensitive and kept private in order to encourage open discussion." (*Id.*) He claims the portion of the April 2018 Minutes Plaintiffs wish to de-designate "memorializes certain observations made in confidence by Board members, as informed by the SAC report, regarding the San Diego Branch." (*Id.* ¶ 11.) Mr. McDermott contends that it may

do more harm to the Institute if only a snippet of the conversation is disclosed publicly, as statements may be taken out of context. (*Id.*)

The statement Plaintiffs wish to de-designate is a portion of a sentence within a larger paragraph concerning the SAC's observations about the San Diego Branch. This statement was repeated time and again in filings in *Ludwig II* without any attempt by Defendants to strike or seal the pleadings or otherwise maintain the confidentiality of the statement in their filings.[1]  Rather, Ludwig itself frequently repeated the word "post-mature" in its filings, without sealing or redaction, even when Plaintiffs made a belated attempt to curb its use. Although Plaintiffs used portions of the April 2018 Minutes in violation of the Protective Order issued in this case, Ludwig multiplied and amplified the public disclosure of the language at issue.

Defendants argue that the fact Ludwig repeated the term "post-mature" in their motion to dismiss is "irrelevant." (ECF No. 116 at 11–12.) However, given the history laid out above, the Court finds those arguments unpersuasive. Ludwig's own treatment of the relevant language from the April 2018 Minutes undermines their assertions of the importance of confidentiality. In sum, Defendants have not demonstrated good cause to maintain the confidentiality of the portion of the April 2018 Minutes that states "overall the Branch is being seen as post-mature." *Cf. Christopher Williams v. City of Long Beach et al.*, No. 2:19-CV-05929-ODW-AFMx, 2021 WL 6497197, at *2 (C.D. Cal. Nov. 23,

---

[1]  On June 10, 2021, over one month after the *Ludwig II* complaint was filed, Defendants raised the issue in this case of Plaintiffs' improper disclosure in violation of the Protective Order in a Joint Statement of Issues in Dispute Pursuant to Section V(B) of Civil Chambers Rules. (ECF No. 69.) After a discovery conference related to the dispute (ECF No. 71), the Court invited, and received, briefing from the parties. (*See* ECF No. 72.) Defendants requested monetary sanctions as well as an order "precluding Plaintiffs from using the confidential April 2018 Board meeting minutes in evidence or argument in connection with their new action." (ECF No. 80-1 at 4.) Defendants did not seek to strike the offending language from the publicly filed *Ludwig II* complaint or from their own pleadings in their motion for sanctions or otherwise. (*See id.* at 4–5.)

2021) (finding the defendants waived the confidentiality of documents included in joint exhibit lists by, *inter alia*, failing to raise the confidentiality issue for over ten months); *Littlejohn v. BIC Corp.*, 851 F.2d 673, 680 (3d Cir. 1988) ("[F]ailure to object to the admission into evidence of the documents, absent a sealing of the record, constituted a waiver of whatever confidentiality interests might have been preserved under the [Protective Order]."); *Nat'l Polymer Prod., Inc. v. Borg-Warner Corp.*, 641 F.2d 418, 421 (6th Cir. 1981) (noting it is a "well-established principle of American jurisprudence that the release of information in open trial is a publication of that information and, if no effort is made to limit its disclosure, operates as a waiver of any rights a party had to restrict its further use").[2] Accordingly, Plaintiffs' motion is **GRANTED**.

### IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to De-Designate One Portion of One Document is **GRANTED**. Accordingly, the statement that "overall the Branch is being seen as post-mature" (at Bates Number LUDWIG0001443) is no longer deemed confidential under the Protective Order. **The Clerk of Court is directed to unseal ECF No. 111, with the exception of Exhibit A (ECF No. 11-1 at 13–26), which shall remain under seal.**

IT IS SO ORDERED.

Dated: February 8, 2022

*Jill Burkhardt*
Hon. Jill L. Burkhardt
United States Magistrate Judge

---

[2] See also *Vedanti Licensing Ltd., LLC v. Google LLC*, No. 3:20-CV-01344-BEN-WVG, 2021 WL 5973060, at *5 (S.D. Cal. Mar. 5, 2021) (finding the attorney-client privilege or work product immunity attached to documents referenced in the complaint had been waived because the privilege holder did not take reasonable steps to preserve the confidentiality of these documents).