UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON CLEVELAND, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>LUDWIG INSTITUTE FOR CANCER RESEARCH LTD, et al.,<br><br>        Defendants.<br><br>AND RELATED COUNTERCLAIM. | Case No.: 19-cv-02141-JM-JLB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS/COUNTER-DEFENDANTS' MOTION TO COMPEL**<br><br>**(ECF Nos. 164 (sealed), 166)** |

  Before the Court is a Motion to Compel filed by Plaintiffs/Counter-Defendants Don Cleveland, Arshad Desai, Frank Furnari, Richard Kolodner, Paul Mischel, Karen Oegema and Bing Ren (collectively, "Plaintiffs"). (ECF Nos. 164 (sealed), 166.) Plaintiffs move to compel the production of documents from Defendants/Counter-Claimants Ludwig Institute for Cancer Research Ltd. ("Ludwig" or "Institute"), Edward McDermott, Chi Van Dang, and John Notter (collectively, "Defendants") responsive to Plaintiffs' Requests for Production 175 and 182. (*Id.* at 2.) Defendants filed an opposition (ECF No. 127), and Plaintiffs filed a reply (ECF No. 167). For the reasons stated below, the Motion to Compel is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

On November 7, 2019, Plaintiffs commenced the above-captioned action, *Cleveland, et al. v. Ludwig Institute for Cancer Research Ltd, et al.*, Case No. 19-cv-02141-JM-JLB (S.D. Cal.) ("*Ludwig I*"). (ECF No. 1.) On July 8, 2020, Plaintiffs filed a Second Amended Complaint ("SAC"), the operative complaint. (ECF No. 26.)

According to the SAC, Plaintiffs are internationally acclaimed cancer research scientists and physicians. (SAC ¶ 1.) Ludwig is an international nonprofit organization dedicated to finding a cure for cancer that operates multiple cancer research branches. (*Id.* ¶¶ 1, 142.) In 1991, Ludwig entered into an "Affiliation Agreement" ("the AA") with the University of California at San Diego ("UCSD") to establish a San Diego Branch ("the Branch"). (*Id.* ¶ 51.) Ludwig agreed to conduct "active" and "continuous" medical research to "discover, develop, or verify knowledge related to causes, diagnoses, treatment, prevention and control of cancer." (*Id.* ¶ 53.) Ludwig also agreed to "bear the costs directly related to conducting the research program." (*Id.* ¶ 62.) The term of the AA is coterminous with a lease agreement for research facilities between Ludwig and UCSD, which allows Ludwig to terminate the lease no earlier than December 31, 2023. (*Id.* ¶¶ 4, 16, 56.) In addition to leasing its facilities to Ludwig, UCSD agreed to: (1) grant privileges for the practice of medicine at its hospital to qualified members of the medical staff at the Branch; (2) grant "academic recognition and titles" to qualified Ludwig employees; and (3) make full time equivalency positions available for Ludwig employees. (*Id.* ¶ 154.)

Between 1996 and 2016, Ludwig hired Plaintiffs to work at the Branch. (*Id.* ¶¶ 26–32.) On May 4, 2018, Defendant McDermott, the President and Chief Executive Officer of Ludwig, and Defendant Dang, Ludwig's Scientific Director, visited the San Diego Branch and announced the Branch would close over the next four to five years. (*Id.* ¶¶ 22, 90.) They admitted that under their agreements with UCSD, they were obligated to keep the Branch open through December 31, 2023, the Termination Date. (*Id.* ¶¶ 56, 90.) McDermott claimed that Ludwig had no obligation to provide any further support to the

1  Branch, or any research funding to Plaintiffs, but that they would provide some minimal
2  funding to enable a transition period. (*Id.* ¶ 90.)
3        On or about May 21, 2018, Ludwig sent letters to Plaintiffs, informing them that
4  their rolling five-year memberships at the Branch would be converted to a fixed term and
5  would have a fixed four- or five-year term remaining. (*Id.* ¶ 91.) Ludwig asserted that its
6  nonrenewal was pursuant to Section 6.6 of Ludwig's "Member-Track Appointment and
7  Promotion Policy," which became effective on December 9, 2013, and is binding upon
8  Ludwig pursuant to the AA ("Member Policy"). (*Id.* ¶¶ 84, 91.) Section 6.6 refers to action
9  following a negative scientific review. (*Id.* ¶ 91.) Under Section 6.6, Ludwig was required
10 to conduct an individual review of each Plaintiff and then receive a recommendation from
11 an independent review committee, the Scientific Advisory Committee, before Ludwig was
12 entitled to convert Plaintiffs' rolling terms into fixed terms. (*Id.*)
13       No individual reviews or independent recommendations occurred prior to the
14 May 21, 2018 letters. (*Id.*) Lab head presentations and a review of the San Diego Branch
15 were scheduled to take place in 2018 and 2019, but were cancelled in November 2017
16 without explanation. (*Id.* ¶ 92.) Plaintiffs' research had been accorded high praise, both
17 by Ludwig and by numerous peer reviews in prestigious medical journals. (*Id.* ¶ 93.)
18       On or about June 12, 2018, counsel for UCSD wrote to McDermott stating that
19 Ludwig was not permitted under the AA to close the Branch prior to December 31, 2023,
20 and that Ludwig was also obligated to operate and adequately fund the Branch until that
21 date. (*Id.* ¶ 96.) The letter also challenged Ludwig's assertions that it performed scientific
22 evaluations of Plaintiffs and could, on that basis, invoke a conversion of Plaintiffs' rolling
23 terms to fixed terms. (*Id.*) Dang then called Plaintiff Kolodner, who was Branch director
24 at the time, and stated that unless Kolodner helped Ludwig obtain the cooperation of UCSD
25 in connection with Ludwig's decision to close the Branch, Ludwig would cut the research
26 funding to the amount Dang and McDermott determined was the absolute minimum
27 Ludwig was required to provide. (*Id.* ¶ 97.)
28 ///

On or about June 25, 2018, McDermott responded to UCSD and stated, "You have asked for assurance that Ludwig will continue to operate the San Diego Branch until December 31, 2023 'as required by the [AA].' You have that assurance." (*Id.* ¶ 98.) McDermott did not dispute UCSD's contention that Ludwig had not performed any individual scientific reviews and thus could not invoke a conversion of Plaintiffs' rolling terms to fixed terms under Section 6.6 of the Member Policy. (*Id.*)

On or about July 12, 2018, McDermott sent Kolodner a letter setting out the Branch's proposed budget for the next five years, provided that Ludwig received the cooperation of the Branch and UCSD in the transition. (*Id.* ¶ 102.) Under the proposed budget, annual funding for research was cut beginning in 2019, effectively eliminating research funding. (*Id.*) Between 2013 and 2018, the budget had always been around $12 million per year. (*Id.* ¶ 100.) Ludwig proposed providing $45 million over the next five years (an average of $9 million per year), gradually cutting the budget to $4.5 million for the year 2023. (*Id.* ¶ 103.)

During a December 2018 meeting with UCSD, McDermott and Dang represented that Ludwig decided to close the Branch because Plaintiffs were not engaged in cancer research at a level commensurate with the quality and seniority of the scientists. (*Id.* ¶¶ 135, 172, 176.) Defendant Notter, the Chairman of Ludwig's Board of Directors, made similar representations in a letter to UCSD on January 30, 2019. (*Id.*)

However, at a meeting on February 12, 2019, McDermott and Dang admitted that Ludwig had not reviewed Plaintiffs' work (*id.* ¶ 105) and promised to provide Plaintiffs with corrected letters regarding the basis for nonrenewal of their membership terms with the Branch (*id.* ¶ 114). On or about February 20, 2019, Ludwig sent "amended and restated" letters to Plaintiffs terminating Plaintiffs' Branch memberships, this time under Section 7 of the Member Policy, which states:

> [Ludwig] may terminate a scientist's status as . . . Member . . . in the event the Branch to which the scientist is assigned is closed or relocated, and/or the scientist position of the affected . . . Member is eliminated for budgetary reasons; provided that [Ludwig] pays the affected . . . Member his/her

> compensation and benefits (or the value thereof) for the balance of the then-current term of his/her appointment or one year whichever is longer.

(*Id.* ¶ 115.)

In their SAC, Plaintiffs asserted the following claims against Ludwig: (1) breach of the AA; (2) breach of Plaintiffs' Intellectual Property ("IP") agreements; (3) breach of Plaintiffs' lab contracts; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel under the AA; (5) declaratory relief; and (6) false light. (SAC ¶¶ 145–70, 182–303.) Plaintiffs also asserted a claim against all Defendants for defamation per se. (*Id.* ¶¶ 171–81.) On November 25, 2020, the Honorable Jeffrey T. Miller dismissed Plaintiffs' claims for breach of the AA and breach of Plaintiffs' IP agreements. (ECF No. 32 at 28.) He also dismissed Plaintiffs' declaratory relief claim with respect to Plaintiffs' claims based on the AA and IP agreements and their claim for breach of the implied covenant in the AA and lab contracts. (*Id.*)

## II.   LEGAL STANDARD

A party is entitled to seek discovery of any non-privileged matter that is relevant to its claims or defenses and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure 34 provides that a party may serve on any other party a request for production of documents, electronically stored information, or tangible things that are within the scope of Federal Rule of Civil Procedure 26(b). Fed. R. Civ. P. 34(a). The propounding party may move to compel discovery if a party fails to produce documents requested under Rule 34. *See* Fed. R. Civ. P. 37(a).

"The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)." *Bryant v. Ochoa*, No. 07CV200 JM (PCL), 2009 WL 1390794, at *1 (S.D. Cal. May 14, 2009) (citing *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995)). District courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). "Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its

objections." *Bryant*, 2009 WL 1390794, at *1 (citing *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)). Those opposing discovery are "required to carry a heavy burden of showing" why discovery should be denied. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

## III.   DISCUSSION

### A.   Background

Plaintiffs served their Second Set of Requests for Production on September 27, 2021. (ECF No. 127 at 4.) Defendants served responses on October 27, 2021. (*Id.*) On November 26, 2021, Plaintiffs raised a discovery dispute regarding Requests for Production (RFP) 175, 176–179, and 182. (ECF No. 113.) The Court held a discovery conference regarding the dispute on December 3, 2021. (ECF No. 115.) On December 17, 2021, the parties jointly requested a briefing schedule for a motion seeking to resolve their remaining disputes, which was modified on January 5, 2022. (ECF Nos. 119, 121.) The present motion,[1] opposition, and reply comply with the deadlines set forth in the briefing schedule.

### B.   RFP 175

#### 1.   Background

Plaintiffs seek to compel responses to RFP 175, which states:

> RFP 175: All DOCUMENTS generated on or after January 1, 2018 referring or relating to amending, modifying or replacing the MEMBER POLICY.

(ECF No. 166 at 12.) The Institute responded as follows:

> The Institute incorporates the General Responses and Objections. The Institute objects to this Request on the grounds that it is vague, overbroad, unduly burdensome, and seeks information that is neither relevant to any

---

[1]   The Court notes that Plaintiffs do not attach to their motion, as required, copies of the "relevant requests and responses at issue (including any material definitions and general objections)." *See* J. Burkhardt Civ. Chambers R. § V(C)(1)(d). All future motions must attach such copies.

claim or defense nor proportional to the needs of the case.  The Institute further objects to this Request to the extent that it seeks information subject to the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

(*Id.*)

2. Defendants' Production to Date

In March 2019, a memorandum addressed to the Institute's Board of Directors was internally circulated along with a proposed revised Member Policy.  (ECF No. 127 at 7.) Defendants have produced this memorandum and the proposed revised Member Policy. (*Id.*) In April 2019, the Institute's Board reviewed the memorandum and proposed revised Member Policy, but it did not adopt any of the proposed changes. (*Id.*) Defendants have produced these Board minutes. (*Id.*) Following the Board's decision in April 2019, Defendant Dang wrote a May 21, 2019 memorandum to the Board requesting approval of a single Member Policy amendment as follows: that going forward as of that time, all Member-track appointments would require approval of the Scientific Director. (*Id.*) Defendants have produced this memorandum. (*Id.*) In June 2019, the Board approved the requested modification. (*Id.*) Defendants have produced the relevant Board minutes. (*Id.*)

3. Discussion

Plaintiffs claim the proposed revised Member Policy, and all documents referring or relating to this proposed revision, are relevant to their declaratory relief and defamation claims. (ECF No. 166 at 5–6.)  Defendants contend the proposed revised Member Policy has no relevance to the defamation claim and limited relevance to the declaratory relief claim. (ECF No. 127 at 5–6.)  The Court will address the parties' arguments below.

a. *Declaratory Relief*

In their SAC, Plaintiffs bring a claim, under California Code of Civil Procedure § 1060, for a declaration regarding the parties' rights, duties, and obligations under the AA and IP agreements. (¶¶ 145–47.)  California's declaratory relief statute provides that "[a]ny person interested . . . under a contract, or who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal

rights and duties of the respective parties . . . ask for a declaration of rights or duties. Cal. Civ. Proc. Code § 1060. "To qualify for declaratory relief, [a plaintiff] would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the plaintiff's] rights or obligations.'" *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 909 (2013), *as modified on denial of reh'g* (Mar. 7, 2013) (quoting *Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 4th 1559, 1582 (2011)).

After Judge Miller's order on Defendants' motion to dismiss, Plaintiffs' only remaining declaratory relief clam concerns Plaintiffs' terms of employment. (*See* ECF No. 32 at 27 n.14 (citing SAC ¶ 147:6–18 (clause six) and ¶¶ 84–85 (discussing Section 7 of Ludwig's Member Track Appointment and Promotion Policy)).) With respect to Plaintiffs' terms of employment, Plaintiffs seek the following declaratory relief:

> Plaintiffs seek . . . a declaration that **Ludwig cannot invoke Section 7 of the Policy** as it relates to the Branch closure until the occurrence of the Termination Date in accordance with the [AA], and that upon such Termination Date, the balance of Plaintiffs' respective "then-current" terms are calculated as follows: (a) five (5) years following the Termination Date as to Plaintiff Cleveland; (b) four (4) years and eight (8) months following the Termination Date as to Plaintiff Kolodner; (c) five (5) years following the Termination Date as to Plaintiff Oegema; (d) five (5) years following the Termination Date as to Plaintiff Desai; (e) four (4) years and seven (7) months following the Termination Date as to Plaintiff Mischel; (f) four (4) years and nine (9) months following the Termination Date as to Plaintiff Ren; and (g) five (5) years following the Termination Date as to Plaintiff Furnari[.]

(SAC ¶ 147:6–18 (clause six) (emphasis added).)

Plaintiffs allege that under the AA, the "Termination Date" is December 31, 2023, which is the earliest Ludwig can terminate its lease with UCSD. (*Id.* ¶ 56.) Section 7 of the Member Policy states the following under the heading, "Other Terminations:"

> Notwithstanding anything to the contrary in this Policy, [the Institute] may terminate a scientists' status as Assistant Member, Associate Member or Member in the following circumstances:

- in accordance with any written employment agreement between [the Institute] and the scientist or any written agreement between [the Institute] and a host institution, or
- in the event the Branch to which the scientist is assigned is closed or relocated, and/or the scientist position of the affected Assistant Member, Associate Member or Member is eliminated for budgetary reasons; provided that [the Institute] pays the affected Assistant Member, Associate Member or Member his/her compensation and benefits (or the value thereof) for the balance of the then-current term of his/her appointment or one year whichever is longer.

(ECF No. 166-1 at 18; *see also* ECF No. 26-3 at 10–11.) Plaintiffs allege they are Members of the Institute. (*See* SAC ¶¶ 26–32.)

As laid out above, according to the SAC, on or about February 20, 2019, Ludwig sent "amended and restated" letters to Plaintiffs purporting to retroactively "terminate" Plaintiffs' Branch membership, as provided in Section 7 of the Member Policy "as it relates to Branch closures." (SAC ¶ 115.) Plaintiffs allege that these letters "were false and deceptive" because "Section 7 provides for termination of a scientist's status as a 'Member' of Ludwig only if and when a branch '*is* closed.' (emphasis added). The language is present tense, referring to *present*—not future—Branch closure. The San Diego Branch is not 'closed.' Nor, under the terms of the [AA], may it be closed prior to December 31, 2023." (*Id.* ¶ 116.)

In their motion to compel, Plaintiffs contend that interpretation of Ludwig's Member Policy is "squarely at issue" in this case. (ECF No. 166 at 3.) Plaintiffs argue that communications regarding the proposed revised Member Policy are relevant because Ludwig's reasons for the proposed changes "to the policy relating to reviews, termination, and renewals of membership terms are relevant to how Ludwig understood the existing policy provisions to work vis-à-vis their actions taken towards Plaintiffs in these same respects." (*Id.* at 7.) Plaintiffs argue that amendments to contractual language are "admissible to support competing interpretations of the disputed terms." (*Id.* at 8 (citing *Corcoran v. CVS Pharmacy*, No. 15-cv-03504-YGR, 2021 U.S. Dist. LEXIS 31560, at

*18–19 (N.D. Cal. Feb. 18, 2021) (citing *Corcoran v. CVS Health Corp.*, 779 F. App'x 431, 433 (9th Cir. 2019)).

In response, Defendants argue that the only section of the Member Policy at issue in this case—Section 7—was "not meaningfully implicated in the proposed Member Policy amendments (and was not amended at all)." (ECF No. 127 at 7.) Defendants assert that the only proposed changes to Section 7 "were non-substantive semantic changes: changing the heading titled 'Other Terminations' to 'Other Circumstances,' and changing the sentence '[the Institute] may terminate a scientist's status as Assistant Member, Associate Member or Member in the following circumstances' to '[the Institute] may terminate a Member-track scientist's appointment in the following circumstances.'" (*Id.* at 8; *see also* ECF Nos. 166 at 6, 166-1 at 7.)

The Court agrees that the proposed changes to Section 7 of the Member Policy appear to be non-substantive changes. However, as the interpretation of Section 7 is squarely at issue in Plaintiffs' declaratory relief claim, the Court finds that Plaintiffs have established the relevance of the documents requested in RFP 175 with respect to Section 7. Accordingly, Defendants shall produce all non-privileged documents generated on or after January 1, 2018, referring or relating to amending, modifying, or replacing Section 7 of the Member Policy.

Plaintiffs also contend that the proposed changes to Section 6 of the Member Policy with respect to a formal scientific review are relevant to their declaratory relief claim. (ECF No. 166 at 5–8.) Plaintiffs argue that "even if in the end Defendants turn out to be correct that only Section 7 of the Member Policy is litigated here, the Member Policy is a contract meaning that when interpreted, it is to be taken together as a whole." (ECF No. 167 at 3.) However, Plaintiffs have not demonstrated the relevance to their declaratory relief claim of Ludwig's documents *referring or relating to* proposed changes to Section 6 or the mission statement of the Member Policy that were never adopted, or to the one change to the Member-track appointments process that was.

///

The May 21, 2018 termination letters sent by the Institute did invoke Section 6.6 of the Member Policy as grounds for converting Plaintiffs' rolling appointments to fixed terms. (*See* ECF No. 14-3 at 87–92.) However, these letters were amended and restated to exclude any reference to Section 6. The Institute specifically stated that the amended and restated letters were intended to "correct[] the reference to the section of the Member Track Appointment and Promotion Policy pursuant to which your Member appointment was converted to a fixed term." (*See id.* at 94–105; *see also* SAC ¶¶ 115–17.) Even if Plaintiffs' declaratory relief claim, which seeks a declaration that "Ludwig cannot invoke Section 7 of the [Member] Policy," might entail consideration of the contract as a whole, that does not carry the day as to the relevance and proportionality of communications regarding proposed changes to other sections of the Member Policy.

    b.  *Defamation*

Next, Plaintiffs argue that RFP 175 is relevant to their defamation claim. In their SAC, Plaintiffs allege they were defamed when McDermott, Notter, and Dang stated that the reason Ludwig was closing the San Diego Branch was because Plaintiffs were "not engaged in cancer research at a level commensurate with the quality and seniority of the scientists." (SAC ¶ 172.) Plaintiffs claim the statement was made to UCSD representatives at a December 2018 meeting and in a January 30, 2019 letter from Notter to UCSD. (*Id.*) Plaintiffs also allege that McDermott, Notter, and Dang "made clear" that the Branch was being closed (1) "due to deficiencies in the Plaintiffs' scientific performance," and (2) because "Plaintiffs did not conduct cancer research." (*Id.* ¶¶ 172–73.) Plaintiffs further allege the statements "caused UCSD to state to one or more of the Plaintiffs that Plaintiffs were at fault for Ludwig's closure of the Branch, which is untrue." (*Id.* ¶ 174.) Plaintiffs allege these statements were a "post hoc pretext" for a business decision by the Ludwig Board to defund the Branch. (*Id.*)

Defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007) (citation omitted); *see also Herring*

*Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1048 (S.D. Cal. 2020), *aff'd*, 8 F.4th 1148 (9th Cir. 2021).  Under California law, "libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face." Cal Civ. Code § 45a.  Libel on its face is libel *per se*.  *Vargas v. Bank of Am., N.A.*, No. 12-CV-2247-L MDD, 2013 WL 1386342, at *4 (S.D. Cal. Apr. 4, 2013).  "Where a plaintiff can prove libel *per se*, damage to reputation is presumed, so that the plaintiff need not introduce evidence of actual damages to recover compensatory, or, in appropriate cases, punitive damages." *Id*. (citing *Barnes–Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986)).

Plaintiffs highlight changes made to Section 6 and Ludwig's mission statement of the Member Policy and argue the highlighted changes serve as grounds for the production of all documents referring or relating to the proposed revised Member Policy.  (ECF No. 166 at 6–8.)  However, Plaintiffs have not demonstrated that there is a dispute over the contractual interpretation of Section 6.  In their SAC, Plaintiffs allege that Defendants did not conduct *any* scientific review, much less one that complied with Section 6.  (*See, e.g.*, SAC ¶¶ 16, 23, 91–92, 95, 98, 105, 137, 176, 184.)  Moreover, Defendants assert that the allegedly defamatory statements "have nothing to do with the Member Policy," thus implicitly conceding that Defendants' allegedly defamatory statements were not based on any review completed pursuant to Section 6 of the Member Policy.  (ECF No. 127 at 6.)  As the truth or falsity of Defendants' allegedly defamatory statements do not turn on any review completed pursuant to Section 6 of the Member Policy, the Court denies Plaintiffs' motion to compel any further responses to RFP 175.

**C.    RFP 182**

1.   <u>Background</u>

Plaintiffs also seek to compel responses to RFP 182, which states as follows:

RFP 182: The DOCUMENTS identified in Section VI of the letter dated September 28, 2021 from counsel for PLAINTIFFS to counsel for DEFENDANTS, to any extent YOU contend that YOU are not required to

produce such DOCUMENTS in response to PLAINTIFFS' First Set of Requests for Production to YOU dated January 12, 2021.

(ECF No. 166 at 12.)

The documents at issue include:

- The "Board meeting papers" referenced in Ludwig_1462
- The "Board papers" referenced in Ludwig_1480
- Documents relating to the proposal referenced in Ludwig_1395 ("In looking for recognition of the partnership between the Ludwig Institute and the University of California San Diego UCSD, Mr. McDermott informs the Board that management of the University has submitted a new proposal.")

(*Id.*) The Institute responded as follows:

> The Institute incorporates the General Responses and Objections. The Institute objects to this Request on the grounds that it is vague, overbroad, unduly burdensome, and seeks information that is not proportional to the needs of the case. The Institute further objects to this Request on the grounds that it seeks production of documents that are not relevant to any claim or defense. The Institute further objects to this Request to the extent that it seeks information subject to the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection. Subject to and without waiving any general or specific objections, the Institute will undertake reasonable efforts to identify, review, and produce non-privileged documents identified in Section VI of Plaintiffs' letter dated September 28, 2021, that it may have in its possession, custody, or control that are relevant to any claim or defense.

*Defendants' Subsequent Response in Meeting and Conferring:*

Defendants continue their process of reviewing and responding to the requests in Plaintiffs' letter dated September 28, 2021 and have not yet definitively determined the list of documents, if any, that Defendants will not be producing on relevance and/or burden grounds.

*Defendants' Subsequent Response at the Discovery Conference*:

Plaintiffs have failed to adequately meet and confer with respect to this bulk request for documents itemized in a separate letter from them. Had they done so, they would know that Defendants are conducting reasonable searches for

and producing non-privileged materials (to the extent they exist, and several do not).

(*Id.* at 12–13.)

### 2. Discussion

Defendants argue RFP 182 is untimely, disproportionate, and overly burdensome. (ECF No. 127 at 9–13.) With respect to timeliness, Defendants represent that Plaintiffs served a first set of RFPs on Defendants on January 12, 2021. (ECF No. 127 at 9.) On February 15, 2021, Defendants served objections and, on the basis of those objections, declined to produce the documents at issue. (*Id.*) The deadline to raise a discovery dispute with respect to Defendants' responses was March 17, 2021. *See* J. Burkhardt Civ. Chambers R. § V(B). Plaintiffs did raise a discovery dispute with respect to Defendants' responses on March 8, 2021. (*See* ECF No. 46.) However, after numerous discovery conferences and a motion to compel, all timely-raised disputes regarding Plaintiffs' first set of RFPs were resolved. (*See* ECF Nos. 46, 47, 49, 53, 55, 58, 95.)

Thereafter, on September 28, 2021, Plaintiffs sent Defendants a meet and confer letter, which identified certain documents which Defendants had previously objected to producing. (ECF No. 127 at 9; *see also* ECF No. 166 at 8.) Plaintiffs also sent a second set of RFPs on September 28, 2021, which included RFP 182, the request at issue here. (ECF Nos. 127 at 9; 167 at 9.) RFP 182 *expressly asks for the production of the documents Defendants previously objected to producing in February 2021.* (ECF No. 166 at 12 (Plaintiffs request production of "[t]he DOCUMENTS identified in Section VI of the letter . . . to any extent YOU contend that YOU are not required to produce such DOCUMENTS in response to PLAINTIFFS' First Set of Requests for Production to YOU dated January 12, 2021.").)

The parties in this case are intimately familiar with the Court's discovery dispute rules. The parties have submitted many discovery disputes to the Court in accordance with Section V(B) of the Court's Civil Chambers Rules, and the Court has held nine discovery conferences in this matter, with another full-day, in-person discovery conference set for

March 29, 2022.  (*See* ECF Nos. 47, 48, 54, 57, 71, 82, 103, 115, 132, 163.)  If Plaintiffs needed additional time to resolve a dispute over the documents at issue, they could have requested additional time.  *See* J. Burkhardt Civ. Chambers R. § IV(C).  Indeed, the parties have requested, and the Court has granted, many extensions of time with respect to discovery disputes in this case.  (*See* ECF Nos. 84, 118, 139, 150, 154, 157, 160, 169, 170.)

Plaintiffs argue that Defendants waived the discovery dispute deadline by failing to object to RFP 182 on grounds of untimeliness or duplication.  (ECF No. 167 at 5.)  However, the discovery dispute deadlines in the Court's Civil Chambers Rules are Court deadlines that Defendants have no capacity to waive.  As stated in the Scheduling Order in this case:

> If the parties reach an impasse on any discovery issue, counsel shall file an appropriate motion within the time limit and procedures outlined in the undersigned magistrate judge's chambers rules.  **A failure to comply in this regard will result in a waiver of a party's discovery issue.  Absent an order of the court, no stipulation continuing or altering this requirement will be recognized by the court.**

(ECF No. 43 ¶ 3 (emphasis in original).)

When Defendants objected to Plaintiffs' January 12, 2021 discovery and declined to produce the documents at issue based upon those objections, Plaintiffs had a procedure for bringing a dispute before the Court.  Having failed to resolve their dispute in accordance with the Court's procedure, Plaintiffs issued a new discovery request specifically requesting the very documents they previously tried to obtain.  Plaintiffs cannot, through a new request, resuscitate a dispute whose time has already passed.  Based on the foregoing, the Court finds the dispute with respect to RFP 182 is untimely and Plaintiffs' motion to compel further responses to this RFP is denied.

### D. RFPs 176–179

Lastly, Plaintiffs seek to "reserve their rights" to bring a motion to compel "pending review" of Defendants production related to RFPs 176–179, which state as follows:

      RFP 176. All COMMUNICATIONS between the Director of the BRANCH or staff at the BRANCH, and staff in LUDWIG'S New York or Zurich offices, that refer or relate to "the allocation of funding to be made available to each of Plaintiffs' laboratories" as referenced in YOUR amended response to Plaintiff Mischel's First Set of Interrogatories Number 3 for the years 2014-2020.

      RFP 177. All COMMUNICATIONS between the Director of the BRANCH or staff at the BRANCH, and staff in LUDWIG'S New York or Zurich offices, that refer or relate to negotiating or establishing the amount of the annual Branch budget or the basis for the amount of the annual Branch budget for the years 2014-2020.

      RFP 178. All COMMUNICATIONS between the Director of the BRANCH or staff at the BRANCH, and staff in LUDWIG'S New York or Zurich offices, that refer or relate to adjusting the annual Branch budget for the hiring of any of the PLAINTIFFS or the promotion of any of the PLAINTIFFS to MEMBER.

      RFP 179. All COMMUNICATIONS between the Director of the BRANCH or staff at the BRANCH, and staff in LUDWIG'S New York or Zurich offices, that refer or relate to "setting Plaintiffs' salaries within the total annual budget approved by the Board" as referenced in YOUR amended response to Plaintiff Oegema's First Set of Interrogatories Number 1 for the years 2014-2020.

(ECF No. 166 at 13–14.)

      Defendants produced responsive documents for the time period 2017–2020 but objected to producing documents for any time before 2017. (ECF No. 166 at 11.) After meeting and conferring, Defendants agreed to apply additional search terms to the emails they received from the former Branch Director, Dr. Webster Cavenee. (*Id.*) On January 13, 2022, Defendants advised Plaintiffs that they returned hits on approximately 220 documents (including families). (*Id.*) Plaintiffs seek to reserve their rights pending review of such production. (*Id.*)

      Pursuant to the Court's Civil Chambers Rules, all discovery disputes must be brought before the Court no later than thirty (30) calendar days after the date upon which the event giving rise to the dispute occurred. *See* J. Burkhardt Civ. Chambers R. § V(B). For written discovery, the event giving rise to the discovery dispute is the date of service

of the response. *See id.* at § V(E).  Without taking a position as to whether or not the time to raise disputes related to these discovery requests has passed, the Court underscores that any dispute Plaintiffs bring before the Court with respect to these or any other RFPs must comply with the Court's discovery dispute deadlines.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel (ECF Nos. 164, 166) is **GRANTED IN PART** and **DENIED IN PART**.  As set forth above, Defendants shall produce all non-privileged documents generated on or after January 1, 2018 referring or relating to amending, modifying or replacing Section 7 of the Member Policy <u>within ten (10) days of the date of this Order</u>.  To the extent any responsive documents are withheld as privileged, Defendants shall produce a privilege log with their production.

**IT IS SO ORDERED.**

Dated:  March 29, 2022

*/s/ Jill Burkhardt*
Hon. Jill L. Burkhardt
United States Magistrate Judge